**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE ELEVENTH CIRCUIT**

_____

**Appeal No.  24-12038-HH**
_____

**UNITED STATES,**

**Appellee**

**v.**

**GREGORY ALLEN WILLIAMSON,**

**Appellant**

_____

**A DIRECT APPEAL OF A CRIMINAL CASE**
**FROM THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**DISTRICT COURT CASE NO.  8:21-cr-00355-WFJ-CPT**

_____

**INITIAL BRIEF OF APPELLANT**
_____

BJORN E. BRUNVAND, ESQ.
Brunvand & Wise Law Group
615 Turner Street
Clearwater, Florida 33756
Florida Bar # 0831077
Telephone: 727-446-7505
Facsimile: 727-446-8147
E-Mail: bjorn@acquitter.com
CJA Counsel for Appellant

No. 24-12038-HH

*United States v. Gregory Allen Williamson*

<u>CERTIFICATE OF INTERESTED PERSONS</u>

In compliance with Federal Rule of Appellate Procedure 26.1 and 11th Circuit Rule 26.11, the undersigned hereby certifies that the following listed persons and entities have an interest in the outcome of this particular case:

1. Brunvand, Bjorn E. counsel for defendant-appellant;

2. Centrone, Gus M., prior counsel for defendant;

3. Chang, Emily, Assistant United States Attorney;

4. Favorit, Erin Claire, Assistant United States Attorney;

5. Hall, A. Fitzgerald, Federal Public Defender;

6. Handberg, Roger B., former United States Attorney;

7. Jung, Hon. William F., United States District Judge;

8. Kehoe, Gregory W., United States Attorney;

9. King, Abigail, Assistant United States Attorney;

10. King, Percy, Federal Public Defender's Office;

11. Minor victims whose identities are protected;

12. Murray, Francis D., Assistant United States Attorney;

13. Nebesky, Suzanne C., Assistant United States Attorney;

C1 of 2

14. Rhodes, David P., Assistant United States Attorney, Chief, Appellate Division;

15. Schmidt, Lindsey Nicole, Assistant United States Attorney;

16. Tuite, Hon. Christopher P., United States Magistrate Judge;

17. Vitier, Raudel, Federal Public Defender's Office;

18. Williamson, Gregory, defendant-appellant.

No publicly traded company or corporation has an interest in the outcome of this appeal.

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Appellant Gregory Allen Williamson respectfully requests oral argument in this appeal.  Counsel believes oral argument will be beneficial to the Court in its resolution of the issues presented herein, particularly given the volume of the record from the lower court and fact-intensive nature of the issues raised.

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

Certificate of Interested Persons ........................................................................... C1

Statement Regarding Oral Argument ..................................................................i

Table of Contents ...........................................................................................ii

Table of Citations..........................................................................................iv

Statement of Jurisdiction................................................................................ ..1

Statement of the Issues....................................................................................2

Statement of the Case......................................................................................3

i)    Facts, Course of Proceedings and Disposition in the Court Below ...............3

ii)    Standards of Review.........................................................................24

Summary of the Arguments ...........................................................................25

Arguments and Citations of Authority..............................................................26

I.    THE DISTRICT COURT ERRED AS A MATTER OF LAW IN
DENYING THE MOTION TO SUPPRESS EVIDENCE
OBTAINED FROM THE RESIDENTIAL AND YAHOO SEARCH
WARRANTS ...........................................................................................26

   A. The District Court Erred in Concluding that Yahoo was not
   Acting as a Government Entity ............................................................27

      1. The Government Coerced or at Least Significantly
      Encouraged Yahoo to Conduct Warrantless Searches of
      Accounts.................................................................................29

      2. Yahoo Performed a Public Function that is Traditionally
      Reserved for Law Enforcement............................................................32

## **TABLE OF CONTENTS, Continued**

**Page**

      3. The Government has Insulated Itself into a Position of Interdependence on ESPS such as Yahoo ............................................33

   B. NCMEC was also a Government Actor for Fourth Amendment Purposes ...............................................................................................35

   C. Even if Yahoo Conducted its Search as a Private Entity, Law Enforcement Exceeded the Scope of that Search .....................................37

   D. Mr. Williamson Carried his Burden of Proving that the Case Agent Recklessly Omitted Material Facts and Made Material Misrepresentations in the Search Warrant Application ...........................41

   E. The Good Faith Exception did not Apply Because the Affidavit Misled the Magistrate Judge and Omitted Critical Facts that Would Have Negated the Existence of Probable Cause .........................45

II.    THE DISTRICT COURT ERRED AS A MATTER OF LAW IN DENYING THE MOTION TO SUPPRESS THE FRUITS OF THE YAHOO SEARCH WARRANT BASED THE FACIAL OVERBREADTH OF THE WARRANT ....................................................47

   A. The Yahoo Search Warrant Violated the Fourth Amendment's Particularity Requirement..........................................................................48

   B. The Good-Faith Exception did not Apply to Save the Fruits of the Unconstitutional Search Warrant ............................................................54

Conclusion ................................................................................................55

Certificate of Compliance with Rule 32(a)...........................................................56

Certificate of Service ................................................................................57

# **TABLE OF CITATIONS**

**Cases**                                                               **Page**

*Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*,
   531 U.S. 288, 121 S.Ct. 924, 148 L.Ed.2d 807 (2001)...................................28

*Coolidge v. New Hampshire*,
   403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971)................................48, 50

*Focus On The Family v. Pinellas Suncoast Transit Authority*,
   344 F.3d 1263 (11th Cir. 2003) .......................................................33

*Franks v. Delaware*,
   438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978)..................... 16, 41-42, 44

*Jackson v. Metropolitan Edison Company*, 419 U.S. 345 (1974) .........................33

*Lebron v. Nat'l R.R. Passenger Corp.*,
   513 U.S. 374, 115 S.Ct. 961, 130 L.Ed.2d 902 (1995)....................................31

*Lugar v. Edmondson*,
   457 U.S. 922, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982)....................................28

*Nat'l Broad. Co., Inc. v. Communications Workers of Am., AFL-CIO*,
   860 F.2d 1022 (11th Cir. 1988) .......................................................33

*Rayburn ex rel. Rayburn v. Hogue*, 241 F.3d 1341 (11th Cir. 2001) ....................28

*Riley v. California*,
   573 U.S. 373, 134 S.Ct. 2473, 2488–91, 189 L.Ed.2d 430 (2014)...................50

*United States v. Ackerman*, 831 F.3d 1292 (10th Cir. 2016)............... 14, 34, 36-37

*United States v. Alford*, 744 F. App'x 650 (11th Cir. 2018)..................... 48, 50-52

*United States v. Allen*, 854 Fed. Appx. 329 (11th Cir. 2021)..............................28

*United States v. Barsoum*, 763 F.3d 1321 (11th Cir. 2014)..................................41

## **TABLE OF CITATIONS, Continued**

**Cases (Cont.)**                                                                                         **Page**

*United States v. Blake*, 868 F.3d 960 (11th Cir. 2017)...................48, 50-51, 53-54

*United States v. DiTomasso*, 81 F. Supp. 3d 304 (S.D.N.Y. 2015).......................29

*United States v. Farley*, 607 F.3d 1294 (11th Cir. 2010) ......................................24

*United States v. Harling*, 705 Fed. Appx. 911 (11th Cir. 2017)...........................37

*United States v. Henry*,
   447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980)....................................30

*United States v. Jacobsen*,
   466 U.S. 109, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984)................................37, 41

*United States v. Leon*,
   468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984)........................ 45-46, 54

*United States v. Martin*, 297 F.3d 1308 (11th Cir. 2002)...............................46, 54

*United States v. McGough*, 412 F.3d 1232 (11th Cir. 2005)................................45

*United States v. Miller*, 982 F.3d 412 (6th Cir. 2020) ..........................................14

*United States v. Montijo*, 2022 WL 93535 (M.D. Fla. Jan. 10, 2022)..................14

*United States v. Reddick*, 900 F.3d 636 (5th Cir. 2018).)....................................14

*United States v. Sarras*, 575 F.3d 1191 (11th Cir. 2009) .....................................41

*United States v. Sims*, 845 F.2d 1564 (11th Cir. 1988) ........................................16

*United States v. Steiger*, 318 F.3d 1039 (11th Cir. 2003).....................................27

*United States v. Wilson*, 13 F.4th 961 (9th Cir. 2021).....................................14, 40

*United States v. Young*, 350 F.3d 1302 (11th Cir. 2003)......................................37

# TABLE OF CITATIONS, Continued

**Cases (Cont.)**                                                     **Page**

*Washington v. Veterans of Foreign Wars of U.S.*,
    196 Fed. Appx. 777 (11th Cir. 2006)................................................28

*Willis v. Un. Health Servs., Inc.*, 993 F.2d 837 (11th Cir. 1993) .........................33

*Walter v. United States*,
    447 U.S. 649, 100 S.Ct. 2395, 65 L.Ed.2d 410 (1980)...............................37, 41

**Statutes and Rules**

18 U.S.C. § 2251 .................................................................................... 9-10

18 U.S.C. § 2252 ......................................................................................10

18 U.S.C. § 2252A ...................................................................................36

18 U.S.C. § 2258A ........................................................................ 13, 29, 33-36

18 U.S.C. § 2422 .......................................................................................9

18 U.S.C. § 3056 ......................................................................................36

34 U.S.C. § 11293 ....................................................................................36

18 U.S.C. § 3231 .......................................................................................1

28 U.S.C. § 1291 .......................................................................................1

11th Cir. R. 26-11 ....................................................................................C1

11th Cir. R. 28-1 .....................................................................................56

FED. R. APP. P. 26.1 .................................................................................C1

FED. R. APP. P. 32 ....................................................................................56

## STATEMENT OF JURISDICTION

Under 28 U.S.C. § 1291, the courts of appeal have jurisdiction from all final decisions of the district courts of the United States, except where a direct review may be had in the Supreme Court of the United States.

The United States District Court, Middle District of Florida, Tampa Division, had jurisdiction pursuant to 18 U.S.C. § 3231.  The district court entered its final judgment and commitment order on June 20, 2024. (Doc. 273.)  Mr. Williamson filed a timely notice of appeal on June 21, 2024. (Doc. 276.)

## **STATEMENT OF THE ISSUES**

I.    Whether the district court erred in denying the Appellant's Fourth Amendment motion to suppress evidence obtained from search warrants directed to the Appellants' home and email accounts when the motion alleged a) that private entities conducted warrantless searches as actors of the government, b) the case agent later exceeded the scope of the purported private searches, and c) the agent then made material misrepresentations and omissions in the applications for the search warrants?

II.    Whether district court erred in finding that a search warrant directed to Yahoo! did not violate the particularity requirement of the Fourth Amendment?

## STATEMENT OF THE CASE

### (i)    Facts, Course of Proceedings, and Disposition in the Court Below

Yahoo, Inc is an Electronic Service Provider ("ESP") that provides email services to users. (Doc. 290:120.)   Yahoo employs "trust and safety moderators" who review emailed content for the presence of possible child pornography. (Doc. 290:120.)  Pursuant to statute, Yahoo reports any such suspected child pornography to the National Center for Missing and Exploited Children ("NCMEC"). (Doc. 290:120.)

Yahoo uses various methods to scan emails to determine if they contain suspected child pornography. (Doc. 290:121.)  Those methods include the use of a program titled "CSAi Match" as well as the review of "photo DNA." (Doc. 290:121.) Through those methods, files are compared against larger databases for matches to hash values of known child pornography files. (Doc. 290:121-22.)  The hash value is akin to a digital footprint for media. (Doc. 291:118.)

If those methods result in a match, a trust and safety moderator typically then manually reviews the suspect file to determine if it contains child pornography. (Doc. 290:122-23.)  If the moderator believes the file contains child pornography, the file is archived along with any other attachments, images, or videos from the email account at issue.  (Doc. 290:123.)  Yahoo then reports its findings to the NCMEC. (Doc. 290:123.)   Yahoo also sends to NCMEC the known contact

information for the person who created the email account at issue as well as the IP address of the device or network from which the suspect email was sent. (Doc. 290:124-25.) Yahoo has no way of determining, however, the identity of the person who sent any such suspect emails. (Doc. 290:130-31.)

The Yahoo moderators have a system of rating any child pornography based on the egregious nature of the material. (Doc. 290:134.) The files are ranked with an A1, A2, B1, or B2 rating depending on the severity of the pornography. (Doc. 290:134.)

In September 2020, Yahoo's review system flagged a Yahoo account belonging to username "Vladlover50" as having been suspected of sending child pornography. (Doc. 290:125-26.) A trust and safety moderator then allegedly reviewed the account and found seven images believed to be child pornography. (Doc. 290:124-26.) Yahoo reported those findings and the corresponding information to NCMEC. (Doc. 290:126.) The moderator did not rate the images on the A-B-1-2 scale. (Doc. 290:134-35.) The Yahoo employee who purportedly would have reviewed the images did not testify at an evidentiary hearing that was later held on a motion to suppress. (Doc. 290:119-121, 139.) A Yahoo witness who testified at the hearing could not identify the identity of the person who allegedly reviewed the images. (Doc. 290:119-121.) Another witness who was a manager at Yahoo during the relevant time period testified at trial that the failure to rate the files flagged

from the "Vlad" account likely indicated that the moderator did not consider the files to be the "worst of the worst." (Doc. 290:134.)  Yahoo had never received any complaints nor tips of criminal activity concerning the email account at issue. (Doc. 290:127.)

Law enforcement later received a report from Yahoo concerning seven images of suspected child pornography from the email address Vladlover50@Yahoo.com, which was registered to "Vlad Vlad." (Doc. 291:119.)  The approximate geolocation for the associated IP address was North Port, Florida. (Doc. 291:119.)  The phone number associated with the account ended in 1469. (Doc. 291:119.)

The case agent found the internet provider for the IP address to be Comcast. (Doc. 291:120.)  He went on to issue an investigative subpoena to Comcast. (Doc. 291:120.)  The agent learned from that subpoena that the internet subscriber was Aliona Williamson with a service address in North Port, Florida. (Doc. 291:122.) That address would be determined to be the residence of the Williamson family. (Doc. 291:122.)  The agent also learned that the 1469 phone number connected to the IP address was registered to a woman in Venice, Florida. (Doc. 291:123.)  That number had been a prior phone number of Mr. Williamson. (Doc. 291:123.)

In the course of the investigation, law enforcement also sought and obtained from a state court a search warrant for all data from email account Vladlover50@Yahoo.com. (Doc. 291:124.)  The agent later testified at trial to

various sexually explicit emails sent from the Vlad email account to an account that would later be connected to Mr. Williamson's stepdaughter, D.A. (Doc. 291:127-155.)  The agent found that certain exhibits attached to various of the emails constituted child pornography. (Doc. 291:152-55.)

After reviewing the email search warrant return, the case agent sought and obtained a search warrant from a state court for the residential address in North Port associated with the IP address. (Doc. 291:155-56.)

On January 27, 2021, the North Port Police Department executed the search warrant at the residence. (Doc. 290:147.)  The residence was the home of Mr. Williamson, his wife Aloina Williamson, their three children, and D.A. (the stepdaughter of Mr. Williamson and biological daughter of Mrs. Williamson). (Doc. 290:147; 291 at 9, 65-66, 68-70, 105.)  During the search, law enforcement collected, among other items, a Gateway all-in-one computer and a Samsung cellular phone that were located in the garage of the residence. (Doc. 290:149, 152.)  Two hard drives, several USB drives, and other digital media were seized from a bedroom connected to Mr. Williamson. (Doc. 290:152-53.)  An Apple iPhone was collected from the stepdaughter's bedroom. (Doc. 290:153-54.)

None of the seized items were examined for the presence of latent fingerprints. (Doc. 290:156.)  Likewise, law enforcement did not perform any DNA testing on any of the seized items. (Doc. 290:156.)

When law enforcement executed the search warrant, it interviewed D.A. (Doc. 291:106-07.) Law enforcement specifically asked D.A. if Mr. Williamson had ever touched her inappropriately. (Doc. 291:106-07.) D.A. answered that he had not. (Doc. 291:107.) A few months later, D.A. was again interviewed in connection with the investigation. (Doc. 291:107.) The interviewer again asked D.A. if Mr. Williamson had ever touched her inappropriately. (Doc. 291:107.) D.A. again responded that Mr. Williamson had never touched her inappropriately. (Doc. 291:107.) D.A. did not thereafter make any allegation that Mr. Williamson ever touched her inappropriately until 2022 when she first spoke with the prosecutor and the case agent together. (Doc. 291:107.)

A forensic examiner employed in law enforcement later testified at trial to examinations he performed on the seized items. He testified that child pornography files were found on the Gateway computer. (Doc. 291:12-13, 25.) The forensic examiner described one of the images from the Gateway computer as "A male, adult male leaning back. You can see his torso. There is an approximate three to five-year old female under his arm and holding his penis." (Doc. 291:32.) The examiner confirmed on cross-examination that when he first examined and logged in to the Gateway computer, he did not wear gloves. (Doc. 291:46.)

The examiner additionally testified that an Acer tower computer that was seized from Mr. Williamson's shared bedroom was found to contain four images

7

that were deemed child pornography and two images that were deemed "age difficult." (Doc. 291:14-19.)

The primary user of the Gateway computer was listed as Gregory Williamson. (Doc. 291:23-24.) The email associated with that computer was Williamson_Gregory@hotmail.com. (Doc. 291:25.) The forensic examiner testified that the "Vladlover50 email" was also used from the Gateway. (Doc. 291:30-31.)

The forensic examiner recovered from the Gateway computer a deleted email allegedly sent from the Williamson_Gregory@hotmail.com address to an email account believed to belong to D.A. on May 20, 2020. (Doc. 291:26.) It read, in the subject line, "Pay close attention" and included in the body a hot link to veryfreeporn.com and one of the pornographic videos. (Doc. 291:27.)

The forensic examiner testified at trial that he could not testify to the identity of the person who would have downloaded the images to the computers. (Doc. 291:42.) He also could not tell who viewed any of the images or if they were viewed on the computer. (Doc. 291:43.) The examiner further testified that any of the emails associated with the computers, including the Vladlover40 and Greg Williamson emails, could have been used by individuals other than Mr. Williamson so long as they had access to the computer and knew the password for the accounts. (Doc. 291:43-44.) He additionally testified that any person, even a person located in

8

another country, could compromise the emails and log in to them remotely. (Doc. 291:44-45.)

Following the execution of the search warrant, the agent reviewed an extraction of the Samsung phone. (Doc. 291:214-15.)  In that extraction, the agent saw several photographs and videos that appeared to be taken from what he believed to be a hidden camera located in D.A.'s bedroom. (Doc. 291:161.)  Certain emails located in the Samsung phone extraction contained attachment images from the camera that depicted D.A. in various stages of undress. (Doc. 291:177-80, 192-94.)  Those emails apparently were sent to and from the same email address. (Doc. 291:179.) The agent then returned to the home to discuss the findings with Mrs. Williamson. (Doc. 291:162-63.)  While he was doing so, D.A. approached him and handed him a USB charger that had a camera inside of it. (Doc. 291:163-64.)  The charger had a micro SD slot where a micro SD card could be used to transfer data from the charger. (Doc. 291:202.)  The agent never recovered the corresponding micro SD card. (Doc. 291:202.)

Mr. Williamson was arrested at the time of the execution of the search warrant.  He was later indicted in the Middle District of Florida, Tampa Division, on one count of Coercion and Enticement of a Minor to Engage in Sexual Activity pursuant to 18 U.S.C. § 2422(b); one count of Attempted Production of Child Pornography pursuant to 18 U.S.C. § 2251(a); two counts of Production and

Attempted Production of Child Pornography pursuant to 18 U.S.C. § 2251(a) and (e); three counts of Distribution of Child Pornography pursuant to 18 U.S.C § 2252(a)(2) and (b)(1); and one count of Possession of Child Pornography pursuant to 18 U.S.C. § 2252(a)(4)(B) and (b)(2). (Doc.1)

<u>The Initial Motion to Suppress</u>

Prior to trial, Mr. Williamson filed a motion to suppress all evidence seized from the search warrants issued for Yahoo email account and for his residence. (Doc. 44.)  The motions asserted that Yahoo and NCMEC were effectively serving as government agents when they searched, seized, and reported to law enforcement the emails and images that initiated the investigation. (Doc. 44.)   The motion additionally asserted that, regardless of whether Yahoo and NCMEC were government agents, the case detective's review of the materials provided to him prior to obtaining a search warrant exceeded the scope of any purported private entity searches that Yahoo and NCMEC might have conducted.  (Doc. 44.)  The motion further set out that the search warrant affidavits included material misrepresentations and omissions that negated the existence of any purported probable cause. (Doc. 44.)

On the misrepresentation/omission of facts issue, Mr. Williamson set out that the case agent omitted from the affidavit the fact that one of child pornography images was sent on September 8, 2020, a date that post-dated the last login of Mr. Williamson's respective email account. (Doc. 44.)  He additionally set out that the

detective misrepresented in the affidavit that seven images of child pornography were uploaded from the email account at issue when the detective only actually found four images that qualified as child pornography. (Doc. 44.)  The motion explained that the affidavit misrepresented and omitted the fact that NCMEC classified three of the files as "CP (unconfirmed)." (Doc. 44.)

The lower court held an evidentiary hearing on October 11, 2022. (Doc. 99.) The Government presented as witnesses an Executive Director of the NCMEC, a former content moderator for Yahoo, a former E-crimes investigator and senior manager for trust and safety at Yahoo, and the case agent. (Doc. 99.)

In addition to evidence set forth above that was presented trial, the evidence established that the Protect our Children Act of 2008 requires ESPs such as Yahoo to report any suspected violations of laws pertaining to child pornography. (Doc. 99.)  The Act requires any such suspected violations to be reported to the NCMEC. (Doc. 99.) The NCMEC, in turn, is a non-for-profit organization that Congress empowered to operate a "CyberTipline" to receive the reports from ESPs. (Doc. 99.) The NCMEC then makes those reports available to law enforcement. (Doc. 99.)

The evidence additionally established that Yahoo required email users to agree to terms of service. (Doc. 99 at 74-77.)  The terms of service included an agreement that users will "not use Yahoo Services to[ ] upload, post, email, transmit, or otherwise make available any Content that is unlawful, harmful, . . . abusive, . . .

obscene, . . . invasive of another's privacy, . . . or otherwise objectionable; [or] harm minors in any way . . ." (Doc. 114 quoting Gov't Ex. 5 at 2.)  The terms further state:

> …Yahoo may or may not pre-screen Content, but that Yahoo and its designees shall have the right (but not the obligation) in their sole discretion to pre-screen, refuse, or remove any Content that is available via the Yahoo Services. . . . [The customer also] acknowledge[s], consent[s,] and agree[s] that Yahoo may access, preserve[,] and disclose [the user's] account information and Content if required to do so by law or in a good faith belief that such access preservation or disclosure is reasonably necessary to: (i) comply with legal process;[ or] (ii) enforce the [terms of service] . . .

Doc. 114 *quoting* Govt. Ex. 5 at 2.)

Following the hearing, and after additional briefing from the parties, the lower court adopted a report and recommendation from the Magistrate Judge and denied the motion to suppress.  (Doc. 114, 144.)_

As an initial finding, the court held, over the Government's objection, that Mr. Williamson had standing to assert the Fourth Amendment challenges he raised in the motion. (Doc. 114:25-27.)

The court then found, however, that Yahoo and NCMEC were private entities and that the Fourth Amendment challenges failed under the private search doctrine. (Doc. 114:30-32.)   In so holding, the court reasoned:

> It is evident from the record that Yahoo was not a government actor. Starting with the first prong, I recognize at the outset that—as Mr. Williamson maintains—ESPs like Yahoo are mandated by the Protect Act to report online sexual child exploitation to NCMEC "as soon as reasonably possible after obtaining actual knowledge of any . . . apparent violations" of certain child pornography statutes. See 18

U.S.C. § 2258A(a)(1)(A)(i), (2)(A). I also recognize that an ESP's knowing and willful failure to fulfill this obligation subjects it to sanctions. Id. § 2258A(e).19 Mere compliance with that law, however, does not constitute state action by a private entity. United States v. Rosenow, 50 F.4th 715, 730 (9th Cir 2022) (noting that "a private actor does not become a government agent simply by complying with a mandatory reporting statute") (citations omitted)). Moreover, the Protect Act only imposes an obligation upon ESPs to report child pornography that is known to them and expressly states that ESPs are not required to search for it. 18 U.S.C. § 2258A(f)...

...Further, there is no evidence that the government instigated or cooperated with Yahoo's review of Mr. Williamson's emails. In fact, quite the opposite is true. According to Ms. Guizzotti's testimony, which I credit, Yahoo undertook its analysis of these communications without any encouragement from the government. (Doc. 99 at 91).

(Doc. 114:30-32.)  The court additionally found that the evidence established that "Yahoo proactively searches sent emails because it has an interest in safeguarding both its users and its reputation." (Doc. 114:32 citing Doc. 99:76.)

The court then rejected an assertion of Mr. Williamson that Yahoo was serving as a government agent because it relied on a directive titled "Compliance Guide for Law Enforcement." (Doc. 114:33.)  The court recognized that the Guide "is designed to assist law enforcement in understanding Yahoo's policies and practices with regard to retention and disclosure of electronic information and to provide answers to frequently asked questions related to subpoenas and other legal process." Doc. 114:33 *quoting* Def. Ex. H at 6.  It further acknowledged that the Guide specifically states that Yahoo had worked with law enforcement and the NCMEC to develop its practices for reporting suspected child pornography. (Doc.

114:34.)  The court concluded, nonetheless, that Yahoo's development of protocols "has no bearing on the company's intent when it searches customer's emails." (Doc. 114:34.)

Later in its opinion, the court rejected Mr. Williamson's contention that Yahoo's search did not fall outside of the private search doctrine because Yahoo could not identify the individuals who reviewed the flagged files at Yahoo. (Doc. 114:36.)  The court reasoned that "[a]ll that needs to be established is that a private entity previously inspected the same images as NCMEC and Detective Keller subsequently reviewed." (Doc. 114:36.)  The court recognized, nonetheless, that a circuit split apparently exists as to the "the application of the private search doctrine when no human reviews the underlying CSAM images." (Doc. 114:36-37, 37 n.21 *citing United States v. Montijo*, 2022 WL 93535 at *1 n.2 (M.D. Fla. Jan. 10, 2022) *comparing United States v. Wilson*, 13 F.4th 961 (9th Cir. 2021) *and United States v. Ackerman*, 831 F.3d 1292 (10th Cir. 2016) *with United States v. Miller*, 982 F.3d 412 (6th Cir. 2020) *and United States v. Reddick*, 900 F.3d 636 (5th Cir. 2018).)

After addressing Yahoo, the court then turned to the question of whether the NCMEC was a government actor and noted that that was a "far closer question." (Doc. 114:34.)  The court, however, declined to make a finding as to whether NCMEC was a government actor because it found that NCMEC's search did not exceed the scope of Yahoo's search. (Doc. 114:34-35.)  The court essentially found

that NCMEC performed an examination of emails that Yahoo had performed prior. (Doc. 114:35.)  The court then reasoned that the case agent likewise "simply looked at the images himself…to confirm they contained CSAM" and did not therefore exceed the scope of Yahoo's search. (Doc. 114:35-36.)  The court made a finding that the case agent "uncovered no new, critical information from the photographs." (Doc. 114:35.)

As to the question of whether the search warrant affidavits made material misrepresentations of fact and/or omitted pertinent information, the court found that Mr. Williamson did not make a requisite showing that the detective intentionally or recklessly omitted the facts concerning the date of the last email login. (Doc. 114:40.)  The court stated "I note as an initial matter that Detective Keller made clear in his affidavit that, according to the log-in data he received from Yahoo, '[September 5, 2020,] was the last time the [user] logged into his Yahoo email before the reported incident occurred on [September 8, 2020,]' which is the date that the child pornographic image referred to herein as image.1-1.jpeg was transmitted." (Doc. 114:40 *quoting* Gov't Ex. 2; Def. Ex. B.)  The court further reasoned that the detective testified at the evidentiary hearing that users can login and stay logged in to an account for "a significant period of time." (Doc. 114:40 *citing* Doc. 99:164-66.)

With respect to the arguments concerning the misrepresentation of the number of images of actual or confirmed child pornography that the detective and the NCMEC found, the court reasoned, "[t]he operative inquiry is not, as Mr. Williamson seems to intimate, whether Detective Keller's affidavits contained errors—they do—but whether the errors were made intentionally or in reckless disregard of the truth." (Doc. 114 at 41 *citing United States v. Sims*, 845 F.2d 1564, 1571 (11th Cir. 1988).)  The court further reasoned that, while the detective made "generalized misstatements" in the affidavits, he also, in other areas of the affidavits, "expressly stated that, based upon his training and experience, only four actually met the statutory definition for child pornography, while the other three did not." (Doc. 114:42.)

The court went on to hold, with respect to the *Franks* misrepresentation/omission arguments, that, even if the misrepresentations and omissions were corrected, probable cause would still exist for the issuance of the search warrants. (Doc. 114:44.)

Finally, the court held that the search warrants would survive Fourth Amendment scrutiny under the good faith exception to the exclusionary rule. (Doc. 114:45-46.)

<u>The Motion to Suppress the Fruits of the Yahoo Search Warrant</u>

Mr. Williamson additionally filed a motion to suppress the email account search warrant, asserting that the warrant violated the Fourth Amendment's particularity requirement because it was overbroad in time and scope. Mr. Williamson asserted that the email account warrant sought virtually unlimited data and lacked any temporal restrictions. (Doc. 134, 171.) While the warrant sought seven categories of information, it also sought "account activity from creation to 11/24/20." (Doc. 134-1:11-12.)

The lower court made a detailed analysis of the warrant and found it to be adequately particularized. (Doc. 173:2-14.) The court reasoned that "the warrant contemplated a two-step procedure whereby Yahoo was initially compelled to turn over all requested records pertaining to the vladlover50 account regardless of whether they were evidence, contraband, or instrumentalities of the stated crime, it confined the subsequent search of those documents to the above-referenced seven distinct categories of information." (Doc. 173:14.) Those seven categories were account information, evidence of user attribution, calendar, contacts, Yahoo email, photos, and search history. (Doc. 173:4-5.) With respect to the lack of any temporal limitation, the court agreed that the warrant lacked any such limitation but reasoned that the omission did not render the warrant invalid. (Doc. 173:17.) The court went on to recognize that the "warrant (like most warrants) could have been better

drafted." (Doc. 173:18.)  In the end, however, the court reasoned that it did not need to decide whether the warrant violated the particularity requirement because it was making a finding that the warrant fell into the good-faith exception to the exclusionary rule. (Doc. 173:19.)  The court held that the Government met its burden of proving that the warrant was not so facially deficient that the detective could not have reasonably assumed it was lawful. (Doc. 173:20.)

The Trial

The case proceeded to a jury trial that began on March 11, 2024. (Doc. 290.) The trial court gave Mr. Williamson a standing objection throughout the course of the trial to the items that were seized pursuant to the challenged search warrants. (Doc. 290:150-51.)  The Government went on to call the case agent, other law enforcement witnesses, and the former Yahoo content moderator to testify in large part to the facts set forth above. (Doc. 290, 291.)

The Government additionally called Mr. Williamson's stepdaughter, D.A. D.A. claimed at trial that Mr. Williamson began to get "overaffectionate" with her when she was around 12 years-old. (Doc. 291:71-72.)  She claimed that when she hugged him, Mr. Williamson would grab her buttocks. (Doc. 291:71.)  She further claimed that he would touch her breasts over and under her clothing. (Doc. 291:72.) D.A. never reported or told anyone about those purported incidents. (Doc. 291:73.) She claimed that she declined to tell anyone because she wanted her mom to be able

to work and wanted her siblings to have their father. (Doc. 291:73.) Later in her testimony, however, D.A. claimed that she did not tell anyone about the alleged incidents because she thought Mr. Williamson would take her siblings and force her and her mom to leave the home. (Doc. 291:79.) D.A. added, on cross-examination, that she was concerned that she and her mother could be deported to Moldova if she reported the alleged incidents. (Doc. 291:105.) D.A. testified that Mr. Williamson had made threats to that effect in the past. (Doc. 291:105.)

D.A. claimed that Mr. Williamson later began to show her pornographic images and videos and to discuss sex with her over email. (Doc. 291:74.) She claimed that he also talked to her about sex in person on occasion. (Doc. 291:74.)

D.A. alleged that, on one specific occasion, Mr. Williamson hugged her and rubbed her vagina over the clothing. (Doc. 291:75-76.) D.A. purported that, a few weeks later, while outside the home on the porch, Mr. Williamson digitally penetrated her vagina. (Doc. 291:77.) She testified at trial that she did not remember how long that alleged episode lasted. (Doc. 291:77.) She claimed that the alleged inappropriate touching continued on a varying basis, sometimes as frequently as weekly. (Doc. 291:78-79.) D.A. alleged that, on one other occasion, Mr. Williamson had told her that if she didn't lock the patio door that led into her bedroom, he would come in her room and "eat her out." (Doc. 291:83.) D.A. testified that she did not know what he meant by that at the time. (Doc. 291:83.) She testified that she thought

it was a joke. (Doc. 291:83.)  She claimed, however, that that night, she woke to Mr. Williamson purportedly performing oral sex on her. (Doc. 291:83-84.)

D.A. testified that, when she was around 11 years-old, she started receiving strange emails that often included sexual material from an unknown person named "Vlad Vlad." (Doc. 291:91.)  D.A. reported the strange emails to Mr. Williamson. (Doc. 291:91.)  She testified that she did not report the emails to her mother because she was closer to Mr. Williamson and felt that he would understand better than her mother would. (Doc. 291:92.)

D.A. testified that she would use Mr. Williamson's computer at times. (Doc. 291:94.)  She claimed that, on one occasion when she was 12 years-old, she saw the "Vlad Vlad" account on one of the computers. (Doc. 291:94.)  D.A. reported that finding to Mr. Williamson. (Doc. 291:94-95.)  Mr. Williamson informed D.A. that he did not know anything about the account. (Doc. 291:94-95.)  He assured her that "it was a glitch and that they just attached his name and that it was very common to happen." (Doc. 291:95.)  D.A. alleged that the "Vlad" emails continued thereafter and that she also received emails from Mr. Williamson's known email. (Doc. 291:95.)  She did not, however, report or tell anyone about those alleged emails. (Doc. 291:95-96.)

In an email sent from the "Vlad" account on July 18, 2019, the email contained the text "Do you have exploding orgasms in your panties like this?" (Doc. 291:97-

98.)  D.A. responded to that email "Stop. You said you would, so just stop, please. I don't like you. I don't harass people like you, so I will be reporting you to the police?" (Doc. 291:98.)

In an email sent from dispatchtwh@gmail.com, which D.A. testified was an address belonging to Mr. Williamson, was written:

> Just because you wanted to be a big girl a few months back does not make me a pervert. If that was the case, then why did you come back for more and more and make me go outside with you and finger your pussy until you finally did cum, or you forget about that? I regret the little affair we did have as I thought you were a little more mature than what you really are. Shame on me. Since you really aren't a virgin anymore other than you have not had a penis inside you, just make sure to find the one that will satisfy your desires when you finally do. Perhaps you should wait until you are married.

(Doc. 291:99-100.)  D.A. alleged that that email was referring to the touching incident that occurred on the outside patio. (Doc. 291:100.)

Other emails were received from account RRyan0881@gmail.com. (Doc. 291:101.)  D.A. claimed that to be an account of Mr. Williamson's. (Doc. 291:101.) One email from that address contained the statement "Would love for you to cum all over my dick, muah. Love you, Deea." (Doc. 291:101.)  Another email stated "When you masturbate, do you cum in your panties or do you take them off? Would love for you to send me a video of you making yourself cum." (Doc. 291:101.)  D.A. testified at trial that she assumed that email was from Mr. Williamson. (Doc. 291:101.)

D.A. additionally testified that Mr. Williamson gifted her a USB phone charger that she had asked for. (Doc. 291:86-87.)  She was 12 years-old when she received the charger. (Doc. 291:104.)  D.A., at that time, used her phone for social media communications, including on Snapchat, TikTok, Instagram, and "everything," in her words. (Doc. 291:104.)  She alleged that she later became suspicious that the charger had a camera in it. (Doc. 291:89.)  After the execution of the search warrant at her house, a detective advised her that the charger contained a camera. (Doc. 291:89.)

D.A. confirmed on cross-examination that her mother, her siblings, and herself had access to the Gateway computer. (Doc. 291:105-06.)  She likewise testified that there were times when she knew the password to Mr. Williamson's computer. (Doc. 291:106.)  She denied, however, having passwords for any of Mr. Williamson's email accounts. (Doc. 291:107-08.)  She also denied having created or having access the "Vlad" email account. (Doc. 291:108.)

D.A. additionally confirmed on cross-examination that she told the initial interviewing law enforcement officers and the later investigative interviewer that Mr. Williamson never touched her inappropriately. (Doc. 291:106-07.)  She agreed that she did not claim that Mr. Williamson ever touched her inappropriately until she met with the prosecutor in 2022. (Doc. 291:106-07.)

In addition to the information discussed above, the case agent, during cross-examination, testified that he had learned during his investigation that Vlad was the name of a former boyfriend of Aliona Williamson. (Doc. 291:198.)

When the Government rested its case, Mr. Williamson moved for a judgment of acquittal on all counts. (Doc. 291:209-210.)  As to the distribution counts charged in Counts Five, Six, and Seven, Mr. Williamson asserted that the Government failed to present any evidence that the images at issue were distributed. (Doc. 291:209.)  On the contrary, he noted, the evidence showed only that the images were emailed and the emails were then intercepted by Yahoo before being delivered. (Doc. 291:209.)  The Government argued, in response to the distribution argument, that D.A. testified to having received the various emails at issue and that Yahoo only flagged emails but did not stop distribution until receiving a tip. (Doc. 291:209-210.)  The lower court denied the motion. (Doc. 291:210.)

In closing arguments, Mr. Williamson asserted that Aloina Williamson had the ability and motive to frame Mr. Williamson for the charged offenses to avoid her potential deportation. (Doc. 292:21-22.)

The jury, however, went on to render verdicts of guilty on all counts. (Doc. 292:52-54.)

Following trial, Mr. Williamson elected to represent himself. (Doc. 293:2.)  Mr. Williamson went on to object to the Presentence Report in its entirety. (Doc.

293:5.)  During sentencing, Mr. Williamson chose to forgo self-representation.  The lower court then reappointed the undersigned as counsel. (Doc. 293:12-23.)  The court went on to impose sentences of life imprisonment on Count One; concurrent terms of 360 months of imprisonment on Counts Two, Three, and Four; a concurrent term of 240 months imprisonment on Counts, Five, Six, and Seven; and a concurrent 120 months imprisonment on Count Eight. (Doc. 273.)  The court further imposed a lifetime term of supervised release. (Doc. 273.)

Mr. Williamson filed a notice of appeal on June 21, 2024. (Doc. 276.)

This appeal follows.

**(ii)**     **<u>Standard of Review</u>**

As to both issues raised in this Brief, this Court reviews the denial of a motion to suppress under a mixed standard of review. *United States v. Farley*, 607 F.3d 1294, 1325-26 (11th Cir. 2010).  The trial court's legal conclusions are reviewed *de novo*, while its factual findings are reviewed for clear error. *Id.*

## SUMMARY OF THE ARGUMENTS

The district court erred as a matter of law on numerous points in denying Mr. Williamson's motion to suppress the evidence obtained from the search warrants directed to his home and his Yahoo accounts. First, the district court erred in finding that Yahoo was not acting on behalf of the Government when it searched emails and other information derived from accounts linked to Mr. Williamson. Both Yahoo and the NCMEC were acting pursuant to federal statutes that imposed obligations that compelled them to act in a law enforcement capacity. Second, the district court erred in finding that the case agent did not exceed the scope of any earlier purported private searches. The Government indeed failed to carry its burden of establishing the scope of the searches that Yahoo and the NCMEC conducted. Third, the district court erred in finding that the case agent did not recklessly misrepresent material facts and make material omissions in the applications for the search warrants. Fourth and finally, the district court erred in finding that the good faith exception to the exclusionary rule would have applied to the two warrants when the warrants were so lacking in probable cause and so recklessly indifferent to the truth.

The district court additionally erred in denying the motion to suppress the Yahoo search warrant based on the warrant's facial overbreadth. The warrant sought virtually all information connected to the account since the account's creation. In doing so, the warrant violated the Fourth Amendment's particularity requirement.

## ARGUMENTS AND CITATIONS OF AUTHORITY

## I.

## THE DISTRICT COURT ERRED AS A MATTER OF LAW IN DENYING THE MOTION TO SUPPRESS EVIDENCE OBTAINED FROM THE RESIDENTIAL AND YAHOO SEARCH WARRANTS.

The district court erred in denying the motion to suppress evidence obtained as a result of the search warrants for Mr. Williamson's home and Yahoo account. The district court preliminarily erred in finding that Yahoo was acting as a private entity and not a government actor when it conducted searches of the Yahoo account. Yahoo was conducting those searches pursuant to federal statutes that effectively compelled Internet Service Providers such as Yahoo to conduct the searches as a matter of course, threatened those electronic service providers ("ESPs") with stiff penalties, and conferred special immunity on the ESPs for conducting the searches. The NCMEC, moreover, was created by Congress and existed for the purpose of operating the statutorily mandated CyberTipline. Under the circumstances, Yahoo and the NCMEC were both acting as agents of the government when they searched the Yahoo accounts. Nonetheless, even assuming that Yahoo and/or the NCMEC conducted the searches as private entities, the Government failed to carry its burden of establishing the scope of the searches that those entities conducted. Consequently, the Government could not establish that the case agent, who had a policy of conducting his own independent review of reported materials, did not exceed the

scope of the prior searches conducted by Yahoo and the NCMEC.  Notwithstanding the Fourth Amendment violations committed by Yahoo, the NCMEC, and the agent in conducting the searches, the case agent made material false representations and omissions in his applications for the search warrants.  The applications were indeed so lacking in probable cause and so recklessly indifferent to the truth that the good faith exception could not apply to permit the Government's use of evidence obtained as a result of those deficient warrants.

**A. <u>The District Court Erred in Concluding that Yahoo was not Acting as a Government Entity</u>**

Among several errors made in the order denying the initial motion to suppress, the district court erroneously determined that Yahoo was not acting as an agent of the government when it conducted a warrantless search of email accounts linked to Mr. Williamson.  The evidence presented in the lower court clearly established that *both* Yahoo and NCMEC were acting as government agents within the purview of the Fourth Amendment.  In the application for the search warrant for Mr. Williamson's residence, law enforcement relied almost exclusively on the information that Yahoo and the NCMEC obtained from the warrantless searches they performed.

"A search by a private person does not implicate the Fourth Amendment unless he acts as an instrument or agent of the government." *United States v. Steiger*, 318 F.3d 1039, 1045 (11th Cir. 2003).  A private person or entity acts as a

government agent if (1) "the government knew of and acquiesced in the intrusive conduct, and (2) "the private actor's purpose was to assist law enforcement efforts rather than to further his own ends." *United States v. Allen*, 854 Fed. Appx. 329, 333 (11th Cir. 2021).

The Supreme Court has further provided that the question of whether a private entity is acting as an agent of the state will vary depending on the circumstances of the case, with no one factor being determinative in every scenario. *See Lugar v. Edmondson*, 457 U.S. 922, 939, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982); *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295-96, 121 S.Ct. 924, 148 L.Ed.2d 807 (2001). This Court has set out more defining standard, holding that "[a] private party will be considered a state actor only where one of the following conditions is met: (1) the state has coerced or at least significantly encouraged the action alleged to have violated the Constitution; (2) the private parties performed a public function that was traditionally the exclusive prerogative of the state; or (3) the state had so far insinuated itself into a position of interdependence with the private parties that it was a joint participant in the enterprise." *Washington v. Veterans of Foreign Wars of U.S.*, 196 Fed. Appx. 777, 779 (11th Cir. 2006) *citing Rayburn ex rel. Rayburn v. Hogue*, 241 F.3d 1341, 1347 (11th Cir. 2001). In the instant case, Yahoo qualified as a state actor under all three of those scenarios.

### 1. The Government Coerced or at Least Significantly Encouraged Yahoo to Conduct Warrantless Searches of Accounts

In searching private email accounts such as the "vladlover" accounts, Yahoo acted as an agent for the government. To be sure, the government clearly knew of the Yahoo's search and reporting activities. Federal law, indeed, required Yahoo to report any findings of suspected child pornography to the NCMEC. Doc. 99:98-99. If Yahoo fails to do so, the law subjects Yahoo to fines of up to $150,000 for a first, single violation and up $300,000 for each subsequent violation. 18 U.S.C. § 2258A(e). Furthermore, when Congress enacted the Protect our Children Act of 2008, it specifically intended for Yahoo and other such ESPs to essentially act in a law enforcement role. *See* Legislative History of Protect our Children Act of 2008, 154 Cong. Rec. H10241-02, H10250, 2008 WL 4373171 (stating "Internet companies will need to do their part too. When we begin to hold Web sites accountable for the images that they host, we've taken the first step towards supporting parents in their efforts to protect children. Our combined efforts will help make the Internet a safer place.").

Contrary to the lower court's findings, the statutes created in the Protect our Children Act compel Yahoo and other ESPs to proactively search for child pornography. *See e.g. United States v. DiTomasso*, 81 F. Supp. 3d 304 (S.D.N.Y. 2015). Even if the Act does not require ESPs to specifically implement procedures for searching out suspected child pornography, the imposition of substantial

penalties for the failure to report suspected child pornography would compel any reasonable entity to implement procedures for seeking out any such material so as to avoid any potential criminal liability. Nonetheless, a private entity can still be an agent of the government even if it is not compelled to act on behalf of the government. For instance, when an individual volunteers to assist law enforcement with a police function, with law enforcement's knowledge, the individual is a government actor. *See United States v. Henry*, 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980). The Supreme Court addressed one such example in *Henry*, *supra*, where law enforcement requested a confidential informant who was in custody with other inmates to "be alert to any statements made by the federal prisoners, but not to initiate any conversation with or question" the defendant in that case with respect to a bank robbery he was charged with. *Id.* at 266. Under those circumstances, the Supreme Court found that the informant was an agent of the government for Sixth Amendment purposes even though law enforcement did not instruct the informant to proactively seek out incriminating information from the defendant. *Id.* at 274-75. The situation at issue in the instant case is effectively the equivalent of the scenario the Court considered in *Henry*. As in *Henry*, Yahoo was asked to be alert for certain information and to report any such information it learned of. In both scenarios, the governmental requests rendered those otherwise private parties agents of the government.

In addition, contrary to the reasoning of the lower court, the fact that the government did not cooperate with Yahoo in the investigation of Mr. Williamson's emails is of no consequence. The Government had knowledge of and acquiesced in Yahoo's searching of email accounts. Beyond that, as set forth above, the Government effectively compelled Yahoo to do so. Suggesting that Yahoo could not be a government actor because the government did not actively participate in Yahoo's actions would nullify the long line of cases that address when and how private entities can act as government agents. Indeed, the Supreme Court has held that "surely [it] cannot be that government, state or federal, is able to evade the most solemn obligations imposed in the Constitution by simply resorting to the corporate form." *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 375, 115 S.Ct. 961, 130 L.Ed.2d 902 (1995). Consistent with that reasoning, if the government needed to actively participate in a private entity's actions in order for the private entity to be deemed a government actor, then law enforcement and other government entities could simply sidestep the doctrine by enlisting private entities to do their bidding and then simply turn a blind eye to the private entities' actions.

Given the circumstances of this case, the statutes discussed above effectively deputize ESPs such as Yahoo as federal agents. Indeed, the entire federal enforcement scheme relies on ESPs such as Yahoo to function as discussed above.

31

For those reasons, the lower court erred in finding that Yahoo was not acting as an agent of the government.

## 2. Yahoo Performed a Public Function that is Traditionally Reserved for Law Enforcement

In denying the motion to suppress, the district court further erred in finding that Yahoo was acting in its own self-interest rather than acting in assistance of law enforcement. As set forth above, Yahoo was acting pursuant to its obligations under federal law. In addition, Yahoo employs an entire division to serve the purpose of searching emails for possible child pornography. The evidence presented at the hearing did not even suggest that Yahoo profits from the work of that division. It is implausible to believe that the work of that division could, in any way, turn a profit for Yahoo. On the contrary, the searching of emails and reporting to NCMEC serves only to comply with federal regulations and to assist law enforcement in the course thereof.

Furthermore, in carrying out its obligations under the Protect Our Children Act, Yahoo is permitted to possess child pornography. Any person or non-law enforcement entity that possessed such material would be committing serious crimes. Federal law thereby confers immunity on ESPs such as Yahoo that are typically only extended to law enforcement. By effectively requiring Yahoo to search out and report suspected child pornography, and conferring immunity on the

company in carrying out those functions, the government has compelled Yahoo to perform a public function that is traditionally reserved for law enforcement.

### 3. The Government has Insulated Itself into a Position of Interdependence on ESPS such as Yahoo

As to the third category of state actors, this Court has provided "[t]he nexus/joint action test applies where 'the state has so far insinuated itself into a position of interdependence with the [private party] that it was a joint participant in the enterprise.'" *Focus On The Family v. Pinellas Suncoast Transit Authority*, 344 F.3d 1263, 1277 (11th Cir. 2003) *quoting Willis v. Un. Health Servs., Inc.*, 993 F.2d 837, 840 (11th Cir. 1993). "To charge a private party with state action under this standard, the governmental body and private party must be intertwined in a 'symbiotic relationship.'" *Nat'l Broad. Co., Inc. v. Communications Workers of Am., AFL-CIO*, 860 F.2d 1022, 1027 (11th Cir. 1988) (quoting *Jackson v. Metropolitan Edison Company*, 419 U.S. 345, 349 (1974)).

Yahoo and the NCMEC are clearly in such a "symbiotic relationship." *Id.* As discussed above, federal law requires Yahoo to report to NCMEC. 18 U.S.C. § 2258A. And, again, Yahoo is subject to serious penalties if it fails to adhere to the reporting mandates. *Id.* Furthermore, while Yahoo is not specifically required by statute to search its email accounts for child pornography, Yahoo does so as a matter of course in an effort to comply with the statutory reporting requirements. The NCMEC, in turn, relies on the reports of ESPs such as Yahoo to carry out its

function.  The NCMEC's existence would be futile without the help of ESPs such as Yahoo.

As further evidence of the symbiotic relationship, Yahoo (through its owner Verizon) touts its partnership with NCMEC.  Verizon's corporate policy describes having a "close partnership" with NCMEC. *See* Verizon Digital Safety Policy, available at https://www.verizon.com/about/ourcompany/company-policies/digital-safety.  Verizon, moreover, is a "Protector level" sponsor of NCMEC and has donated millions of dollars to NCMEC to "further support NCMEC's mission…[and] to amplify NCMEC's voice." *Id.*  Yahoo and the NCMEC clearly work hand-in-hand in a symbiotic relationship carrying out the statutorily mandated functions of the NCMEC.

Moreover, Yahoo also satisfies the "nexus" test due to its close relationship with NCMEC, which is itself a state actor. *See e.g. United States v. Ackerman*, 831 F.3d 1292 (10th Cir. 2016) (holding NCMEC to be a governmental entity or agency for Fourth amendment purposes).  Section 2258A delegates to the NCMEC powers mandating that NCMEC is the sole collaborator with state and federal law enforcement in carrying out its duties. *Id.* at 1296.  Likewise, the NCMEC alone maintains the CyperTipline that ESPs such as Yahoo must report to.  Those ESPs, moreover, are obligated to make reports to that tipline, not to law enforcement.  The NCMEC, in turn, makes the reports to law enforcement.  The statutory framework

that imposes the relevant obligations on ESPs and the NCMEC is a well-oiled machine that seeks out and initiates law enforcement investigations into child pornography. The government clearly relies on and is dependent on ESPs and the NCMEC in investigating and prosecuting those serious crimes.

### B. NCMEC was also a Government Actor for Fourth Amendment Purposes

As addressed above, the NCMEC, like Yahoo, is also an agent of the Government for purposes of the Fourth Amendment. The district court declined to address the question of whether the NCMEC is a government actor because it erroneously found that neither the NCMEC nor the case agent exceeded the scope of Yahoo's alleged private search. As set forth above, however, Yahoo was a government actor and, notwithstanding that conclusion, the Government failed to carry its burden of establishing the scope of Yahoo's search.

As to the NCMEC, the evidence established that, while it may not be an official government agency, it operates as a government agency and is funded as a government agency. The NCMEC is statutorily obligated under federal law to operate the CyberTipline. Doc. 99:40-42; 18 U.S.C. § 2258A. Congress created the NCMEC to do just that. *Id.* No other entity carries out that role.

Section 2258A, moreover, obligates the NCMEC to forward every report of a violation to federal law enforcement agencies and to make those reports available to state and local law enforcement. 18 U.S.C. § 2258A(c). Federal law similarly

requires the NCMEC to operate the national clearinghouse for information about missing and exploited children. Doc. 99:40; 34 U.S.C. § 11293(b).  Federal law likewise requires the NCMEC to assist federal law enforcement in the recovery of missing and exploited children. 34 U.S.C. § 11293(b)(1)(H).  The statute that imposes those obligations similarly mandates that the NCMEC provide training to law enforcement agencies in identifying and locating non-compliant sex offenders. Doc. 99:41; 34 U.S.C. § 11293(b)(1)(I).  NCMEC, furthermore, has the power to call on other federal agencies for assistance. Doc. 99:42; 18 U.S.C. § 3056(f).

Aside from its statutorily mandated obligations, the NCMEC, like Yahoo, is also specifically authorized by federal law to receive and possess child pornography. 18 U.S.C. §§ 2252A(a)(2), 2258A(a) and (b)(4).  For any private entity, carrying out those actions would be criminal.

In light of all of those facts, the Tenth Circuit Court of Appeals found the NCMEC to be a state actor in *United States v. Ackerman*, *supra*, 831 F.3d 1292, 1296-1300 (10th Cir. 2016).  The court essentially found that its conclusion was not even a close call: "in the face of so much law and evidence suggesting NCMEC qualifies as a governmental entity, the government offers almost no reply." *Id*. at 1298.  The court found that, regardless of which test was employed, "it's hard to see how we could avoid deeming NCMEC the government's agent in this case." *Id.* at 1301.

36

Consistent with *Ackerman*, and based on the many facts set forth above, the NCMEC is a governmental entity for Fourth Amendment purposes. For that reason, the NCMEC's search of the images at issue, without a warrant, violated the Fourth Amendment just as the searches by Yahoo and the case agent had.

### C. Even if Yahoo Conducted its Search as a Private Entity, Law Enforcement Exceeded the Scope of that Search

Even if one assumes for purposes of argument that Yahoo carried out searches of the email accounts as a private entity, law enforcement's subsequent search exceeded whatever the scope of the private search was. Law enforcement's search therefore violated the Fourth Amendment regardless of whether Yahoo acted as a government agent.

In the motion hearing, the Government bore the burden of proving the scope of the search carried out by the entity that it purported to be a private actor, which in this case, was Yahoo. Even if Yahoo were a private actor, the Government did not meet its burden of establishing the scope of that search.

The Government may replicate a private search, "as long as government officials constrain their search to the parameters of the search conducted by the private individual." *United States v. Harling*, 705 Fed. Appx. 911, 916 (11th Cir. 2017) *citing United States v. Young*, 350 F.3d 1302, 1306–07 (11th Cir. 2003); *see also United States v. Jacobsen*, 466 U.S. 109, 115, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984); *Walter v. United States*, 447 U.S. 649, 100 S.Ct. 2395, 65 L.Ed.2d 410

(1980). Consequently, law enforcement violates the Fourth Amendment if it conducts a search that is broader in scope than the previously occurring private search. *Id.* The lawfulness of law enforcement's actions thereby turns on the scope of the earlier private search. With respect to the scenario of the instant case, if law enforcement viewed allegedly illegal images that were not reviewed by the private entity in its search, law enforcement's search exceeded the scope of the private search

In the instant case, the Government did not, and seemingly could not, present testimony from any witness at Yahoo who would have viewed the images at issue. It similarly failed to present any reliable testimony to establish that the NCMEC actually viewed the images at issue. The NCMEC originally claimed it did not view the images, only to change that position later. Regardless, the NCMEC does not know who allegedly viewed the images, or when they were allegedly viewed. Doc. 99:59-60. The NCMEC also did not know whether the "hash matches" corresponding to six of the images in the CyberTipline Report had been previously categorized by NCMEC. Doc. 99:56. Therefore, with respect to the searches conducted by *both* Yahoo and the NCMEC, the Government presented no evidence of what *actually* occurred.

Despite the foregoing, the district court found that "as a matter of policy" a Yahoo agent "reviews and manually selects each of the images to be uploaded with

the report and then specifically attests that he or she has inspected those photographs by checking a box affirming the same." Doc. 114:35.  At the motion hearing, however, the Government did not admit any written policies into evidence. Moreover, even if that could be construed as Yahoo's "policy," the Government presented no evidence that Yahoo actually followed that policy.  To be sure, the Yahoo employee who would have reviewed the images at issue never testified in the lower court.  The Yahoo representative who testified at the motion hearing, Ashley Guizzotti, initially testified that former Yahoo employee Jessica Hines personally reviewed the images at issue, but later admitted that she did not know whether an employee of Yahoo actually even viewed the images at all. Doc. 99:102.  Therefore, while evidence was presented that images must be viewed before submitting the images to the CyberTipline, the Government presented no evidence to show that that actually occurred in the instant case.

Under the circumstances, the district court erroneously found that law enforcement did not exceed the scope of Yahoo's search.  Given the evidence presented, it was impossible to reach such a conclusion because the Government never established the scope of the search.  The district court, instead, assumed what the scope of the search much have been based on the mere existence of a still largely undefined company policy.  The Government could not, however, establish the actual scope of Yahoo's search in the instant case without evidence of an actual

policy and, more importantly, evidence that any such policy was actually followed in the instant case. Without having such proof, the district court was left to rely on a pyramiding of inferences and assumptions as to what must have happened in the instant case. The evidence was not, therefore, sufficient to establish the scope of any purported private search.

In the end, the case agent viewed images from the email accounts without knowledge of whether Yahoo had viewed those same images in its searches. To be sure, the agent testified that it was his policy to review every image submitted as part of a report of child pornography, regardless of whether a private party had previously viewed the images. Doc. 99:191. The agent, likewise, conducted no investigation into what images Yahoo and/or the NCMEC might have viewed.

Under a similar set of circumstances, the Ninth Circuit, in *United States v. Wilson*, 13 F.4th 961, 971 (9th Cir. 2021), found that law enforcement's actions exceed the scope of an earlier private search. In that case, Google made a report of suspected child pornography to the NCMEC CyberTipline. Google had set forth in a declaration that it did not view the images prior to submitting them to NCMEC. *Id*. at 965. The NCMEC passed Google's report on to law enforcement. The investigating agent, like the case agent in the instant case, had a policy that "called for inspecting the images without a warrant whether or not a Google employee had reviewed them." *Id*. at 965. The Ninth Circuit found under the circumstances that

the government did not carry its burden to prove that law enforcement's warrantless search of the images was valid. *Id*. at 971. The court held that the "government's actions here exceed the limits of the private search exception as delineated in *Walter* and *Jacobsen* and their progeny." *Id.*

Because the case agent had no knowledge regarding what actually occurred during the alleged private search, including who conducted it or when, the Government could not credibly establish that the agent did not exceed the scope of any alleged private search. As a matter of law, the agent's actions therefore undoubtedly exceeded the scope of any purported private search.

### D. Mr. Williamson Carried his Burden of Proving that the Case Agent Recklessly Omitted Material Facts and Made Material Misrepresentations in the Search Warrant Application

Pursuant to *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), the trial court is required to hold an evidentiary hearing when a defendant "'makes a substantial preliminary showing' that an affiant made intentionally false or recklessly misleading statements (or omissions), and those statements are 'necessary to the finding of probable cause.'" *United States v. Barsoum*, 763 F.3d 1321, 1328 (11th Cir. 2014) *quoting Franks*, 438 U.S. at 155-56. "'When assessing whether the alleged false statements and omissions were material, the trial court is to disregard those portions of the affidavit which the defendant has shown are arguably false and misleading.'" *Id.* at 1328-29 *quoting United States v. Sarras*, 575

F.3d 1191, 1218 (11th Cir. 2009).  The defendant must then establish that, but for the misrepresentations or omissions, probable cause would not have existed for the issuance of the warrant.  *Id.*

In the instant case, the case agent recklessly omitted material facts and made material misrepresentations in the application for the search warrant for Mr. Williamson's residence.  The NCMEC categorized three of the seven reported images of potential child pornography as "CP (Unconfirmed)."  That classification meant that the age of the individual in the images could not be determined.  Despite that classification, the case agent falsely alleged in the search warrant affidavit that all of the images were child pornography.

In doing so, the agent both misrepresented the facts and omitted the material fact that the NCMEC could not confirm that three of the images were child pornography.  Indeed, at the motion hearing, the agent even testified that a finding of "age difficult" images does not provide probable cause for a search warrant. Doc. 99:183.  Even if the agent did not know what the NCMEC meant by "CP (Unconfirmed)," he reasonably should have known what that designation meant given his experience investigating child pornography cases.  At best, the agent's misrepresentation and omissions were in reckless disregard for the truth.  At worst, they were intentional.  In either scenario, Mr. Williamson made the requisite threshold showing required under *Franks*.

In addition to the misrepresentations and omissions about three of the seven images, the agent also omitted from the warrant applications the fact that he had no information as to whether the Yahoo account was logged-in or logged-out on September 8, 2020, when a pornographic image was sent from the account. Doc. 99:180, Ex. B.  By the time he authored the warrant application for Mr. Williamson's residence, the agent was aware of the relevant dates that the "vladlover" account was logged in leading up to September 8, 2020.  Those dates were August 31, September 1, September 2, September 3, and September 4, 2020 – with the last being four days prior to the date the image was sent. Doc. 99:127, 185, Def. Ex. D.

Despite the omission of those material facts, the district court found that the detective had "training and experience" to know that users "can stay logged into [their] accounts for a significant period of time." Doc. 114:40.  The agent testified, however, that he had no such training. Doc. 99:187 (discussing training on other topics and stating that training "has no bearing on the logging in or logging out."). Yahoo had never advised him how long an account can remain logged in for before it would log itself out. Doc. 99:187.  Yahoo, for its part, had no method to track whether an account was logged in manually or automatically. Doc. 99:128. The Yahoo witness, likewise, testified that Yahoo does not know whether the account at issue was logged in or logged out at the time of the alleged transmission. Doc. 99:89.

43

The agent, moreover, performed no investigation into how or when Yahoo accounts themselves log out. Doc. 99:187.

Given the evidence presented in the district court, it is highly plausible that the email account at issue was logged out on September 8, 2022, when one of the images was allegedly sent from that account. Compounding on the misrepresented and omitted facts regarding the "CP (Unconfirmed)" designations, the omitted facts concerning when the account was last logged in was critical to the probable cause determination. Again, the omission of those facts was, at best, a reckless disregard for the truth.

Given the foregoing, Mr. Williamson carried his burden of making a threshold showing under *Franks*. The agent's misrepresentations and omissions were material and were, at the very least, made in reckless disregard for the truth. But for the omissions and material misrepresentations, probable cause would not have existed for the issuance of the search warrant.

**E. The Good Faith Exception did not Apply Because the Affidavit Misled the Magistrate Judge and Omitted Critical Facts that Would Have Negated the Existence of Probable Cause**

In addition to the error in finding that probable cause existed for the issuance of a search warrant, the district court further erred in finding that the good-faith exception would save the fruits of the unlawful search warrant. Under the good-faith exception to the exclusionary rule, even when a search warrant is found to be invalid, evidence obtained in good faith, reasonable reliance on the defective search warrant may still be admissible. *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). The Supreme Court held in *Leon* that the Government would not be barred from using evidence that was obtained from a faulty search warrant "by officers acting in reasonable reliance on a search warrant issued by a detached and neutral magistrate but ultimately found to be unsupported by probable cause." *Id.* at 900, 905 (emphasis added). The Government bears the burden of proving the applicability of the good-faith exception. *United States v. McGough*, 412 F.3d 1232, 1239 (11th Cir. 2005).

Even when the good-faith exception might otherwise apply, this Court has recognized that four exceptions exist to the *Leon* good-faith exception:

(1) where "the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth;"
(2) "where the issuing magistrate wholly abandoned" his detached and neutral judicial role;

(3) where the affidavit supporting the warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable;" and

(4) where, depending upon the circumstances of the particular case, a warrant is "so facially deficient - *i.e.*, in failing to particularize the place to be searched or the things to be seized - that the executing officers cannot reasonably presume it to be valid."

*United States v. Martin*, 297 F.3d 1308, 1313 (11th Cir. 2002) *quoting Leon*, 468 U.S. at 923.

In the instant case, the affidavit submitted in support of the search warrant clearly misled the issuing court and included information that the affiant knew or should have known was untrue. Based on the information that was omitted and misrepresented in the affidavit, the affiant misled the issuing court with an affidavit that he knew was false and was made in reckless disregard of the truth. Furthermore, when considered in the context of the offenses proposed in the search warrant application, the affidavit was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Martin*, 297 F.3d at 1313. Under the totality of the circumstances, no reasonable law enforcement officer could rely in good faith on a warrant issued pursuant to that affidavit.

For all of the reasons set forth above, the district court erred in denying Mr. Williamson's motion to suppress the fruits of the search of his home and the search of the Yahoo accounts. Mr. Williamson therefore respectfully requests the Court to

vacate the judgment and remand this case with instructions to enter an order of dismissal.

## II.

### THE DISTRICT COURT ERRED AS A MATTER OF LAW IN DENYING THE MOTION TO SUPPRESS THE FRUITS OF THE YAHOO SEARCH WARRANT BASED THE FACIAL OVERBREADTH OF THE WARRANT

The search warrant directed to the Yahoo account compelled Yahoo to provide law enforcement with all "account activity from creation to 11/24/20." The search warrant was not tailored in any whatsoever to the suspected activity that was under investigation. Instead, the warrant was a general warrant that sought virtually all information connected to the account for the history of the account's existence. The failure to make any reasonable efforts to particularize the information sought in the warrant violated Mr. Williamson's right to be free from unreasonable searches and seizures. Moreover, given the facial overbreadth of the warrant, the good faith exception to the exclusionary rule cannot operate to save the fruits of the unconstitutional search warrant. The district court thereby erred as a matter of law in denying the motion to suppress.

### A. **The Yahoo Search Warrant Violated the Fourth Amendment's Particularity Requirement**

The protections of the Fourth Amendment dictate "searches deemed necessary should be as limited as possible." *Coolidge v. New Hampshire*, 403 U.S. 443, 467, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). "The 'specific evil' that limitation targets 'is not that of intrusion per se, but of a general, exploratory rummaging in a person's belongings.'" *United States v. Blake*, 868 F.3d 960, 973 (11th Cir. 2017) *quoting Coolidge*, 403 U.S. at 467. "That type of rummaging was permitted during the colonial era by the 'general warrant,' an instrument 'abhorred by the colonists.'" *Id. quoting id.* "The Fourth Amendment is intended to preclude 'general warrants' by 'requiring a 'particular description' of the things to be seized.'" *Id. quoting id*.

The district court's analysis of the instant issue revolved around two opinions from this Court, *United States v. Blake*, *supra*, 868 F.3d 960, and *United States v. Alford*, 744 F. App'x 650 (11th Cir. 2018). The district court found that the warrant at issue in the instant case was more akin to the warrant at issue in *Alford* as opposed to the overly broad warrant at issue in *Blake*. The evidence did not support the district court's conclusion.

In *Blake*, this Court considered whether two warrants - one issued to Microsoft and the other issued to Facebook - violated the particularity requirement of the Fourth Amendment. *Blake*, 868 F.3d at 973-74. Both warrants sought information pertaining to the investigation of a prostitution ring. *Id.* With respect to the

Microsoft warrant, the Court found that the warrant "limited the emails to be turned over to the government, ensuring that only those that had the potential to contain incriminating evidence would be disclosed." *Id.* at 973. The Court further reasoned, however, that "it is somewhat troubling that the Microsoft warrant did not limit the emails sought to emails sent or received within the time period of Moore's suspected participation in the conspiracy." *Id.* at 973 n.7. It concluded, nonetheless, that the warrant was not unconstitutional because it was limited in scope to only "only discrete categories of emails that were connected to the alleged crimes." *Id.* The Court only went so far as to hold that the warrant "was okay." *Id.* at 973.

As to the Facebook warrant, on the other hand, the Court found that the warrant "required disclosure to the government of virtually every kind of data that could be found in a social media account." *Id*. at 974. The Court found the all-encompassing scope of that warrant unnecessary. *Id.* The Court went on to provide examples of how the warrant could have been more narrowly tailored to comply with the particularity requirement. *Id.* It noted that, "[w]ith respect to private instant messages, for example, the warrants could have limited the request to messages sent to or from persons suspected at that time of being prostitutes or customers." *Id.* It further provided that the warrants should been limited to requesting only data from the time period that the defendant was suspected of participating in the conspiracy. *Id.* The Court found that such "limitations might then have provided probable cause

49

for a broader, although still targeted, search of Moore's Facebook account." *Id.*   It further held that "[t]hat procedure would have undermined any claim that the Facebook warrants were the internet-era version of a 'general warrant.'"[1] *Id. citing Coolidge*, 403 U.S. at 467; *Riley v. California*, 573 U.S. 373, 134 S.Ct. 2473, 2488–91, 189 L.Ed.2d 430 (2014).

One year after *Blake*, this Court decided *Alford*, *supra*, 744 Fed. Appx. 650. In *Alford*, law enforcement sought and obtained a search warrant directed to Google in connection with a child pornography investigation. *Id.* at 652.  The warrant at issue in *Alford* sought a broad range of types of information but was narrowly tailored to limited information surrounding a communication made on a specific date. *Id.*  The warrant was specifically confined to only information pertaining to a specific date and time, compelling Google to provide only data "which may aid in obtaining the identification and/or location of the individual whom contacted K-mart in Hamilton, MT via phone call [to various phone numbers] on September 16th, 2014 at approximately 2145 hours MST." *Id*.  This Court found that the *Alford* warrant fell "somewhere between the Microsoft and Facebook warrants in Blake because, like the Facebook warrants, it requested nearly every kind of data that could be found in a Google account, but like the Microsoft warrant, the information

---

[1] Despite those shortcomings, the Court found that the warrant fell within the good-faith exception to the exclusionary rule. *Id.* at 974-75.

requested was all potentially incriminating because it could have identified the K-Mart caller." *Id.* at 653. The Court further provided that the warrant affiant was not "merely rummaging around Alford's Google account to find whatever he could, but rather was trying to find the identity of the caller and potential victim." *Id.*

Turning to the instant case, the warrant issued to Yahoo was materially indistinguishable from the *Blake* Facebook warrant. The warrant at issue in *Blake*, like the warrant at issue in the instant case, was not limited in time or scope. The request made in the warrant to Yahoo was the functional equivalent of a general warrant. Just as the *Blake* Facebook warrant could have been tailored to data relevant to the suspected offenses being investigated, the Yahoo warrant could have been just as narrowly tailored. Law enforcement could have easily limited the data requested to only information pertaining to the accountholder's identity and to only activity surrounding the suspected transmissions of child pornography. Those limitations would have allowed law enforcement to obtain the information it needed without delving into essentially all of the data arising from the lifetime of the email account. Just the same, law enforcement could have easily restricted account activity data to only a specific date range encompassing the suspected dates the potential child pornography was transmitted. By instead requesting all "account activity from creation…" the warrant potentially sought decades worth of data.

The warrant at issue in the instant case was also remarkably different from the warrant this Court considered in *Alford*. The warrant at issue in *Alford* was narrowly tailored to limited information surrounding a communication made on a specific date and a specific time. The warrant further narrowed the requested information to that which could be used to determine the identification and location of the parties to a specific communication. The warrant at issue in the instant case had no such comparable limitations whatsoever, even with respect to the seven categories of requested information.

The district court mistakenly found that the instant search warrant was "confined" to "seven distinct categories of information." Doc. 173 at 14. The court reasoned that the warrant provided for a "bifurcated search protocol" that the case agent claimed to have been necessary because Yahoo purportedly could not differentiate between potentially incriminating evidence and innocuous information connected to the account. *Id.* That analysis overlooked the fact that the warrant's list of information that could be collected and searched further encompassed virtually everything that could be obtained from Yahoo. In light of the overbroad, all-encompassing request for "account activity from creation to 11/24/20," the warrant's categorization of information subject to collection under the warrant was futile. The listing of other categories of information is meaningless when a

corresponding "category" encompasses all conceivable information that could be obtained.

Moreover, even if the seven categories of information were arguably narrowly tailored to some specific target, the warrant nonetheless, compelled Yahoo to provide virtually all information connected to the account. Regardless of whether or not law enforcement would search that information "further," the Fourth Amendment violation occurred when law enforcement compelled Yahoo to provide it with the information Mr. Williamson had a reasonable expectation of privacy in.

In the end, the warrant at issue in the instant case compelled all "account activity from creation to 11/24/20." Doc. 134-1 at 11-12. The phrase encompassed every single email, attachment, search history, webpage visited. Virtually no information fell outside the purview of the warrant.

As set forth above, the warrant at issue in this case was not sufficiently narrowly tailored to comply with the Fourth Amendment's particularity requirement. Contrary to the lower court's reasoning, the breadth of the Yahoo warrant was tantamount to the overbroad Facebook warrant at issue in *Blake*. Given the overbreadth of the warrant, the lower court erred in denying the motion to suppress.

### B. __The Good-Faith Exception did not Apply to Save the Fruits of the Unconstitutional Search Warrant__

As with the warrant for the search of Mr. Williamson's home, the warrant for the Yahoo account did not fall within the good-faith exception to the exclusionary rule. *See supra* Section I-E (discussing *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), and the good-faith exception in greater detail).

When the warrant at issue in *Blake* was executed, this Court obviously had not issued its opinion in *Blake*. Since 2017, however, *Blake* has been the law. The *Blake* opinion was, therefore, undoubtedly binding precedent at the time the warrant to Yahoo was issued. Moreover, as set forth above, the Yahoo warrant was remarkably similar to the Facebook warrant at issue in *Blake*. In light of *Blake*, no reasonable law enforcement officer could have relied on the search warrant given the warrant's obvious overbreadth. Contrary to the lower court's finding, the question of the particularity of the warrant was not even close. The warrant compelled Yahoo to produce virtually everything in the Yahoo account. The warrant therefore squarely fell within one of the recognized exceptions to the good-faith exception: that is warrant is "so facially deficient - i.e., in failing to particularize the place to be searched or the things to be seized - that the executing officers cannot reasonably presume it to be valid." *United States v. Martin*, 297 F.3d 1308, 1313 (11th Cir. 2002). Given the facial overbreadth of the Yahoo warrant, no reasonable law enforcement officer would have relied on it. The good faith exception cannot

save the fruits of that warrant.  Mr. Williamson correspondingly asks this Court to reverse the denial of his motion to suppress.

## **CONCLUSION**

Based on the foregoing, Appellant Gregory Allen Williamson respectfully requests that this Honorable Court reverse the judgment and sentence and remand this case to the district court with instructions to enter an order of dismissal.

Respectfully Submitted,

s/ *Bjorn E. Brunvand*
BJORN E. BRUNVAND, ESQ.
Brunvand & Wise Law Group
615 Turner Street
Clearwater, FL 33756
Florida Bar # 0831077
Telephone:  727-446-7505
Facsimile:  727-446-8147
E-Mail: bjorn@acquitter.com
CJA Counsel for Appellant

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)</u>

The undersigned certifies, pursuant to 11th Cir. R. 28-1, that this Brief complies with the type-volume limitation of Federal Rule of Appellate Procedure because it contains 12,650 words, excluding the parts exempted by subsection 32(a)(7)(B)(iii).  Microsoft Word software was used to count the words in the foregoing Brief.  This Brief, likewise, complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point, Times New Roman font.

s/ *Bjorn E. Brunvand*
BJORN E. BRUNVAND, ESQ.
Brunvand & Wise Law Group
615 Turner Street
Clearwater, FL 33756
Florida Bar # 0831077
Telephone:  727-446-7505
Facsimile:  727-446-8147
E-Mail: bjorn@acquitter.com
CJA Counsel for Appellant

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing was filed using the CM/ECF system, which will send a notice of electronic filing to all counsel of record, on May 7, 2025.

s/ *Bjorn E. Brunvand*
BJORN E. BRUNVAND, ESQ.
Brunvand & Wise Law Group
615 Turner Street
Clearwater, FL 33756
Florida Bar # 0831077
Telephone:  727-446-7505
Facsimile:  727-446-8147
E-Mail: bjorn@acquitter.com
CJA Counsel for Appellant