## IN THE UNITED STATES COURT OF APPEALS

## FOR THE ELEVENTH CIRCUIT

_____

### Appeal No.  24-12038-HH
_____

### UNITED STATES,

### Appellee

### v.

### GREGORY ALLEN WILLIAMSON,

### Appellant

_____

### A DIRECT APPEAL OF A CRIMINAL CASE
### FROM THE UNITED STATES DISTRICT COURT
### FOR THE MIDDLE DISTRICT OF FLORIDA
### DISTRICT COURT CASE NO.  8:21-cr-00355-WFJ-CPT
_____

### APPENDIX OF APPELLANT – VOLUME III
_____

BJORN E. BRUNVAND, ESQ.
Brunvand & Wise Law Group
615 Turner Street
Clearwater, Florida 33756
Florida Bar # 0831077
Telephone: 727-446-7505
Facsimile: 727-446-8147
E-Mail: bjorn@acquitter.com
CJA Counsel for Appellant

# Doc. 114 –

# Report and

# Recommendation as to

# Motion to Suppress

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION


UNITED STATES OF AMERICA

v.                                              Case No. 8:21-cr-355-WFJ-CPT

GREGORY ALLEN WILLIAMSON
a/k/a "VLAD VALD"
_____/


### REPORT AND RECOMMENDATION

Before me on referral is Defendant Gregory Allen Williamson's contested motion to suppress evidence seized from his Yahoo[1] email account and his home pursuant to two search warrants authored by a North Port Police Department Detective (NPPD), James Keller. (Docs. 44, 106). Detective Keller obtained these warrants following his review of suspected child pornographic images that Yahoo found in Mr. Williamson's email account without a warrant, and that were subsequently transmitted to the National Center for Missing and Exploited Children (NCMEC) before being forwarded to Detective Keller. *Id.*

In support of his motion, Mr. Williamson argues that Yahoo and NCMEC's warrantless seizure of the images violated the Fourth Amendment because both entities were functioning as government agents at the time. *Id.* Mr. Williamson

---

[1] During the relevant period, Yahoo was known as Oath Holdings Inc. d/b/a Yahoo! but will be referred to herein merely as Yahoo for the sake of simplicity.

alternatively contends that even if Yahoo and NCMEC were not state actors, Detective Keller's pre-warrant review of the images was unlawful because it exceeded the scope of Yahoo and NCMEC's private search. *Id.* And lastly, Mr. Williamson asserts that pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), the warrants contained material misrepresentations and omissions, without which they lacked probable cause and are not saved by the good faith exception under *United States v. Leon*, 468 U.S. 897 (1984). (Docs. 44, 106).

I held an evidentiary hearing on Mr. Williamson's motion, during which the Executive Director of NCMEC's Exploited Children Division, Jennifer Newman, a Yahoo legal services manager, Ashley Guizzotti, a former Yahoo employee, Jessica Hines, and Detective Keller all testified. (Doc. 99). In accordance with the Court's directive issued shortly thereafter (Doc. 97), the parties subsequently filed proposed findings of fact and conclusions of law based upon the evidence adduced at the hearing (Docs. 105, 106).[2] After careful review of those submissions, as well as the other pertinent portions of the record, I respectfully recommend that Mr. Williamson's motion be denied. Below are my findings of fact and conclusions of law that lead me to this recommendation. Unless otherwise indicated, my factual findings relate to the pertinent time frame and are predicated upon my assessment of the weight of the evidence offered by the parties, including the testimony of the witnesses.

---

[2] The Court's Order requiring these submissions instructed the parties that they should include in their filings all the facts and legal authority they wished the Court to consider and should not incorporate by reference any other legal memoranda. (Doc. 97)

I.

A.

Yahoo is a private corporation that provides its customers with email services, among other products.  (Doc. 99 at 72); Gov't Exh. 3 at 1.  NCMEC is a not-for-profit organization that Congress has tasked with operating a CyberTipline.  (Doc. 99 at 11–14, 40).  The CyberTipline is a national recording and reporting mechanism for child sexual exploitation and essentially serves as a conduit for child pornography-related tips made by the public and electronic service providers (ESPs) like Yahoo.  *Id.* at 14–16.

The Protect Our Children Act of 2008 (Protect Act or the Act) dictates that ESPs must make a report to NCMEC of "any [known] facts or circumstances from which there is an apparent violation of" specified criminal offenses involving child pornography.  18 U.S.C. § 2258A(a)(1)–(2).  NCMEC, in turn, is mandated by the Act to make each "CyberTipline" report available to federal law enforcement.  *Id.* § 2258A(c).  ESPs that fail to comply with the strictures of the Act face substantial fines. *Id*. § 2258A(a)(1), (e).

As with many, if not all, ESPs, Yahoo requires its customers to agree to terms of service in order to use its products.  (Doc. 99 at 74–76).  Among other things, these terms of service prohibit customers from using their Yahoo email accounts to engage in unlawful behavior or to "harm minors in any way . . . ."  Gov't Exh. 5 at 2.  Yahoo's terms of service also contain an acknowledgement by its customers that the company may pre-screen, access, and/or disclose the contents of their communications under

3

certain defined circumstances. *Id.* at 3–4. These contractual provisions reflect, at least in part, Yahoo's interest in protecting both its customers and its own reputation by not serving as a "host [for] abusive material, especially [that which causes] harm to minor[s]." (Doc. 99 at 76); *see also id.* at 91. Conduct that falls within this category includes "sharing or distributing . . . imagery or videos of a minor in an abusive way or a sexual way." *Id.* at 76.

To enforce its terms of service, Yahoo scans all sent emails for images[3] of child pornography or, as it is sometimes called, child sexual abuse material (CSAM). *Id.* at 76–80. This process involves an automated comparison of a unique identifier akin to a digital fingerprint associated with each image—known as a hash value[4]—to the hash values of previously identified CSAM files. *Id.* at 20–22, 78–80, 169–70. Yahoo, NCMEC, and other ESPs maintain lists of such hash values for this purpose. *Id.* at 21–23, 77–78, 170.

If there are no matches between a sent image's hash value and those of known CSAM, Yahoo's process generally ends and no further action is taken. *Id.* at 77–78. On the other hand, if there is a "hash match," Yahoo's system places the photograph into a queue for examination by one of its human moderators, who are called trust and safety agents. *Id.* at 77–80. These agents are housed in Yahoo's legal department and

---

[3] To avoid being repetitious, I will employ the terms image, photograph, and file interchangeably throughout my report and recommendation.

[4] Hash values are also known as PhotoDNA. (Doc. 99 at 79–84).

are continually trained on how to recognize CSAM. *Id.* at 80–81.[5] As a legal services manager, Ms. Guizzotti is involved in managing the work performed by trust and safety agents, including the detection and review of CSAM. *Id.* at 71–72.

One of the roles of a trust and safety agent is to inspect a hash-matched file to ascertain whether it, in fact, contains CSAM. *Id.* at 79–80. If the file includes CSAM, an agent will archive all images in the customer's email account and then analyze those photographs to discern whether they constitute CSAM as well. *Id.* at 79–80, 114–15, 117–22. After consulting with legal counsel about any images that fall into a gray area, the agent will generate a CyberTipline report regarding the CSAM photographs to be submitted to NCMEC. *Id.* at 81–84.

CyberTipline reports sent to NCMEC must identify both the incident type (e.g., child pornography, sex tourism, child molestation, etc.) and the time of the incident. *Id.* at 16–18, 20; Gov't Exh. 1 at 3; Def. Exh. A at 3. ESPs may, but are not mandated to, provide additional information in their CyberTipline reports. (Doc. 99 at 20). In the case of Yahoo, it typically includes such supplemental information as the hash value, file name, and the images it deems to be CSAM, along with the customer's name, email address, and IP address. *Id.* at 81–83; Gov't Exh. 1 at 1–5; Def. Exh. A at 1–5.

---

[5] An agent's training includes studying the parameters of CSAM, shadowing experienced agents, and participating in monthly "calibrations" with both their manager and Yahoo legal counsel to review images that are borderline CSAM. (Doc. 99 at 79–81, 103–05).

To designate the CSAM photographs for their reports, Yahoo agents must manually select those images from a display screen and then verify that they examined the images by checking a box "yes" in response to the question, "Did Reporting ESP view the entire contents of uploaded file?" (Doc. 99 at 82, 84–86, 101–04, 134–37, 140–41).[6] Once Yahoo forwards a CyberTipline report to NCMEC for further investigation, it disables the customer's account. *Id.* at 86, 126–27. Yahoo uses an internal Excel spreadsheet to track its review of suspected CSAM images and its submissions of CyberTipline reports to NCMEC. *Id.* at 104–05, 111–26.

Upon its receipt of a CyberTipline report, NCMEC conducts an independent comparison of the hash values of the specified images with its own hash list. *Id.* at 21–25. NCMEC divides its hash list into categories based upon the nature of the photographs. *Id.* These categories include apparent child pornography, child pornography unconfirmed, child clothed, child unclothed, and anime. *Id.* at 24–25, 35–36, 66. Pertinent to the issues before the Court, NCMEC applies the label of apparent child pornography to an image when it believes the activity depicted in the photograph "meets the federal definition of child pornography" and it is "overtly clear" a child is involved in that activity. *Id.* at 66. By contrast, NCMEC employs the label of child pornography unconfirmed when it believes "the activity depicted . . . appears to meet the federal definition of child pornography" but "there may be [a]

---

[6] Ms. Guizzotti and Ms. Hines credibly testified that Yahoo's agents do not check the "yes" box unless they have personally reviewed the images being forwarded to NCMEC. (Doc. 99 at 85, 134–37).

question of the age of the individual seen in that particular image."[7]  *Id.* at 35; *see also id.* at 39–40.  NCMEC only places an image on its CSAM hash list if the file was reviewed by at least two of its analysts and the analysts reached the same conclusion. *Id.* at 21–24.

NCMEC, however, does not view its designations to be definitive, nor does it consider itself "the determiner[ ] of what is illegal or legal content."  *Id.* at 9–10, 25–26.  As explained by Ms. Newman, who has worked at NCMEC for twenty-one years, including as a CyberTipline analyst, NCMEC's classification of an image amounts to "an educated and informed impression of what is being depicted," and NCMEC relies on law enforcement to do its own independent "investigation and assessment" of a file.  *Id.* at 9–10, 25.

If NCMEC's hash value analysis results in a match, NCMEC will assign the same designation (i.e., apparent child pornography, child pornography unconfirmed, etc.) to the reported images as that ascribed to the identical photographs found in its own list.  *Id.* at 22–25, 55–56.  If there is no hash match, a NCMEC analyst will review the reported images, determine whether they constitute CSAM, and—if so—affix the proper label.  *Id.* at 21–25, 35, 55–58, 66–68; Gov't Exh. 1 at 6; Def. Exh. A at 6.  A NCMEC analyst, however, will not inspect any image file unless the ESP affirmatively indicates in its CyberTipline report that it "view[ed] the entire contents of the uploaded

---

[7] NCMEC also refers to these images as "age indeterminate" or "age difficult."  *Id.* at 35, 39.

file" or states that the "entire contents of [the] uploaded file [were] publicly available."
(Doc. 99 at 65).

When NCMEC decides that a CyberTipline report warrants further investigation by the police, it will employ an opensource tool called MaxMind to learn the geographical location of the user's IP address so that it can make the report available through a secure online portal to the appropriate law enforcement agency or task force. *Id.* at 14, 17–18, 26–27, 61–62, 64–65; Gov't Exh. 1 at 8; Def. Exh. A at 8. The agency or task force will then receive an email notification alerting it that there is a NCMEC CyberTipline report for its review. *Id.* at 26.

### B.

On September 8, 2020, Yahoo scanned an email sent to Mr. Williamson's alleged email account—vladlover50@gmail.com—that included an image which hash-matched to known CSAM. (Doc. 99 at 117); Gov't Exh. 1 at 3; Def. Exh. A at 3. After inspecting this photograph, a Yahoo agent—Jessica Hines—elected to archive 167 image files from Mr. Williamson's account. (Doc. 99 at 114–15, 117–21, 144–45). Those archived files were then examined by at least one other agent and found to include seven photographs containing CSAM. *Id.* at 117–22, 135–45. The file names for those photographs were: image.125-1.jpeg, image.118-1.jpeg, image.120-1.jpeg, image.97-1.jpeg, image.5-1.jpeg, image.4-1.gif, and image.1-1.jpeg. Gov't Exh. 1; Def. Exh. A. Two days later, on September 10, 2020, Yahoo submitted a CyberTipline report to NCMEC relative to these seven photographs, and disabled Mr. Williamson's email account in the process. (Doc. 99 at 122); Gov't Exh. 1; Def. Exh. A.

In its CyberTipline report, Yahoo identified the incident type as possession, manufacture, and distribution of child pornography, and the offense date as September 8, 2020.  Gov't Exh. 1 at 3; Def. Exh. A at 3.  Yahoo also included the name, phone number, email address, and IP address associated with Mr. Williamson's email account, as well as the upload date and time for each of the seven images.[8]  Gov't Exh. 1 at 3–7; Def. Exh. A at 3–7.  In addition, Yahoo responded in the affirmative to the question "Did [it] view entire contents of uploaded file?"  *Id.*

After receiving Yahoo's CyberTipline report, NCMEC compiled its own report which indicated that a hash match was obtained for all seven images but that no analysts reviewed the files.  Gov't Exh. 1 at 6; Def. Exh. A at 6.  At the hearing, however, NCMEC's Executive Director, Ms. Newman, clarified that her analysis of the relevant information in advance of her testimony revealed only one of the photographs—image.4-1.gif—hash-matched with NCMEC's list and the remaining six files were examined by one or more of NCMEC's analysts as part of its handling of Yahoo's report.[9]  (Doc. 99 at 28–30, 34, 54–61, 66–70).  In the end, NCMEC classified two of the files—image.118-1.jpeg and image.1-1.jpeg—as apparent child pornography; four of the files—image.125-1.jpeg, image.97-1.jpeg, image.5-1.jpeg,

---

[8] According to the report, image.125-1.jpeg was uploaded on November 8, 2019, images.118-1.jpeg and.120-1.jpeg were both uploaded on December 6, 2019, image.97-1.jpeg was uploaded on January 16, 2020, image.5-1.jpeg was uploaded on September 1, 2020, image.4-1.gif was uploaded on September 2, 2020, and image.1-1.jpeg was uploaded on September 8, 2020.  Gov't Exh. 1 at 3–7; Def. Exh. A at 3–7.

[9] Ms. Newman explained that this error was caused by a "transition in workflow as a result of [the] COVID" pandemic. (Doc. 99 at 28–29); *see also id*. at 57–60.

and image.4-1.gif—as "CP (unconfirmed)" (i.e., child pornography unconfirmed); and

one of the files—image.120-1.jpeg—as "child clothed."[10]  Gov't Exh. 1 at 6; Def. Exh.

A at 6.

A NCMEC analyst subsequently used MaxMind to geolocate the customer's IP

address listed by Yahoo and determined that it was situated in North Port, Florida.

(Doc. 99 at 61–62); Gov't Exh. 1 at 8; Def. Exh. A at 8.  Once that information was

added to NCMEC's report along with the data reflected above, the report was directed

first to the Central Florida Internet Crimes Against Children Task Force (CFICAC),[11]

and then to the NPPD, where it was assigned to Detective Keller in mid-November

2020.  (Doc. 99 at 27, 31, 60–62, 152–56); Gov't Exh. 1 at 10; Def. Exh. A at 10.

By that point in his career, Detective Keller had been with NPPD for

approximately eight years and had been tasked with investigating sex crimes for over

a year-and-a-half.  (Doc. 99 at 153); Gov't Exh. 2; Def. Exh. B.  During the latter time

frame, Detective Keller was assigned to both CFICAC and the FBI's Child

Exploitation and Human Trafficking Task Force and attended multiple training

sessions regarding the investigation and identification of CSAM.  (Doc. 99 at 152–54);

Gov't Exh. 2; Def. Exh. B.  He also received forty hours of instruction regarding

---

[10] With respect to the child clothed photograph, Ms. Hines stated there are sometimes files depicting
child sexual exploitation where the minor is not nude which an agent may include in a CyberTipline
report depending upon the agent's evaluation of the file.  (Doc. 99 at 142).

[11] CFICAC is a subdivision of a national task force—ICAC—that is headed by the Federal Bureau of
Investigation (FBI).  (Doc. 99 at 153).

CyberTipline reports in particular and additionally worked on multiple cases involving such reports.  (Doc. 99 at 154–57); Gov't Exh. 2; Def. Exh. B.

Detective Keller opened NCMEC's CyberTipline report through the on-line portal, reviewed the document, and inspected the seven images provided by NCMEC. (Doc. 99 at 154–60).  Following these steps, Detective Keller issued a subpoena to the Internet Service Provider associated with the IP address identified in the report and learned that the subscriber of that IP address was an individual with the initials A.W. residing at 2575 Rolling Road, North Port, Florida.  *Id.* at 156, 159–61; Gov't Exh. 2; Def. Exh. B.  Detective Keller then consulted the Florida Driver and Vehicle Information Database and discovered that A.W. shared this address with Mr. Williamson.  Gov't Exh. 2; Def. Exh. B.

Based upon this information, Detective Keller applied to a state court judge on December 1, 2020, for a search warrant for Mr. Williamson's Yahoo email account. (Doc. 99 at 159–61); Def. Exh. C.  Detective Keller included as part of his supporting affidavit a detailed description of the contents of each of the above seven photographs, as well as an attestation that he personally examined the images.  (Doc. 99 at 160–63, 180–85); Def. Exh. C.  Relying on Florida's definition of CSAM and his own training and experience, Detective Keller also stated that he deemed four of these photographs—image.125-1.jpeg, image.97-1.jpeg, image.4.1.gif, and image.1-1.jpeg —to be CSAM involving prepubescent and minor females; two of the photographs— image.118-1.jpeg and image.5-1.jpeg—to be "age difficult" (i.e., it was difficult for Detective Keller to determine the approximate ages of the subjects in the images); and

the remaining file—image.120-1.jpeg—to be child erotica.  (Doc. 99 at 180–85); Def. Exh. C.  The state court judge authorized the warrant the same day.  Def. Exh. C.  In response to this warrant, Yahoo produced, among other items, the photographs that it sent to NCMEC as part of its CyberTipline report, as well as an activity log listing the dates and times that the Yahoo customer logged into the email account.  (Doc. 99 at 87–90, 127); Gov't Exh. 1; Def. Exh. A.

With this information in hand, Detective Keller applied for a state search warrant for Mr. Williamson's residence on January 27, 2021.  Gov't Exh. 2; Def. Exh. B.  Detective Keller's supporting affidavit for this warrant was similar in all material respects to the one he authored for the Yahoo search warrant with the following exceptions.  *Compare id. with* Gov't Exh. 1; Def. Exh. A.  The detailed descriptions of the images in Detective Keller's residential affidavit included the approximate ages of the minors depicted in, and the labels NCMEC assigned to, those photographs in its CyberTipline report.  (Doc. 99 at 160–63, 189–91); Gov't Exh. 2; Def. Exh. B.  In addition and of significance here, Detective Keller represented that the four CSAM photographs described above involved a seven to eight year old girl in image.1-1.jpeg; an eleven to twelve year old girl in image.125-1.jpeg; a twelve to thirteen year old girl in image.97-1.jpeg; and a twelve to fifteen year old girl in image.4-1.gif.[12]  (Doc. 99 at 160–63, 182, 190–92); Gov't Exhs. 1, 2; Def. Exhs. A, B.  Detective Keller also

---

[12] Detective Keller testified that the estimated age ranges he provides in warrants are based upon his training and experience and are "very conservative" so that he can avoid "any issues . . . with the approximation of ages."  (Doc. 99 at 156–57).

represented that NCMEC categorized three of these files—image.125-1.jpeg, image.97-1.jpeg, and image.4-1.gif—as "[c]hild [p]ornography." (Doc. 99 at 160–63, 182, 190–92); Gov't Exhs. 1, 2; Def. Exhs. A, B. As it turns out, however, Detective Keller's characterization of these three NCMEC classifications was different than how NCMEC identified them, as NCMEC had designated the three images, along with another photograph, image.5-1.jpeg, as child pornography *unconfirmed*. *Id*. When asked about this discrepancy at the hearing, Detective Keller explained that as a general matter, he treats NCMEC's labels only as a suggestion and that he views himself as the one responsible for making the final determination of whether an image is truly CSAM. (Doc. 99 at 160–65, 170–73, 182–85). He additionally testified that he did not know until the hearing that NCMEC defined child pornography "unconfirmed" the same way he defined "age difficult." *Id.* at 170–73, 180–83.

Detective Keller executed the residential search warrant on the same day that it was authorized by the state court judge. Gov't Exh. 2; Def. Exh. B. During the course of the search of Mr. Williamson's home, agents seized a variety of electronic equipment, including cell phones, computers, compact discs, digital video discs, hard drives, and disk cards. (Doc. 106-2).

## II.

### A.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The Amendment's protections, however, extend only to items

or places in which a person has a "reasonable expectation of privacy." *California v. Ciraolo*, 476 U.S. 207, 211 (1986) (quoting *Katz v. United States*, 389 U.S. 347, 360 (1967) (Harlan, J., concurring)).[13] The question of "whether an individual has a reasonable expectation of privacy in the object of [a] challenged search[ ] has come to be known colloquially . . . as Fourth Amendment 'standing.'" *United States v. Ross*, 963 F.3d 1056, 1062 (11th Cir. 2020) (en banc).

In this case, Mr. Williamson asserts that he had a reasonable expectation of privacy with respect to both his residence and his Yahoo emails. (Doc. 106). Although the government does not dispute that Mr. Williamson has Fourth Amendment standing to contest the search of his home, it maintains that he has no such standing relative to his emails. (Doc. 105). Given the threshold nature of this issue, I begin with that question.

To establish Fourth Amendment standing, a person must have "both a subjective and an objective expectation of privacy" in the item or place searched. *United States v. King*, 509 F.3d 1338, 1341 (11th Cir. 2007) (citation and quotation omitted). "The subjective component requires that a person exhibit an actual

---

[13] The Supreme Court in *United States v. Jones* held that government conduct can also constitute a Fourth Amendment search when it involves a physical intrusion (a trespass) on a constitutionally protected space or thing for the purpose of obtaining information. 565 U.S. 400, 404–08 (2012). Mr. Williamson does not assert a trespass theory here and has thus waived any such claim. *See Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1319 (11th Cir. 2012) ("[T]he failure to make arguments and cite authorities in support of an issue waives it."); *Mendoza v. U.S. Att'y Gen.*, 327 F.3d 1283, 1286 n.3 (11th Cir. 2003) (finding an issue to be abandoned where no argument was made) (citations omitted). The Court need not address the matter in any event if it accepts my conclusion—described *infra*—that Mr. Williamson had a reasonable expectation of privacy in his Yahoo emails.

expectation of privacy, while the objective component requires that the privacy expectation be one that society is prepared to recognize as reasonable." *Id.* The individual challenging a search bears the burden of satisfying both of these elements. *Rakas v. Illinois*, 439 U.S. 128, 130 n.1 (1978) ("The proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure."); *United States v. Cooper,* 133 F.3d 1394, 1398 (11th Cir. 1998) ("The individual challenging [a] search bears the burdens of proof and persuasion.") (citation omitted).

Both parties rely on Yahoo's terms of service agreement with Mr. Williamson in arguing their respective positions as to whether he had a reasonable expectation of privacy in his Yahoo emails. As referenced previously, that agreement provides, in relevant part, that Yahoo's customers may "not use Yahoo Services to[ ] upload, post, email, transmit, or otherwise make available any Content that is unlawful, harmful, . . . abusive, . . . obscene, . . . invasive of another's privacy, . . . or otherwise objectionable; [or] harm minors in any way . . . ." Gov't Exh. 5 at 2. The agreement also states that a customer:

> [A]cknowledge[s] that Yahoo may or may not pre-screen Content, but that Yahoo and its designees shall have the right (but not the obligation) in their sole discretion to pre-screen, refuse, or remove any Content that is available via the Yahoo Services. . . . [The customer also] acknowledge[s], consent[s,] and agree[s] that Yahoo may access, preserve[,] and disclose [the user's] account information and Content if required to do so by law or in a good faith belief that such access preservation or disclosure is reasonably necessary to: (i) comply with legal process;[ or] (ii) enforce the [terms of service] . . . .

15

*Id.* at 3.

The parties interpret these provisions to arrive at diametrically opposing outcomes as it relates to Mr. Williamson's alleged use of his email account to send and receive child pornography.  Mr. Williamson insists Yahoo's terms of service "do not provide for any other action to be taken [aside from disabling his account] and certainly do not make clear that information will be disclosed to any other party or law enforcement." (Doc. 106 at 21).  The government counters that by voluntarily creating a Yahoo account and stipulating to its terms of service, Mr. Williamson "agree[d] to Yahoo accessing, preserving, and disclosing his account information and content" and "waive[d] any reasonable expectation of privacy that he may have had in his Yahoo account."  (Doc. 105 at 6–7).

Mr. Williamson and the government rely on different cases to buttress their terms of service claims.  Mr. Williamson primarily predicates his argument on the Sixth Circuit's *en banc* decision in *United States v. Warshak*, 631 F.3d 266 (6th Cir. 2010). (Doc. 106 at 19–22).  In that case, the defendant—Mr. Warshak—had an email account with NuVox Communications (NuVox), which was also his internet service provider.  *Warshak*, 631 F.3d at 288.  Mr. Warshak agreed to NuVox's terms of service, which included the condition that "NuVox may access and use individual Subscriber information in the operation of [NuVox] and as necessary to protect [NuVox]."  *Id.* at 287.

As part of its investigation of Mr. Warshak's business operation for fraud and other offenses, the government used a subpoena and court order issued under the

16

Stored Communications Act, 18 U.S.C. §§ 2701, *et seq*. to obtain thousands of Mr. Warshak's emails from NuVox, at least several of which were apparently of evidentiary value. *Warshak*, 631 F.3d at 281–83, 292 n.22. Mr. Warshak moved the trial court to exclude these emails on the grounds that the government's warrantless seizure of such communications violated the Fourth Amendment. *Id*. at 281–82. The court denied the motion, and Mr. Warshak was ultimately convicted of a number of crimes following a jury trial. *Id*. at 281.

On appeal, the Sixth Circuit commenced its analysis with the issue of Mr. Warshak's Fourth Amendment standing to contest the government's acquisition of his emails. *Id*. at 283–84. The court found Mr. Warshak "plainly manifested" a subjective expectation that these transmissions "would be shielded from outside scrutiny" given that they contained his "entire business and personal life," including matters that were "often sensitive and sometimes damning" to him. *Id*. The court also determined that Mr. Warshak's subjective expectation of privacy was one that society was prepared to recognize as reasonable notwithstanding his terms of service agreement with NuVox. *Id*. at 284–88. The court reasoned:

> As an initial matter, it must be observed that the mere ability of a third-party intermediary to access the contents of a communication cannot be sufficient to extinguish a reasonable expectation of privacy. In *Katz*, the Supreme Court found it reasonable to expect privacy during a telephone call despite the ability of an operator to listen in. Similarly, the ability of a rogue mail handler to rip open a letter does not make it unreasonable to assume that sealed mail will remain private on its journey across the country. Therefore, the threat or possibility of access is not decisive when it comes to the reasonableness of an expectation of privacy.

17

> Nor is the *right* of access. . . . [A]t the time *Katz* was decided, telephone
> companies had a right to monitor calls in certain situations. Specifically,
> telephone companies could listen in when reasonably necessary to
> protect themselves and their properties against the improper and illegal
> use of their facilities. In this case, the NuVox subscriber agreement tracks
> that language, indicating that "NuVox may access and use individual
> Subscriber information in the operation of the Service and as necessary
> to protect the Service." Thus, under *Katz*, the degree of access granted to
> NuVox does not diminish the reasonableness of [Mr.] Warshak's trust in
> the privacy of his emails.

*Id*. at 286–87 (internal quotation marks and citations omitted).[14]

Although deciding that "some degree of routine access is hardly dispositive with respect to the privacy question," the court did state that it was "unwilling to hold that a subscriber agreement will *never* be broad enough to snuff out a reasonable expectation of privacy." *Id*. at 287. The court noted, for example, that "if [a service provider] expresses an intention to audit, inspect, and monitor its subscriber's emails, that might be enough to render an expectation of privacy unreasonable." *Id*. (internal quotation

---

[14] In arriving at this conclusion, the court recognized "the prominent role that email has assumed in modern communication," observing:

> Since the advent of email, the telephone call and the letter have waned in importance, and an explosion of Internet-based communication has taken place. People are now able to send sensitive and intimate information, instantaneously, to friends, family, and colleagues half a world away. Lovers exchange sweet nothings, and businessmen swap ambitious plans, all with the click of a mouse button. Commerce has also taken hold in email. Online purchases are often documented in email accounts, and email is frequently used to remind patients and clients of imminent appointments. In short, "account" is an apt word for the conglomeration of stored messages that comprises an email account, as it provides an account of its owner's life. By obtaining access to someone's email, government agents gain the ability to peer deeply into his activities.

*Warshak*, 631 F.3d at 284; *see also id*. at 286 ("Email is the technological scion of tangible mail, and it plays an indispensable part in the Information Age.").

marks and citations omitted). The court added, however, that where "there is no such statement, the [provider's] control over the [emails] and ability to access them under certain limited circumstances will not be enough to overcome an expectation of privacy." *Id.* (internal quotation marks and citations omitted). The court further cautioned that in "most situations," a subscriber agreement will not "be sweeping enough to defeat a reasonable expectation of privacy in the contents of an email account." *Id.* at 286.

The government does not address *Warshak* and instead cites two other decisions—*United States v. Montijo*, 2022 WL 93535 (M.D. Fla. Jan. 10, 2022) and *United States v. DiTomasso*, 56 F. Supp. 3d 584, 595 (S.D.N.Y. 2014)—to bolster its position. (Doc. 105 at 7). In the first case, the defendant—Mr. Montijo—sent a child pornographic video to another person during a chat on Facebook's instant messaging program. *Montijo*, 2022 WL 93535, at *1–3. Facebook was monitoring the chat (or at least the files circulated at the time) and, upon discovering the video, notified law enforcement. *Id.* The video was thereafter sent to a local police officer, who viewed the video without a warrant and then used the video's contents to obtain search warrants for Mr. Montijo's home and car. *Id.* Mr. Montijo was eventually charged with producing and possessing child pornography following the execution of those warrants. *Id.*

In response to a subsequent motion by Mr. Montijo to suppress this search warrant evidence, the government contended, *inter alia*, that Mr. Montijo did not have

a reasonable expectation of privacy in his Facebook messenger chat.  *Id.* at *3.  In addressing that issue, the court examined Facebook's terms of service governing Mr. Montijo's use of the platform.  *Id.* at *6–7. Those terms of service advised Facebook customers, in pertinent part:

> We employ dedicated teams around the world and develop advanced technical systems to detect misuse of our Products, harmful conduct towards others, and situations where we may be able to help support or protect our community.  If we learn of content or conduct like this, we *will* take appropriate action—for example, . . . [by] *contacting law enforcement*.
>
> * * *
>
> And we develop automated systems to improve our ability to detect and remove abusive and dangerous activity that may harm our community and the integrity of our Products.

*Id.* at *7 (emphasis added and in original).

Along with these terms of service, Facebook's Community Standards set forth written guidelines as to what customers could share on Facebook.  Gov't Exh. 2 at 12. One of those standards—entitled "Child Sexual Exploitation, Abuse and Nudity"— read, "[w]e do not allow content that sexually exploits or endangers children, [and w]hen we become aware of apparent child exploitation, *we report it to . . . NCMEC[, ] in compliance with applicable law*."  *Id.* (emphasis added).

In light of this language, the court determined that Mr. Montijo did not have a reasonable expectation of privacy in his messenger communications.  *Id.*  It explained that Facebook provided him with "fair warning" that "he risked being reported to law

enforcement or NCMEC if Facebook discovered that he sent, received, or distributed apparent child pornography." *Id.*

In the second case, the defendant—Mr. DiTomasso—had an American Online (AOL) email account to which another party sent two emails containing child pornography. *DiTomasso*, 56 F. Supp. 3d at 587. AOL's monitoring programs detected this illicit content and reported it to NCMEC. *Id.* During roughly the same time frame, Mr. DiTomasso also used a separate online platform—Omegle.com—to engage in an anonymous chat with another individual, which Omegle discovered included evidence of child pornography. *Id.* at 588. Omegle likewise reported these chats to NCMEC. *Id.*

Mr. DiTomasso was later charged with the production and transportation of child pornography and moved to suppress the evidence obtained from both AOL and Omegle. *Id.* at 586. In response, the government argued that Mr. DiTomasso did not have a reasonable expectation of privacy in his AOL or Omegle communications because, *inter alia*, both providers cautioned him by way of their user agreements with him that they might be monitoring his activity. *Id.* at 592. Among other things, AOL's privacy policy and customer agreement "forbade users from 'post[ing] content that contain[ed] explicit or graphic descriptions or accounts of sexual acts,'" informed its users that "'AOL reserve[d] the right to take any action it deem[ed] warranted' in response to illegal behavior, including 'cooperat[ing] with law enforcement;'" and stated that "AOL itself may disclose to others—including law enforcement—'information relevant to a crime that has been or is being committed.'" *Id.* at 588.

Omegle's privacy policy advised its customers, in pertinent part, that it kept "'record[s] of the IP addresses involved in every chat' . . . 'for the purpose of law enforcement,'" among other reasons, and that it "captured" and "monitor[ed]" webcam videos on an ad hoc basis "for misbehavior." *Id*. at 588–89 (citation omitted).

The court in *DiTomasso* rejected the government's reasonable expectation of privacy argument, choosing instead to follow the lead of the Sixth Circuit in *Warshak* and the Ninth Circuit in *Quon v. Arch Wireless Operating Co.*, 529 F.3d 892 (9th Cir. 2008), *rev'd on other grounds,* 560 U.S. 746 (2010). *DiTomasso*, 56 F. Supp. 3d at 592 n.62 (citations omitted). In *Quon*, the Ninth Circuit held that users of text messaging services had a reasonable expectation of privacy in their texts stored on their service provider's network even though the service provider may have been able to access the contents of the messages for its own purposes. *Quon*, 529 F.3d at 904. The *DiTomasso* court reasoned:

> [I]t would subvert the purpose of the Fourth Amendment to understand its privacy guarantee as "waivable" in the sense urged by the government. In today's world, meaningful participation in social and professional life requires using electronic devices—and the use of electronic devices almost always requires acquiescence to some manner of consent-to-search terms. If this acquiescence were enough to waive one's expectation of privacy, the result would either be (1) the chilling of social interaction or (2) the evisceration of the Fourth Amendment. Neither result is acceptable.

*Id*. at 592.

In reaching this determination, the court in *DiTomasso* looked to the Supreme Court's Fourth Amendment jurisprudence involving what it believed to be analogous

situations.  The court noted, for instance, that "the Supreme Court has held that employees, including public employees, enjoy an expectation of privacy in their workplace desks—and that th[is] expectation stays intact vis-a-vis law enforcement even if it would be unreasonable, given the 'operational realities' of the workplace, for employees to expect the same privacy protection from their supervisors."  *Id*. at 593, 593 n.64 (citing *O'Connor v. Ortega*, 480 U.S. 709, 717–18 (1987)).  The court also observed that the Supreme Court has similarly ruled that a hotel guest's granting of access to his room for "limited purposes," such as housekeeping or an emergency, "neither vitiates [the guest's] expectation of privacy in the room nor authorizes hotel employees to consent to a search by the government on behalf of the guest."  *Id*. 593, 593 n.65 (citing *Stoner v. California*, 376 U.S. 483 (1964)).[15]

> The *DiTomasso* court went on to conclude:

> Both of these holdings cut against the government's position.  In essence, the government argues that by consenting to have his emails and chats searched by AOL and Omegle—as [Mr.] DiTomasso arguably did when he agreed to their respective terms of use—he also consented to permitting the government to search.  Fourth Amendment privacy, however, is a context-sensitive question of societal norms. In some domains, people expect information to stay shielded from law enforcement even as they knowingly disclose it to other parties.  As the Supreme Court has recognized, workplace desks and hotel rooms are two such domains.  In the digital age, electronic communication is another.

---

[15] The court additionally cited *Chapman v. United States*, 365 U.S. 610 (1961), in which the Supreme Court reached the same conclusion with respect to an apartment.

*Id.* at 593.   In short, the court held that Mr. DiTomasso had a reasonable expectation of privacy in both his AOL emails and Omegle chats.  *Id.* at 592–96.

Against this backdrop, I find that Mr. Williamson's Fourth Amendment standing argument has merit.  I note at the outset that, as the above discussion reveals, *DiTomasso* undermines rather than buttresses the government's contention that Mr. Williamson did not have a reasonable expectation of privacy in his Yahoo emails.  As a result, the government's Fourth Amendment standing argument rests solely on *Montijo* and the court's finding in that case that Mr. Montijo did not have a reasonable expectation of privacy in his Facebook messenger communications given Facebook's terms of service and its Community Standards.   While I do not agree with Mr. Williamson's assertion that there is "*no* evidence" Yahoo's subscriber agreement "permitted [it] to disclose information to law enforcement or anyone else" (Doc. 106 at 21) (emphasis added), Yahoo's terms of service do not include the type of language contained in Facebook's user contract or its community standards described in *Montijo*.

Recall that the relevant part of Yahoo's customer agreement authorized it to pre-screen and remove content that violated its terms of service and to access or disclose user content only if it was "required" to do so by law or because it had a good faith belief that such steps were reasonably necessary "to comply with legal process" or to enforce the terms of service.  Gov't Exh. 5.  As Ms. Guizzotti testified on cross-examination, these terms of service do not indicate to Yahoo's customers that their

"information *will* be disclosed to law enforcement," at least absent some compulsion. (Doc. 99 at 126) (emphasis added).

By contrast, as discussed in *Montijo*, Facebook's terms of service and Community Standards expressly stated that Facebook will proactively reach out to law enforcement and NCMEC when it discovers "harmful conduct towards others" (including—no doubt—harmful conduct involving children) or "situations where [it] may be able to help . . . protect [the] community" (including—again obviously— safeguarding children). *Montijo*, 2022 WL 93535, at *7 ("If [Facebook] learn[s] of [harmful conduct], we *will* take appropriate action . . . [by] contacting law enforcement") (emphasis added and omitted); *id*. ("[Facebook does] not allow content that sexually exploits or endangers children, [and w]hen we become aware of apparent child exploitation, *we report it to . . . NCMEC*[,] in compliance with applicable law.") (emphasis added). Yahoo's user contract, on the other hand, conspicuously makes no mention of aiding or collaborating with the police and, in fact, does not even reference "law enforcement" at all. As a result, I conclude that Mr. Williamson had a reasonable expectation of privacy in his Yahoo emails.[16] A survey of other decisions addressing

---

[16] Notably, the government does not raise, much less brief, the separate argument that Mr. Williamson consented to the search of his emails based upon Yahoo's terms of service. As the court stated in *DiTomasso*, "[e]ven if a search would otherwise be invalid . . . because it encroaches unreasonably on one's expectations of privacy[,] 'an individual may [nonetheless] consent to a search, thereby rendering it'" permissible under the Fourth Amendment. 56 F. Supp. 3d at 590 (quoting *United States v. Garcia*, 56 F.3d 418, 422 (2d Cir. 1995) and citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973)). Because the government does not assert this theory, it has waived the right to do so. *See Hamilton*, 680 F.3d at 1319; *Mendoza*, 327 F.3d at 1286 n.3.

Even if the government is deemed not to have waived this contention, it is difficult to see how it could succeed on a consent theory under the circumstances presented. In *DiTomasso*, the court held

Fourth Amendment standing based upon an ESP's terms of service provides support for this conclusion. *See, e.g.*, *Matter of Search of Encrypted Data Provided by Nat'l Ctr. For Missing & Exploited Children*, 2021 WL 2100997, at *4 (D.D.C. May 22, 2021) (stating that the defendant had a reasonable expectation of privacy in his Google email account even though Google's terms of service "prohibit[ed customers from] using [its] platform to violate the law" and reserved the right for Google to "'take down'" content—such as child pornography—which either violated applicable law or "'could harm [ ] . . . third parties,'" and even though Google "independently and voluntarily [took] steps to monitor and safeguard [its] platform") (citing *United States v. Miller*, 982 F.3d 412, 426 (6th Cir. 2020)); *United States v. Coyne*, 387 F. Supp. 3d 387, 395–96 (D. Vt. 2018) (rejecting the government's contention that the user agreements for Yahoo and Microsoft, among others, vitiated any expectation of privacy despite language in

---

that where, as here, a defendant's constitutional claim is based upon the proposition that an ESP was "acting as [a] government agent[ ] when [it] monitored his electronic communications, the [ESP's] policies only defeat [that] constitutional claim if, by agreeing to them, [the defendant] was consenting to a search by [the ESP] *as* [a] government agent[ ]." 56 F. Supp. 3d at 596. The court went on to find that Mr. DiTomasso consented to AOL's search of his emails but not to Omegle's review of his chats. *Id.* at 596–97. Akin to the court's thinking in *Montijo* on the matter of Fourth Amendment standing, the *DiTomasso* court grounded its consent finding relative to AOL on the fact that AOL's terms of service made it apparent to AOL's users it would *affirmatively* help the police ferret out any wrongdoing by them. As the court observed:

> Not only does [AOL] explicitly warn [its] users that criminal activity is disallowed, and that [it] monitors for such activity[, its] policy also explains that "AOL reserves the right to take any action it deems warranted" in response to illegal behavior, including . . . "cooperat[ing] with law enforcement." The policy also makes clear that AOL reserves the right to reveal to law enforcement information about "crimes[s] that [have] been or [are] being committed." [In short,] AOL's policy makes clear that [it] intends to *actively assist law enforcement*.

*Id.* at 597 (emphasis added and citations omitted).

As noted above, Yahoo's terms of service do not include the kind of language contained in AOL's policy.

those contracts notifying customers that—in the case of Yahoo—"Yahoo's automated systems analyze[d] all communications content . . . for . . . abuse protection" and—in the case of Microsoft—Microsoft had the right to "access, transfer, disclose, and preserve personal data, including [the customer's] content . . . when [it] ha[d] a good faith belief that doing so [was] necessary to (1) comply with applicable law or respond to valid legal process").[17]

B.

The government argues that irrespective of whether Mr. Williamson has Fourth Amendment standing with respect to his Yahoo emails, his challenge to the subsequent review of his communications by Yahoo, NCMEC, and Detective Keller fails under the private search doctrine.  (Doc. 105); *see generally United States v. Jacobsen*,

---

[17] The Eleventh Circuit's unpublished decision in *United States v. Jones*, 149 F. App'x 954 (11th Cir. 2005) (per curiam)—which neither party references in their respective submissions—does not require a different result.  In *Jones*, the court ruled that co-conspirators in a drug ring did not have a reasonable expectation of privacy in the texts messages sent or received by one of their cohorts, who later elected to cooperate with the government and testify against them.  *Id.* at 959.  In arriving at this determination, the court stated that "an individual sending an e-mail loses 'a legitimate expectation of privacy in an e-mail that had already reached its recipient.'"  *Id.* (quoting *Guest v. Leis*, 255 F.3d 325, 333 (6th Cir. 2001)).

   The problem with applying *Jones* here is two-fold.  First, the government does not mention *Jones* or assert the Fourth Amendment standing theory upon which *Jones* relies.  As such, the government has waived any such claim.  *Hamilton*, 680 F.3d at 1319; *Mendoza*, 327 F.3d at 1286 n.3.  This result appears to be especially apt since one of the cases the government does cite—*DiTomasso*—explicitly rejects this line of argument.  *DiTomasso*, 56 F. Supp. 3d at 591–92 (characterizing as "baseless" the government's assertion that "by exchanging emails and chats with other people[, Mr.] DiTomasso relinquished his expectation of privacy in those statements").

   Second, while it seems undisputed that one of the seven images at issue was included in an email sent by Mr. Williamson, the other six photographs were not, as they were retrieved from Mr. Williamson's archived emails.

27

466 U.S. 109, 113 (1984); *Walter v. United States*, 447 U.S. 649, 653–59 (1980).  Mr. Williamson asserts the opposite.  (Doc. 106).  I turn to this issue now.

It is well settled that "[a] search by a private [entity] does not implicate the Fourth Amendment unless [it] acts as an instrument or agent of the government." *United States v. Steiger,* 318 F.3d 1039, 1045 (11th Cir. 2003); *see also Skinner v. Ry. Labor Execs. Ass'n*, 489 U.S. 602, 614 (1989) ("Although the Fourth Amendment does not apply to a search or seizure, even an arbitrary one, effected by a private party on his own initiative, the Amendment protects against such intrusions if the private party acted as an instrument or agent of the [g]overnment.").  A corollary to this long-established principle is that where an individual's expectation of privacy in particular information has been "frustrated" by a non-state actor, law enforcement may later lawfully use that information without a warrant.  *United States v. Sparks*, 806 F.3d 1323, 1334 (11th Cir. 2015) (citation omitted), *overruled on other grounds by Ross*, 963 F.3d at 1056.  As a result, a warrantless search performed by the government following a private search violates the Fourth Amendment only to the extent "it is broader than the scope of the previously occurring private search."  *Id.* (citations omitted).  A government search crosses this threshold when it "meaningfully exceeds" the parameters of the private search, *United States v. Harling*, 705 F. App'x 911, 816 (11th Cir. 2017), such as when an officer "learn[s] new, critical information" from his examination of the materials at issue, *Montijo*, 2022 WL 93535, at *4–5.

In this case, Mr. Williamson maintains that both Yahoo and NCMEC were functioning as government agents when they engaged in their warrantless review of

his emails and that this intrusive conduct therefore contravened the Fourth
Amendment. (Doc. 106). Mr. Williamson also contends that the unlawful searches
conducted by Yahoo and NCMEC render Detective Keller's subsequent warrants for
his Yahoo email account and his residence fatally infirm. *Id.* After careful review, I
find that Mr. Williamson's state actor argument directed at Yahoo fails and that the
remainder of his private search challenge necessarily fails as well.

Determining whether a private entity was operating as an instrument or agent
of the government centers "on the degree of the [g]overnment's participation in the
private party's activities, a question that can only be resolved in light of all the
circumstances." *Skinner*, 489 U.S. at 614–15 (internal quotation marks and citations
omitted). Courts in this Circuit employ a two-prong test in resolving this issue: (1)
whether the government knew of and acquiesced in the challenged conduct, including
by openly encouraging or cooperating in the search; and (2) whether the private entity's
motive was to assist law enforcement's efforts rather than to advance its own ends.
*Id.*; *United States v. Emile*, 618 F. App'x 953, 955 (11th Cir. 2015) (quoting *United States
v. Ford*, 765 F.2d 1088, 1090 (11th Cir. 1985); *United States v. Smythe,* 84 F.3d 1240,
1243 (10th Cir.1996)); *see also U.S. v. Propst*, 369 F. App'x 42, 45 (11th Cir. 2010) (citing
*Steiger,* 318 F.3d at 1045).[18] The burden of establishing that a private actor is a
government agent rests with Mr. Williamson. *United States v. Allen*, 2019 WL 5842684,
at 7 (M.D. Fla. Oct. 7, 2019) (citing *United States v. Gumerlock*, 590 F.2d 794, 799 (9th

---

[18] Unpublished opinions are not considered binding precedent but may be cited as persuasive
authority. 11th Cir. R. 36-2.

Cir. 1979)), *report and recommendation adopted*, 2019 WL 5802657 (M.D. Fla. Nov. 7, 2019), *aff'd*, 854 F. App'x 329 (11th Cir. 2021); *United States v. Hearst*, 2022 WL 16832834, at *10 (N.D. Ga. Mar. 10, 2022) (citing *United States v. Ginglen*, 467 F.3d 1071, 1074 (7th Cir. 2006)).  On appeal, a district court's determination as to whether a private entity is an arm of the state is reviewed for clear error.  *Allen*, 854 F. App'x at 333 (citing *Ford*, 765 F.2d at 1090).

It is evident from the record that Yahoo was not a government actor.  Starting with the first prong, I recognize at the outset that—as Mr. Williamson maintains—ESPs like Yahoo are mandated by the Protect Act to report online sexual child exploitation to NCMEC "as soon as reasonably possible after obtaining actual knowledge of any . . . apparent violations" of certain child pornography statutes.  *See* 18 U.S.C. § 2258A(a)(1)(A)(i), (2)(A).  I also recognize that an ESP's knowing and willful failure to fulfill this obligation subjects it to sanctions.  *Id.* § 2258A(e).[19]

Mere compliance with that law, however, does not constitute state action by a private entity.  *United States v. Rosenow*, 50 F.4th 715, 730 (9th Cir 2022) (noting that "a private actor does not become a government agent simply by complying with a mandatory reporting statute") (citations omitted)).  Moreover, the Protect Act only imposes an obligation upon ESPs to report child pornography that is *known* to them and expressly states that ESPs are not required to search for it.  18 U.S.C. § 2258A(f);

---

[19] Some courts have viewed the penalties for failing to report child pornography as providing an incentive for ESPs *not* to search for such illicit content so that they can claim willful ignorance. *See, e.g.*, *United States v. Ringland*, 966 F.3d 731, 736 (8th Cir. 2020).

*Rosenow*, 50 F.4th at 730 (drawing a distinction under the Protect Act between "mandated *reporting*" and "mandated *searching*"); *United States v. Meals*, 21 F.4th 903, 907 (5th Cir. 2021) (observing that while the Protect Act insists ESPs report child exploitation to NCMEC, the Act "neither compels nor coercively encourages internet companies to search actively for such evidence"). Yahoo is thus "free to choose not to search [its] users' data" and, when it does search, it "do[es] so of [its] own volition." *Rosenow*, 50 F.4th at 730. Multiple courts that have confronted this issue—including with respect to Yahoo—have reached the same conclusion. *See, e.g., id.* at 731 (holding "that federal law did not transform Yahoo's . . . private searches into governmental action"); *United States v. Cameron*, 699 F.3d 621, 636–38 (1st Cir. 2012) (holding that Yahoo's statutory duty under the Protect Act to report to NCMEC "did not impose any obligation to search for child pornography," but "merely an obligation to report child pornography of which Yahoo[ ] became aware"); *Phillips v. United States*, 2021 WL 1342301, at *4 (M.D. Fla. Apr. 9, 2021) ("Yahoo[ ] is a private actor, which conducted a private search of the [defendant's] email account.") (citing *Cameron*, 699 F.3d at 637–38); *see also Meals*, 21 F.4th at 907 (rejecting the defendant's argument that the Protect Act transformed Facebook into a government agent); *Miller*, 982 F.3d at 424 (declining to find Google to be a state actor based upon the Protect Act, reasoning that the Act directs "providers only to report child pornography that they know of; it does not compel them to search for child pornography of which they are unaware")

(collecting cases);[20] *Ringland*, 966 F.3d at 736 (same); *United States v. Stevenson*, 727 F.3d 826, 830 (8th Cir. 2013) (refusing to adopt the defendant's argument that AOL's hash-detection program which automatically reported child pornography to NCMEC in accordance with the Protect Act amounted to state action); *United States v. Richardson*, 607 F.3d 357, 364–67 (4th Cir. 2010) (same); *United States v. Hart*, 2021 WL 2412950, at *8 (M.D. Pa. June 14, 2021) (determining that Kik was not a government actor when it searched a user's account and reported suspected child pornography to NCMEC pursuant to the Protect Act).

Further, there is no evidence that the government instigated or cooperated with Yahoo's review of Mr. Williamson's emails. In fact, quite the opposite is true. According to Ms. Guizzotti's testimony, which I credit, Yahoo undertook its analysis of these communications without any encouragement from the government. (Doc. 99 at 91).

Nor does Mr. Williamson prevail on the second prong. Ms. Guizzotti made clear during her testimony that Yahoo proactively searches sent emails because it has an interest in safeguarding both its users and its reputation. *Id.* at 76. Courts have found similar testimony to be unexceptional and consistent with an ESP's expected business interests. *See, e.g.*, *Ringland*, 966 F.3d at 736 (deeming Google not to be a government agent, in part, because it "acted out of its own obvious interests in

---

[20] As the court pointed out in *Miller*, courts have similarly held that laws mandating teachers or doctors to report child abuse also "do not transform private parties into government actors for purposes of various constitutional provisions." *Miller*, 982 F.3d at 424 (citing *Mueller v. Auker*, 700 F.3d 1180, 1191–92 (9th Cir. 2012); *Brown v. Newberger*, 291 F.3d 89, 93–94 (1st Cir. 2002)).

removing child sex abuse from its platform"); *Cameron*, 699 F.3d 637–38 (stating that although "it is certainly the case that combating child pornography is a government interest[,] this does not mean that Yahoo[ ] cannot voluntarily choose to have the same interest," and adding that a private party will not be deemed to be a government agent "simply because the government has a stake in the outcome of a search") (internal quotation marks and citation omitted); *United States v. Wolfenbarger*, 2019 WL 6716357, at *11–12 (N.D. Ca. Dec. 10, 2019) (concluding that "Yahoo had its own legitimate, independent motivation" for endeavoring to remove child pornography from its services, including "creati[ng] a safe place for its users—many of whom [were] minors themselves") (internal quotation marks omitted); *Coyne*, 387 F. Supp. 3d at 397 ("The ESPs have been very clear about their purpose in identifying child pornography, which is commercial and not primarily altruistic. Obviously the ESPs involved in this case share a moral repugnance for child pornography, but their efforts to detect child pornography and close subscriber accounts involved in its transmission are strongly motivated by business concerns.").

Mr. Williamson's reliance on Yahoo's "Compliance Guide for Law Enforcement" (Guide) in this respect is unavailing. (Doc. 106 at 28); Def. Exh. H. It is true, as he observes, that the Guide provides at the beginning that it "is designed to assist law enforcement in understanding Yahoo's policies and practices with regard to retention and disclosure of electronic information and to provide answers to frequently asked questions related to subpoenas and other legal process." Def. Exh. H at 6. It is also true, as Mr. Williamson further notes, that the Guide additionally has a section

specifically devoted to Yahoo's procedures for making reports to NCMEC, in which it states that Yahoo has "worked with law enforcement and [NCMEC] to develop practices for reporting instances of apparent child pornography . . . as required by [the Protect Act]." *Id.* at 12.

That said, the mere fact that Yahoo has developed protocols to facilitate its interactions with the government has no bearing on the company's intent when it searches its customer's emails. *Rosenow*, 50 F.4th at 735 ("[A] private party's otherwise legitimate, independent motivation is not rendered invalid just because law enforcement assistance may further its interests."). At most, it evidences that Yahoo is aware of its obligations under the Protect Act to report known instances of child pornography, not to affirmatively search for such content, and that Yahoo has an understandable interest in ensuring that law enforcement is educated as to its policies and procedures to prevent any confusion on the matter. In sum, I find that Mr. Williamson does not meet his burden of establishing that Yahoo was a state actor when it searched his emails.

Mr. Williamson's NCMEC state actor argument, on the other hand, presents a far closer question. In fact, several courts have found NCMEC to be a government entity or agent for Fourth Amendment purposes. *See, e.g., United States v. Ackerman*, 831 F.3d 1292, 1308 (10th Cir. 2016) (Gorsuch, J.); *Coyne*, 387 F. Supp. 3d at 400 (collecting cases). The Court need not reach that issue here, however, because even assuming *arguendo* that NCMEC was operating as an arm of the state when it inspected Mr. Williamson's emails, its examination did not exceed the scope of Yahoo's review

of those communications.  *Montijo*, 2022 WL 93535, at *3 (noting that under the
private search dotrine, the government is permitted "to replicate a prior private search
[without a warrant] provided it stays within the same parameters") (citing *Sparks*, 806
F.3d at 1334).

To see why this is so, remember that—as a matter of policy—Yahoo will not
submit a CyberTipline Report to NCMEC unless one of its agents reviews and
manually selects each of the images to be uploaded with the report and then
specifically attests that he or she has inspected those photographs by checking a box
affirming the same.  (Doc. 99 at 82, 84–86, 101–04, 134–37, 140–41).  And the
evidence in this case demonstrates that this box was checked with respect to Yahoo's
examination of Mr. Williamson's emails.  The evidence also demonstrates that
NCMEC—like Yahoo—ran an automated analysis of those files and had its staff
examine six of the seven images reported.  As such, I find that NCMEC did not go
beyond the boundaries of Yahoo's prior search of Mr. Williamson's emails.  *Phillips*,
2021 WL 1342301, at *4 (finding no Fourth Amendment violation where NCMEC
did not exceed the scope of Yahoo's private search).

I reach the same conclusion with respect to Detective Keller's review of the
images after he received them from NCMEC but he before applied for the warrants
for Mr. Williamson's Yahoo email account and his home.  I credit Detective Keller's
testimony that he simply looked at the images himself at that juncture to confirm they
contained CSAM.  In doing so, he uncovered no new, critical information from the
photographs.  He merely saw the same files Yahoo previously analyzed and then made

his own determinations as to whether the photographs constituted CSAM. As a result, Detective Keller also did not exceed the scope of Yahoo's prior search. *See Ringland*, 966 F.3d at 737 ("Because [the officer] searched only the same files that [the ESP] searched, the [officer] did not expand the search beyond [the ESP's] private party search.") (citations omitted); *United States v. Powell*, 925 F.3d 1, 6 (1st Cir. 2018) (finding a government actor's review of screenshotted images of suspected child pornography reported by a private ESP following the ESP's search of a user account did not disclose any previously unknown facts and the government's review did not therefore require a warrant).

The fact that Yahoo may not now be able to identity the particular employees at the company who reviewed the files is not—as Mr. Williamson maintains—of any importance. All that needs to be established is that a private entity previously inspected the same images as NCMEC and Detective Keller subsequently reviewed. *See Montijo*, 2022 WL 93535, at *5 ("[The d]efendant makes much about the [g]overnment not providing evidence on the contractors' identities and how Facebook found the offending files. But Facebook and its contractors are private persons. So the who and how Facebook searches its programs do not lessen the private search doctrine's application here."). Indeed, at least one other court has found that the government's human review of an image after a private ESP performed *solely* an

automated hash analysis fell within the scope of the ESP's private search.[21]  *See Miller*, 982 F.3d at 427.

## C.

Mr. Williamson's final challenge is that even if the warrants for his Yahoo email account and his residence were valid under the private search doctrine, they nonetheless fail under *Franks* because Detective Keller's supporting affidavits included material misrepresentations and omissions, without which the affidavits lacked probable cause.  (Doc. 106).  The government counters that Mr. Williamson does not make the requisite showing necessary to sustain his *Franks* argument.  (Doc. 105).[22]

It is well established that a search warrant is presumptively valid once issued. *Franks*, 438 U.S. at 171.  The Supreme Court instructs, however, that (1) "where [a] defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit," and (2) "the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request."  *Id.* at 155–56 (emphasis added).  The requirement of a *Franks* hearing also extends to situations where facts are intentionally or recklessly omitted

---

[21] I do note that there is apparently a circuit split about the application of the private search doctrine when no human reviews the underlying CSAM images.  *See Montijo*, 2022 WL 93535, at *1 n.2 ("A seemingly straightforward issue—does the private search doctrine apply here—presents tough constitutional questions that circuit and district courts have answered differently.") (comparing *United States v. Wilson*, 13 F.4th 961 (9th Cir. 2021) and *Ackerman*, 831 F.3d at 1292 with *United States v. Miller*, 982 F.3d 412 (6th Cir. 2020) and *United States v. Reddick*, 900 F.3d 636 (5th Cir. 2018)).

[22] To prevent the possible piecemeal litigation on the *Franks* issue, I received evidence at the hearing regarding the veracity of the challenged averments contained in Detective Keller's affidavits.

from a warrant affidavit if the "inclusion of the omitted facts would have prevented a finding of probable cause." *United States. v. Lebowitz*, 676 F.3d 1000, 1010 (11th Cir. 2012) (per curiam) (quoting *United States v. Kapordelis*, 569 F.3d 1291, 1309 (11th Cir. 2009)).  A defendant must satisfy both of the prongs of the *Franks* analysis to be entitled to an evidentiary hearing.  *United States v. Arbolaez*, 450 F.3d 1283, 1293 (11th Cir. 2006) (per curiam) (citing *Franks*, 438 U.S. at 155-56).

The substantial preliminary showing required by the first part of the *Franks* test "is not lightly met."  *Id.* at 1294.  As the Eleventh Circuit has explained:

> To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine.  There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof.  They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons.  Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained.

*Id.* (quoting *Williams v. Brown*, 609 F.2d 216, 219 (5th Cir. 1979)).

If such a showing is made, a trial court must proceed to the second part of the *Franks* analysis and decide if probable cause still exists once "those portions of the affidavit which the defendant has shown are arguably false or misleading" are excised. *Kapordelis*, 569 F.3d at 1309 (citing *Franks*, 438 U.S. at 171-72).  If probable cause does remain, there is no *Franks* violation and no need for a hearing.  *United States v. Capers*, 708 F.3d 1286, 1296 (11th Cir. 2013) (citation omitted); *Lebowitz*, 676 F.3d at 1010–11.

If a defendant makes the requisite showing under *Franks* to secure a hearing, he must then prove an allegation of perjury or reckless disregard at the hearing by a preponderance of the evidence. *United States v. Barsoum*, 763 F.3d 1321, 1328 (11th Cir. 2014). Where a defendant meets this burden, the search warrant must be voided if, "with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause." *Franks*, 438 U.S. at 156. Under such circumstances, the fruits of the search are subject to exclusion to the same extent as if probable cause was lacking on the face of the affidavit. *Id.*

Here, Mr. Williamson posits three arguments in support of his *Franks* challenge. First, he claims Detective Keller omitted from the residential warrant affidavit the fact that one of the photographs—image 1-1.jpg—was sent on September 8, 2020, which was after the last log-in date listed in the activity logs for Mr. Williamson's email account and which "would [thus] call . . . into question" whether the image was really transmitted from that account. (Docs. 44, 106). Second, Mr. Williamson asserts Detective Keller misrepresented at one point in both of his affidavits that there were seven CSAM images uploaded by the user of Mr. Williamson's email account even though Detective Keller later found only four of the photographs met the statutory definition for CSAM. *Id.* And third, Detective Keller misstated in the residential affidavit that NCMEC classified three of the files as child pornography when NCMEC actually designated those images as "CP (unconfirmed)." *Id.* These contentions do not amount to the substantial preliminary showing required under *Franks* and certainly

do not undermine the validity of the warrants for Mr. Williamson's Yahoo email account and his home.

Beginning with the first argument, Mr. Williamson does not make the necessary initial showing, much less prove by a preponderance, that Detective Keller intentionally or recklessly omitted the challenged log-in date from his residential affidavit. I note as an initial matter that Detective Keller made clear in his affidavit that, according to the log-in data he received from Yahoo, "[September 5, 2020,] was the last time the [user] logged into his Yahoo email before the reported incident occurred on [September 8, 2020,]" which is the date that the child pornographic image referred to herein as image.1-1.jpeg was transmitted. Gov't Exh. 2; Def. Exh. B. Further, Detective Keller testified at the hearing that the fact the last log-in date on Mr. Williamson's email account was September 5, 2020, three days prior to the transmission of image.1-1.jpeg, "[h]a[d] no bearing" on the probable cause showing because he knows "[f]rom [his] training and experience, [including] dealing with many CyberTips," that users "can stay logged into [their] accounts for a significant period of time." (Doc. 99 at 164–66); *see also id.* at 186–88. This testimony was credible and consistent with the testimony tendered by Ms. Guizzotti, who stated that although "Yahoo [e]mail users must be logged into an account to send email messages," they can remain logged into Yahoo for a "couple of weeks." *Id.* at 88–90; *see also id*. at 89 ("[The] time stamp value in Yahoo's [activity logs] corresponds to the date and time when the user either logged in the reported account or extended a previous log-in session. By logging in or by extending a log in session, the user would remain logged

40

into the Yahoo account on the same device for a period of two weeks."). Mr. Williamson does not offer any sworn affidavits or other reliable witness statements to refute this evidence. *Franks*, 438 U.S. at 171 (noting that "[a]ffidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained" by a defendant seeking a *Franks* hearing); *see also Arbolaez*, 450 F.3d at 1294 ("There is no affidavit or otherwise sworn statement alleging that [the affiant] knowingly or recklessly included false statements in the search warrant affidavit. Accordingly, we find that [the defendant] has failed to make the necessary 'substantial preliminary showing' and that there is no error.").

Mr. Williamson's suggestion that Detective Keller should have investigated "how or when Yahoo logs out accounts" (Doc. 106 at 41) is likewise deficient. Ms. Guizzotti credibly testified that Yahoo is not able "to track when an account is either manually or automatically logged out" and that no such data exists. (Doc. 99 at 128). Mr. Williamson makes no offer of proof to rebut these sworn attestations either.

I am similarly unpersuaded by Mr. Williamson's second and third contentions concerning Detective Keller's misstatements in both of his affidavits that all seven images constituted CSAM and that, in the residential affidavit, NCMEC designated three of the images as "child pornography" instead of "CP (unconfirmed)." The operative inquiry is not, as Mr. Williamson seems to intimate, whether Detective Keller's affidavits contained errors—they do—but whether the errors were made intentionally or in reckless disregard of the truth. *United States v. Sims*, 845 F.2d 1564, 1571 (11th Cir. 1988) (finding that it is not enough to show that statements in an

affidavit were wrong under *Franks*, a defendant must establish that the affiant knowingly or recklessly included such falsities and/or material omissions) (citing *Franks*, 438 U.S. at 171–72); *see also United States v. Flowers*, 531 F. App'x 975, 981 (11th Cir. 2013) (per curiam) ("*Franks* requires the defendant to offer proof that the affiant had the requisite intent.") (citing *Franks*, 438 U.S. at 171).

With this principle in mind, the problem with Mr. Williamson's arguments is that they fail to take into account the entirety of Detective Keller's averments and to view them in a common sense and realistic manner. *United States v. Joyce*, 2012 WL 7148366, at *2 (S.D. Fla. Dec. 12, 2012) (emphasizing that courts must "utilize common sense" when reviewing search warrant affidavits and must read them "in a realistic and non-technical manner" that takes into account the "affidavit as a whole"), *report and recommendation adopted*, 2013 WL 560817 (S.D. Fla. Feb. 13, 2013). Most importantly, Mr. Williamson downplays, if not ignores, the fact that immediately following these generalized misstatements made by Detective Keller, he described the seven images—often graphically—and expressly stated that, based upon his training and experience, only four actually met the statutory definition for child pornography, while the other three did not. As the government aptly observes in its submission, by setting forth such a particularized accounting of the contents of the child pornographic images, Detective Keller "provided the necessary information to allow [the] court to make a [probable cause] determination[,]" and his "detailed descriptions negated any potential confusion or error caused by [his] initial misclassification" and misstatements about the photographs. (Doc. 105 at 17).

In light of these additional qualifying attestations made by Detective Keller, it is difficult to afford much credence to Mr. Williamson's assertion that Detective Keller's mistakes were the result of any malfeasance. The fact that Mr. Williamson does not meaningfully aver, much less prove—whether through a declaration from a CSAM expert or some other equally weighty evidence—that Detective Keller's descriptions and classifications of the images were false buttresses this conclusion.

Detective Keller's testimony regarding the matter of NCMEC's classifications likewise undermines Mr. Williamson's contentions. At the hearing, Detective Keller advised that he did not place much importance on NCMEC's labels like "CP (unconfirmed)," viewing them instead to be "suggestion[s]" and believing the ultimate decision on the age of a minor, for example, to rest with him. (Doc. 99 at 162, 170–71, 184). Indeed, he testified that he typically does not incorporate NCMEC's designations in his affidavits at all, as was the case with the Yahoo warrant. *Id.* at 168–69, 189–90. Detective Keller's perspective on this issue was bolstered by Ms. Newman, who—as referenced previously—testified that NCMEC "rel[ies] on law enforcement to do their [own] independent review[,] investigation[,] and assessment of" suspected CSAM files and that NCMEC is "not the determiner[ ] of what is illegal or legal content." *Id.* at 26. While Detective Keller later found out his understanding of NCMEC's "CP (unconfirmed)" classification was wrong (as he candidly admitted under oath), my evaluation of his overall testimony and the other evidence of record does not support Mr. Williamson's claim that this misunderstanding by Detective Keller was intentional or the product of recklessness.

43

One other item in the record bears this out.  In NCMEC's CyberTipline report forwarded to the NPPD, NCMEC labeled one of the images—image.118-1.jpeg—as "apparent child pornography."  Gov't Exh. 1; Def. Exh. A.  This meant that, as Ms. Newman attested, NCMEC concluded the photograph met the federal definition of child pornography and that it was "overtly clear" a child was involved in the sexual activity depicted in the file.  (Doc. 99 at 66).  Yet, in his affidavit, Detective Keller deemed this image to be "age difficult" and thus—in his view—having little, if any, probative value to the probable cause determination.  *Id.* at 184.  Stated differently, Detective Keller rejected NCMEC's designation of a photograph that would have further supported his warrant application in favor of assigning his own label that detracted from it.

In addition to failing to make the necessary showing on the first prong of the *Franks* analysis, Mr. Williamson does not meet his burden as to the second prong. *Lebowitz*, 676 F.3d at 1010 (stating "[a] defendant bears the burden of demonstrating" at "the second step" of the *Franks* analysis that had the affiant excluded the misrepresentations or included the alleged omissions, it "would have prevented a finding of probable cause").  Even were the Court to correct the affidavits to account for the omitted log-in information, Detective Keller's misstatement about the seven images constituting CSAM, and his mischaracterizations of certain of the NCMEC labels, the affidavits would still contain ample probable cause.  In short, they establish that a detective well-versed in the contours of CSAM personally viewed seven images extracted from an email account tied to Mr. Williamson's residence, found a number

44

of them to constitute child pornography, and then detailed the contents of those photographs for the reviewing judge to make his or her own determination. (Doc. 99 at 160–63). As Mr. Williamson conceded at the July 2022 oral argument, one such image would have been sufficient to demonstrate probable cause.

### D.

In conjunction with the above determinations, I also find the warrant to be valid under the good faith exception. Generally, evidence seized in violation of the Fourth Amendment is subject to suppression under the exclusionary rule, the purpose of which is "to deter future unlawful police conduct." *United States v. Calandra*, 414 U.S. 338, 347 (1974). The Supreme Court recognized in *United States v. Leon*, however, that "where the officer's conduct is objectively reasonable, excluding the evidence will not further the ends of the exclusionary rule in any appreciable way. . . ." 468 U.S. 897, 918 (1984) (internal citation omitted). As a result, the *Leon* Court concluded that where an officer has relied on a warrant in an objectively reasonable manner, the evidence obtained, even though the warrant is found to be defective, will not be excluded. *Id.*

In light of *Leon*, an officer's reliance on a warrant will not qualify as "objectively reasonable" only in situations where (1) probable cause is based on statements in an affidavit that are knowingly or recklessly false; (2) the reviewing judge fails to perform a neutral and detached function and instead merely "rubber stamps" the warrant; (3) the affidavit is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; or (4) the warrant was so facially deficient that the

executing officer could not reasonably have assumed it was valid. *Id.* at 914–15. The government bears the burden of demonstrating that none of these circumstances exist in cases where it seeks to rely on *Leon*. *United States v. Morales*, 987 F.3d 966, 974 (11th Cir. 2021).

The government has met its burden here. It is evident from his submission that Mr. Williamson only seeks to avail himself of the first circumstance described above. Yet I have already been found that Detective Keller did not make any intentional or reckless omissions or misrepresentations. Thus, the good faith exception under *Leon* applies.

III.

In light of the foregoing, I respectfully recommend that Mr. Williamson's motion to suppress (Doc. 44) be denied.

Respectfully submitted this 10th day of February 2023.

HONORABLE CHRISTOPHER P. TUITE
United States Magistrate Judge

**NOTICE TO PARTIES**

A party has fourteen (14) days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions. A party's failure to file written objections, or to move for an extension of time to do so, waives

46

that party's right to challenge on appeal any unobjected-to factual finding(s) or legal conclusion(s) the District Judge adopts from the Report and Recommendation. *See* 11th Cir. R. 3-1; 28 U.S.C. § 636(b)(1).

Copies to:
Honorable William F. Jung, United States District Judge
Counsel of record

# Doc. 134 –

# Second Motion to

# Suppress

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

UNITED STATES OF AMERICA,

     v.                            CASE NO. 8:21-cr-355-WFJ-CPT

GREGORY ALLEN WILLIAMSON,

     Defendant.

_____/

## DEFENDANT'S SECOND MOTION TO SUPPRESS

Defendant Gregory Allen Williamson, pursuant to the Fourth Amendment of the Constitution of the United States, hereby files this Motion to Suppress and respectfully requests to suppress evidence gathered from the results of a search warrant on Yahoo. As detailed below, that warrant is overbroad and the good-faith exception does not apply. For the reasons explained in the Memorandum below, this motion should be granted.

## FACTUAL BACKGROUND

1. Mr. Williamson was arrested on or about January 27, 2021. He was indicted on November 3, 2021, for alleged violations of 18 U.S.C. § 2422(b), 18 U.S.C. § 2252(a), 18 U.S.C. § 2252(a)(2), and 18 U.S.C. § 2252(a)(4)(B). Doc. 1.

2. This case arises from a report from Oath Holdings d/b/a Yahoo ("Yahoo") to the National Center for Missing and Exploited Children ("NCMEC") through its CyberTipline reporting system.

3.     The CyberTipline report identifies seven images and provides the date they were uploaded through a Yahoo e-mail account titled *vladlover50@yahoo.com*, and the internet protocol ("IP") address from which they were uploaded.

4.     On or about December 10, 2020, Detective James Keller with the North Port Police Department, who is also a member of the Internet Crimes Against Children Task Force, submitted a warrant application to Yahoo for information related to the *vladlover50@yahoo.com* email address.[1]   A copy of that warrant application and the signed warrant is attached as **Exhibit A**.[2]

5.     The warrant required Yahoo to turn over the following data:

- Account Information - User name, primary email address, secondary email addresses, connected applications and sites, and account activity from creation to 11/24/20, including account sign in locations, browser information, platform information, and internet protocol (IP) addresses;

- Evidence or user attribution – accounts, e-mail accounts, passwords, PIN codes, account names, user names, screen names, remote data storage accounts, credit card number or other payment methods, contact lists, calendar entries, text messages, voice mail messages, pictures, videos, telephone numbers, mobile devices, physical addresses, historical GPS locations, two-step verification information,

---

[1] Prior to the issuance of this warrant, another warrant application had been submitted and signed requesting information for *vladlover5@yahoo.com*, which is an incorrect email address.   Yahoo brought the error to the attention of law enforcement, and the warrant was resubmitted with the correct e-mail address.

[2] It is unknown whether Yahoo was served with both the warrant application and the warrant, or only served with the warrant.

or any other data that may demonstrate attribution to a particular user or users or the account(s);

- Calendar - All calendars, including shared calendars and the identities of those with whom they are shared, from creation to l 1/24/20, calendar entries, notes; alerts, invites, and invitees;

- Contacts - All contacts stored by Yahoo! (Oath Holdings Inc.,) including name, all contact phone numbers, emails, social network links, and images;

- Yahoo! Email - All email messages from creation to 11/24/20, including by way of example and not limitation, such as inbox messages whether read or unread, sent mail, saved drafts, chat histories, and emails in the trash folder.  Such messages will include all information such as the date, time, internet protocol (IP) address routing information, sender, receiver, subject line, any other parties sent the same electronic mail through the 'cc' (Carbon copy) or the 'bee' (Blind carbon copy), the message content or body, and all attached files;

- Photos - All images, graphic files, video files, and other media files stored by Yahoo! (Oath Holdings Inc.,) associated with the listed account;

- Search History - all search history and queries from creation to 11/24/20, including by way of example and not limitation, such as World Wide Web (WEB), images, news, shopping, ads, videos, maps, travel, and finance.

6.    The warrant was signed by a judge on December 11, 2020.

7.    Yahoo submitted its response to the search warrant to Detective

Keller electronically on or about December 23, 2020.

<u>MEMORANDUM OF LAW</u>

**I.    The Yahoo search warrant is unconstitutionally overbroad.**

For the reasons detailed below, the Yahoo search warrant is unconstitutionally overbroad and the results must be suppressed.

**A.    The Fourth Amendment**

The Fourth Amendment protects individuals against unreasonable searches and seizures. *See Hudson v. Michigan*, 547 U.S. 586, 593 (2006) ("Until a valid warrant has issued, citizens are entitled to shield 'their persons, houses, papers, and effects' from the government's scrutiny." (*quoting* U.S. Const. amend. IV)). It provides:

> "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV.

With respect to the appropriate breadth of a search warrant, the "the Fourth Amendment requires that 'those searches deemed necessary should be as limited as possible.'" *United States v. Blake*, 868 F.3d 960, 973 (11th Cir. 2017) (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971)).

The "specific evil" that tailoring warrans targets "is not that of intrusion per se, but of a general, exploratory rummaging in a person's belongings." *Id*.  That type of rummaging was permitted during the colonial era by the "general

warrant," an instrument "abhorred by the colonists." *Id*.  The Fourth Amendment is intended to preclude "general warrants" by "requiring a 'particular description' of the things to be seized." *Id*.

### B.   The Yahoo warrant was unconstitutionally and impermissibly overbroad.

The warrant was overbroad, virtually unlimited in scope and time period and allowing law enforcement to generally rummage through a personal internet account.

In *Blake*, the Court examined the breadth of two search warrants to technology companies – one to Microsoft and one to Facebook – related to an investigation into a child sex trafficking ring.  *Id*. at 973.  The Court found the warrant to Microsoft to be properly broad because it "limited the emails to be turned over to the government, ensuring that only those that had the potential to contain incriminating evidence would be disclosed. Those limitations prevented 'a general, exploratory rummaging' through" the defendant's email correspondence. *Id*.

However, the Facebook warrant was found to be improperly overbroad. The Eleventh Circuit held that the warrant "required disclosure to the government of virtually every kind of data that could be found in a social media account." *Id*. at 974.  For instance, with respect to private instant messages, "the warrants could have limited the request to messages sent to or from persons suspected at that time

of being prostitutes or customers." *Id.* Further, the Court held that "the warrants should have requested data only from the period of time during which [the defendant] was suspected of taking part in the prostitution conspiracy." *Id.* Had such limitations been in place, the Court held, the disclosures could then have provided additional probable cause for a subsequent, broader search. *Id.* Instead, it held that the "Facebook warrants were the internet-era version of a 'general warrant.'" *Id.* (citing *Coolidge*, 403 U.S. at 467; *cf. Riley v. California*, 573 U.S. 394, (2014) ("The sum of an individual's private life can be reconstructed through a thousand photographs labeled with dates, locations, and descriptions...."))[3]

Similarly, in *United States v. Mercery*, 591 F. Supp. 3d 1369 (M.D. Ga. 2022), the warrant demanded the social media company turn over, among other things:

"(1) All identity and contact information, including full name, e-mail address, physical address (including city, state, and zip code), date of birth, phone numbers, gender, hometown, occupation, and other personal identifiers;

(2) All past and current usernames associated with the account;

(3) The dates and times at which the account and profile were created, and the Internet Protocol ("IP") address at the time of sign-up;

(4) All activity logs including IP logs and other documents showing the IP address, date, and time of each login to the account, as well as any other log file information;

---

[3] The *Blake* Court ultimately found that the good-faith exception applied and did not suppress the results of the improper warrant. 868 F.3d at 974. As detailed below, the good-faith exception does not apply here.

(5) All information regarding the particular device or devices used to login to or access the account, including all device identifier information or cookie information, including all information about the particular device or devices used to access the account and the date and time of those accesses;

(6) All data and information associated with the profile page, including photographs, "bios," and profile backgrounds and themes;

(7) All communications or other messages sent or received by the account October 26, 2019, until October 26, 2020;

(8) All user content created, uploaded, or shared by the account, including any comments made by the account on photographs or other content October 26, 2019, until October 26, 2020.

(9) All photographs and images in the user gallery for the account;

(10) All location data associated with the ac[count] October 26, 2019 until October 26, 2020 including geotags March 16, 2019 until March 16, 2020;
. . .
(16) All information about connections between the account and third-party websites and applications;"

*Id*. at 1379-80.   In suppressing the warrant results, the *Mercery* court examined *Blake* and found that, like Blake, the warrant to Instagram was overbroad.  It held that the "compelled disclosure is not tailored to evidence of the crimes under investigation, the time period during which [the defendant] allegedly committed the crimes, or the persons allegedly involved in the crimes." *Id*. at 1381.  Instead, the Court held, "the warrant amounts to a general rummage of [defendant's] entire Instagram account."  *Id*.  It held that the Instagram warrant "authorizes the government to search and seize data that is not related to the probable cause established in [law enforcement's] affidavit," and "[i]t allows

officers to search and seize virtually all of the information on [the defendant's] Instagram account, with no temporal limitations or limitations" defined by the offense being investigated. *Id*. at 1382. Thus the results of the warrant were suppressed.[4]

As in *Blake* and *Mercery*, the warrant to Yahoo here is unconstitutionally overbroad and amounts to a "general rummaging" through the entire account. Like *Mercery*, the warrant here requires Yahoo "to disclose virtually every type of data associated with" the account, including "every Internet Protocol ("IP") address he has ever logged in from; every photograph and image on the account; . . .[and] every 'connection' between the account and third-party websites." *Id*. at 1381. But the warrant to Yahoo here goes further than even *Mercery*, demanding every message, every contact, every internet search, and every calendar entry, with no limitations related to the offense.

Further, the warrant here is not properly limited in time. Of the seven categories of information demanded, four demand data "from creation" of the account to the present, which is effectively the same as no limitation at all. *See e.g. United States v. Shah*, 5:13-CR-328-FL, 2015 WL 72118, at *14 (E.D.N.C. Jan. 6, 2015) (finding warrant to Google lacked particularity because it provided for seizure of

---

[4] Unlike *Blake*, the *Mercery* court found that the good-faith exception did not apply and therefore the evidence was due to be suppressed, as discussed in detail below.

all evidence "since account inception"). Meanwhile, the other three categories do not even attempt to limit the demands by time period.

As in *Mercery*, law enforcement here could have submitted a properly tailored warrant first and then a broader warrant later. For instance, through the NCMEC report, it knew the dates the seven alleged pornographic images were uploaded to Yahoo. Law enforcement could have limited its warrant to those images and emails, gained additional information about who they were sent to and any other data it could glean, and built its case properly piece by piece. Instead, it demanded a data dump of every single piece of information, regardless of whether that information was pertinent to the charged offense.

Further, the warrant application includes law enforcement's attempt at rationalizing some of these requests, but it is done in a superficial and meaningless way. For instance, when requesting every single internet search related to the account, the warrant application states that "I believe a review of the suspect's search history would reveal information relevant to the ongoing criminal investigation by revealing what information the suspect sought and when he sought it." Ex. A, p. 7. This is no different than saying "I want the search history because it will tell me the search history." There is not even an attempt to relate this request to the offense, which at the time law enforcement had no reason to believe related to internet searches.

Likewise, with respect to calendar entries, which law enforcement had no reason to believe were related to the offense that had been committed, Detective Keller states that law enforcement wants all calendar entries (including the identities of those with whom calendar entries were shared) because "I believe this information will identify dates and appointments relevant to this investigation, as well as, identify previously unknown co-conspirators and/or witnesses, and any potential corroborative evidence."   That attempted rationalization is merely law enforcement using a lot of words to say "fishing expedition."  At this point in the investigation, there was not a single piece of evidence linking the crime to calendar entries, nor a single piece of evidence indicating that there were any co-conspirators.  Indeed, none have been charged.

Because this warrant was unconstitutionally overbroad, it amounts to the same type of "general warrant" that was deemed improper in *Blake* and *Mercery*. Like those cases, the warrant here should likewise be deemed overbroad and the results should be suppressed.

## II.     The good-faith exception does not apply here.

Even if the Court deems the warrant overbroad, precedent holds that the Court must examine whether the good-faith exception applies.  Here, the Court should hold it does not apply.

Under *United States v. Leon*, 468 U.S. 897 (1984), where officers have an objective basis to rely in good faith on a facially valid warrant, the evidence secured under that warrant should only be suppressed in four specific situations: "(1) where the issuing magistrate or judge was misled by information in an affidavit that the affiant knew was false; (2) where the judicial officer that issued the warrant 'wholly abandoned his judicial role'; (3) where the warrant is based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable'; and (4) where the warrant issued is 'so facially deficient ... that the executing officers cannot reasonably presume it to be valid.'" *Mercery*, 591 F. Supp. 3d at 1377 (quoting *Leon*, 468 U.S. at 923).

Here, it appears that situations (3) and (4) above are relevant. With respect to situation (3), whether the warrant lacked probable cause is an issue that is currently pending before this Court. *See* Defendant's Objections to Magistrate Judge's Report and Recommendation to Deny Motion to Suppress, Doc. 118.

In *Mercery*, the Court held that it could not "find law enforcement reasonably relied in good faith on the judge's determination that there was probable cause to issue the Instagram Warrant, and excluding the evidence obtained under the warrant will further the purpose of the exclusionary rule to deter future Fourth Amendment violations when seeking warrants to search social media accounts." 591 F. Supp. 3d at 1383. First, it held that the Eleventh Circuit's

11

ruling in *Blake* "put law enforcement on notice that warrants authorizing the type of broad search of social media accounts like the one in this case are overbroad." *Id.* As in *Mercery*, law enforcement here was also on notice of the Eleventh Circuit's decision in *Blake* regarding overbroad warrants to social media companies.

Further, the *Mercery* court found that the warrant was both overbroad in what it compelled Instagram to produce and "contains no limitation on what the government can seize from the broad production of data." *Id.* It recognized that, with respect to electronic data, the general practice for compliance with Federal Rule of Criminal Procedure 41 is a "two-step process" - the "search" wherein the warrant will compel the third party to produce a broad array of electronic information, and the "seizure" wherein the warrant will authorize the seizure of a specified information. *Id.* at 1382; see Fed. R. Crim. P. 41(e)(2)(B).

The *Mercery* court noted that the warrant in *Blake* contained a limitation that "after all the data had been 'disclosed,' "law enforcement would only "seize[ ]" "data that 'constitute[d] fruits, evidence, and instrumentalities' of a specified crime." *Id.* at 1381-82. In *Mercery*, the warrant to Instagram had no such limitation. Likewise, the warrant here "contains absolutely no limitation on what data law enforcement could seize after" the broad disclosure by Yahoo. *Id.* Indeed, it explicitly says that the data that could be seized is co-extensive with the data that could be searched. Ex. A, p. 10-11.

The *Mercery* court found it "most important," that its ruling "excluding the evidence obtained under the unconstitutional warrant will deter future violations." 591 F. Supp. 3d at 1383. It recognized the vast and ever-increasing prevalence of technology companies as "hubs of personal information," and that law enforcement officers "need to know that a warrant must provide guidelines for determining what evidence may be searched and seized and must be tailored to the probable cause established in the supporting affidavit." *Id.*

That admonition is no less meaningful here. Indeed, in a different context Detective Keller has already demonstrated a lack of knowledge with the constitutional boundaries of search warrants. During the evidentiary hearing on Mr. Williamson's first motion to suppress, Detective Keller testified that he was unaware that he was not supposed to review images that had not been previously reviewed by a private party. He testified that it was his policy and practice to review all images related to every NCMEC CyberTipline Report, regardless of whether those images had been previously viewed by any private entity. Doc. 99, p. 155: 6-10; p. 190: 3-7. His policy to review every did not change until shortly before the October 2022 evidentiary hearing in this matter and required the intervention of legal counsel from the State Attorney's Office. Doc. 99, p. 190: 12-20. Unlike law enforcement here, there was no indication in *Mercery* that the officers lacked knowledge regarding the proper scope and execution of a

constitutional search.  Yet that Court nonetheless found the good-faith exception inapplicable and excluded the fruits of that search.

As in *Mercery*, the good-faith exception should not apply and the results of the warrant to Yahoo should be excluded.[5]

## **CONCLUSION**

For the above reasons, Mr. Williamson respectfully requests that this Motion be granted, that all evidence obtained as a result of the search warrant to Yahoo be suppressed, and that the Court grant all other relief that the Court deems necessary and proper.


Dated:  March 3, 2023             Respectfully submitted:

                                  /s/ Gus M. Centrone
                                  Gus M. Centrone (FB# 30151)
                                  KYNES, MARKMAN & FELMAN, P.A.
                                  P.O. Box 3396
                                  Tampa, FL  33601-3396
                                  Telephone: (813) 229-1118
                                  Facsimile: (813) 221-6750
                                  GCentrone@kmf-law.com

                                  *Counsel for Defendant Gregory Allen Williamson*

---

[5] Because the results of that search contained contraband, undersigned counsel does not have an itemized list to provide the Court of all items to be suppressed.  However, such a list would certainly contain every e-mail and every image from the "vladlover50" Yahoo account.

## <u>CERTIFICATE OF SERVICE</u>

I HERBY CERTIFY that on March 3, 2023, I electronically filed the foregoing with the Clerk of Court through the CM/ECF Filing System which will send a notice of electronic filing to all counsel of record.


/s/ Gus M. Centrone
Gus M. Centrone

# EXHIBIT A

## IN THE CIRCUIT COURT OF THE 12th JUDICIAL CIRCUIT IN AND FOR SARASOTA COUNTY, FLORIDA

## APPLICATION FOR COURT ORDER/SEARCH WARRANT COMPELLING PRODUCTION OF OATH HOLDINGS INC. (YAHOO!) ACCOUNT RECORDS

In Re:  A Criminal Investigation - Child Exploitation
Case No.20-099177
User account identified by Username:
   1.  **vladlover50@yahoo.com**

This account is under the control of:
   **Attention: Custodian of Records**
   **Oath Holdings Inc.**
   **701 First Avenue**
   **Sunnyvale, CA 94089**

BEFORE ME, a Judge of the Circuit Court, personally or by sworn attestment appeared Detective/Officer James Keller #304 a duly sworn law enforcement officer of the North Port Police Department, State of Florida, who after being first properly sworn, makes application for an order compelling Yahoo! (Oath Holdings Inc.) to search for, and obtain, and to provide information and data in the above described Yahoo! (Oath Holdings Inc.) account to the applicant Detective/Officer listed above, who states under oath that he/she has sufficient grounds to believe and does believe that the laws of the State of Florida have been violated, to-wit:

The laws prohibiting possession and promotion of child pornography controlled by Florida State Statute 827.071. And, that the officer has reason to believe and does believe that evidence connected with the crime is currently located within the below identified Yahoo! (Oath Holdings Inc.) accounts.

THE DESCRIPTION OF THE USER ACCOUNTS are as follows;
User account identified by Username:
   1.  **vladlover50@yahoo.com**

GROUNDS FOR ISSUANCE:
The following grounds for issuance of the Order Compelling Production of Yahoo! (Oath Holdings Inc.) account records, as required by Florida Statutes exist, to-wit:  the evidence sought is relevant to proving the above described offense has been committed and such evidence is contained within the Yahoo! (Oath Holdings Inc.) accounts described above. *See Florida Statute 933.02(3).*

Yahoo! (Oath Holdings Inc.) is an out-of-state corporation that provides electronic communication services or remote computing services to the public. Your Affiant seeks to

seize the below-described evidence pursuant to Florida Statute § 92.605 and § 934.23, as well as the United States Code 18 U.S.C. 2703, and California Statute § 1524.2, which compel out-of-state electronic communication service or remote computing service that provides such services to the public to provide information requested pursuant to search warrants, court orders or subpoenas issued in the State of Florida.

## FACTS STATED IN SUPPORT OF APPLICATION:

Your Affiant has sufficient reasonable grounds to believe that the above-named crime has been committed and that evidence in the form of electronic communication and or data held or possessed by Yahoo! (Oath Holdings Inc.) may be discovered. This detective/officer believes probable cause exists for the following reasons:

1. Your Affiant is a Detective/Officer with the North Port Police Department and is currently assigned to the Criminal Investigations Division. Your Affiant has been a police officer for approximately seven years and seven months and has been assigned to the Criminal Investigations Division for four years and three months Your Affiant is charged with the responsibility of investigating crimes such as crimes against property and persons.

2. Your Affiant is currently assigned to the Central Florida Internet Crimes Against Children Task Force (ICAC) since May 2019. Your affiant is also currently assigned to the FBI Child Exploitation and Human Trafficking Task Force since December 2019 as a Task Force Officer. Your Affiant has been a duly sworn Police Officer for the City of North Port Police Department since December 2012. From January 2013 to March 2016, your Affiant was assigned to the North Port Police Departments Patrol Division. In March 2016, your Affiant was assigned to the Property Crimes Unit of the Criminal Investigative Division at the North Port Police Department. In March 2017, your Affiant was assigned to the Major Crimes Unit of the Criminal Investigations Division at the North Port Police Department. In May 2019, your Affiant was tasked with investigating sex crimes in the aforementioned capacity. Your Affiant is currently the North Port Police Department's agency affiliate for the Internet Crimes Against Children (ICAC) Task Force. In his career, your Affiant has conducted criminal investigations to include: crimes involving sexual abuse of children, sexual abuse of adults, aggravated battery, robbery, home invasion, kidnapping, child pornography, and homicide. Your Affiant has obtained a Bachelor of Science of Interdisciplinary Studies from Liberty University. Your Affiant has attended a 2 hour course of instruction on an Introduction to Human Trafficking. Your Affiant has attended a 40 hour course of instruction on Sex Crimes Investigations hosted by South West Florida Public Safety Academy. Your Affiant has attended a 40 hour course of instruction on Case Preparation and Courtroom Presentations Investigations hosted by South West Florida Public Safety Academy. Your Affiant has attended an 8 hour course of instruction on Pedophiles and Child Abductions hosted by South West Florida Public Safety Academy. Your Affiant has attended multiple 1 hour course(s) of instruction to include, Part 1 ICAC App-Based Chat Sites, Part II ICAC App-Based Chat Sites, Legal Issues for Undercover Chat Investigations,

and Evolution of Online Ad Site Investigations hosted by National Criminal Justice Training Center of Fox Valley Technical College. Your Affiant has attended a 40 hour course of instruction on Undercover Online Chat Operations hosted by National Criminal Justice Training Center of Fox Valley Technical College. Your Affiant has attended a 40 hour course of instruction on ICAC Investigative Techniques hosted by National Criminal Justice Training Center of Fox Valley Technical College. Your Affiant has attended a 24 hour peer-to-peer BitTorrent Investigations and a 24 hour peer-to-peer Child Protection System (CPS) Basic P2P Investigations. Your Affiant has attended a 4 hour Identify and Investigate Human Trafficking class. Your Affiant has attended a 40 hour course of instruction on Child Exploitation Investigations hosted by South West Florida Public Safety Academy.

3. Based on all the above described training and experience, the investigative facts and activity set forth herein, your Affiant has developed probable cause to believe and does believe that the crimes described herein have been and are being committed at or within the City of North Port, Sarasota County, Florida.

4. On September 10, 2020, Oath Holdings Inc. (Yahoo!), who is an Electronic Service Provider (ESP), submitted a child exploitation cyber tip (79384716) to the National Center for Missing and Endangered Children (NCMEC). Oath Holdings Inc. (Yahoo!) reported that the Yahoo! user identified as "vladlover50@yahoo.com" uploaded apparent child pornography on 9/8/20 at 1600 hours UTC from IP 2601:701:c200:ef50:f00e:48dc:fd43:543c to the Yahoo! Server (image three below "image.1-1.jpeg"). The reported user also uploaded other apparent child pornography on the following dates: 9/2/20, 11/8/19, 9/8/20, 12/6/19, 1/16/20, 9/1/20, and 12/6/19. Oath Holdings Inc. (Yahoo!) reported that the user account was disabled and the account was preserved.

5. On October 22, 2020, the National Center for Missing and Endangered Children (NCMEC) researched the reported IPv6 address of "2601:701:c200:ef50:f00e:48dc:fd43:543c" through a public available website called Maxmind. Maxmind provided an approximate GPS location of North Port, Florida. The case was forwarded to the Internet Crimes Against Children Task Force (ICAC) in Central Florida who assigned it to North Port Police Department for further investigation.

6. On November 11, 2020, the North Port Police Department (NPPD) received the cyber tip (79384716). I reviewed the cyber tip and determined that the reported user uploaded seven pictures of child sexual abusive material (CSAM).

7. The first image, "image.4-1.gif", is child sexual abusive material (CSAM). This image is a gif file and is of a prepubescent minor white female torso area laying on a bed. An adult white male is captured with an erect penis ejaculating on the minor's pubic bone area above her genitals. The image is intended to cause sexual stimulation from the viewer.

8. The second image, "image.125-1.jpeg", is child sexual abusive material (CSAM).
   The image is of a white female minor standing and wearing a white and red dress.
   The bottom of the dress is pulled up revealing the minor's genitals and is the focal
   point of the image. The image is intended to cause sexual stimulation from the
   viewer.

9. The third image, "image.1-1.jpeg", is child sexual abusive material (CSAM). The
   image is of a prepubescent minor white female torso area laying on a bed. An
   adult white male is in the image with an erect penis and semen on the minor's
   pubic bone area above her genitals. The image is intended to cause sexual
   stimulation from the viewer.

10. The fourth image, "image.120-1.jpeg", is of a white female clothed. The image is
    child erotica and not child sexual abusive material (CSAM).

11. The fifth image, "image.97-1.jpeg", is child sexual abusive material (CSAM). The
    image is of a prepubescent minor white female laying on a bed naked with her
    legs spread open and semen on her stomach above her genitals. The image is
    intended to cause sexual stimulation from the viewer.

12. The sixth image, "image.5-1.jpeg", and the seventh image, "image.118-1.jpeg"
    are of a white female. The pictures are age difficult.

13. I searched the IPv6 address (2601:701:c200:ef50:f00e:48dc:fd43:543c) the image
    was uploaded with through the American Registry for Internet Numbers (ARIN)
    and it came back registered to Comcast. An investigative subpoena was executed
    to Comcast for the IP address. Comcast provided a response with a subscriber of
    Sara Barnes with a subscriber address of 2575 Rolling Rd. North Port, FL 34288.

14. Based upon the above facts and circumstances, I believe that probable cause exists
    to search and seize evidence from the Oath Holdings Inc. (Yahoo!) user account
    "vladlover50@yahoo.com" for the purposes of locating evidence as it relates to
    F.S.S. 827.071(5) - Possession of Image/Video of Sexual Performance by a Child.

Because the out-of-state electronic communication service or remote computing service
provider has no reasonable means to distinguish evidence of the crimes from any other
records contained within the sought-after account, your Affiant seeks to compel the service
provider to seize a copy of all records pertaining to the account and provide the entirety of
the records to your Affiant. Once your Affiant has obtained those records, your Affiant
and/or other representatives of his/her agency shall conduct an actual search of the items
obtained from the out-of-state electronic communication service or remote computing
service provider in order to sort the evidence of the violations articulated above and
specifically sought herein, which may be intermingled with innocent or innocuous
documents or records.

BACKGROUND OATH HOLDINGS INC:

Your Affiant seeks to seize records from Yahoo! (Oath Holdings Inc.,) to provide information requested pursuant to an issued search warrant. Information relating to an email provider such as Yahoo! (Oath Holdings Inc.,) can be found in the records possessed by the provider and on computer or mobile device(s) that sent the electronic transmissions. Once your Affiant has obtained those records, your Affiant and/or other representatives of law enforcement shall conduct a search of the items obtained from Yahoo! (Oath Holdings Inc.,) in order to identify the evidence of the crimes articulated above and specifically sought herein.

Through experience and training, your Affiant also knows that Yahoo! (Oath Holdings Inc.,) stores files for their subscribers. These files can be stored as an attachment in an email which was either received, sent, or attempted to be sent in the past, or have been saved. An analysis of these saved files is necessary to the investigating officers in order to further establish evidence of the crime.

Yahoo! (Oath Holdings Inc.,) maintains information about their customers including primary email addresses, secondary email addresses for account password recovery, applications, websites, and services that are allowed to access the user's Yahoo! (Oath Holdings Inc.,) account or use the user's Yahoo! (Oath Holdings Inc.,) account as a password login, and account login activity such as the geographic area the user logged into the account, what type of internet browser and device they were using, and the internet protocol (IP) address they logged in from. The IP address is roughly analogous to a telephone number assigned to a computer by an internet service provider. The IP can be resolved back to a physical address such as a residence or business with Wi-Fi access or residential cable internet. I believe this information will assist in the investigation by identifying previously unknown email accounts and location history information tending to show the movements of the suspect, his mobile device, and/or computers.

I know that Yahoo! (Oath Holdings, Inc.) may not verify the true identity of an account creator, account user or any other person who accesses a user's account using login credentials. For these reason's it is necessary to examine particularly unique identifying information that can be used to attribute the account data to a certain user. This is often accomplished by analyzing associated account data, usage, and activity through communication, connected devices, locations, associates, and other accounts. For these reasons it may be necessary to search and analyze data from when the Yahoo! (Oath Holdings Inc.,) account was initially created to the most current activity.

**1. Calendar - All calendars, including shared calendars and the identities of those with whom they are shared, calendar entries, notes, alerts, invites, and invitees.**

Yahoo! (Oath Holdings Inc.,) offers a calendar feature that allows users to schedule events. Calendar events may include dates, times, notes and descriptions, others invited to the event, and invitations to events from others. I believe this information will identify dates and appointments relevant to this investigation, as well as, identify previously unknown co-conspirators and/or witnesses, and any potential corroborative evidence.

2. **Contacts - All contacts stored by Yahoo! (Oath Holdings, Inc.) including name, all contact phone numbers, emails, social network links, and images.**

When a user links to their Yahoo! Using a tablet or mobile device, the names, addresses, phone numbers, email addresses, notes, and pictures associated with the account may be transferred to the mobile device and vice versa. This process may continuously update so when a contact is added, deleted, or modified using either the Yahoo! (Oath Holdings Inc.,) account or the mobile device the other is simultaneously updated. I believe this information is pertinent to the investigation as it will assist with identifying previously unknown coconspirators and/or witnesses. Docs (Documents)-All documents including by way of example and not limitation, Docs (a web based word processing application), Sheets (a web-based spreadsheet program), and Slides (a web based presentation program.) Documents will include all files whether created, shared, or downloaded.

3. **Yahoo! Mail - All email messages, including by way of example and not limitation, such as inbox messages whether read or unread, sent mail, saved drafts, chat histories, and emails in the trash folder. Such messages will include all information such as the date, time, internet protocol (IP) address routing information, sender, receiver, subject line, any other parties sent the same electronic mail through the 'cc' (carbon copy) or the 'bcc' (blind carbon copy), the message content or body, and all attached files.**

The Yahoo! (Oath Holdings Inc.,) account may be used to send and receive electronic mail messages and chat histories. These messages include incoming mail, sent mail, and draft messages. Messages deleted from Yahoo! (Oath Holdings Inc.,) are not actually deleted. They are moved to a folder labelled Trash and are stored there until the user empties the Trash file. Additionally, users can send and receive files as attachments. These files may include documents, videos, and other media files. I believe these messages would reveal motivations, plans and intentions, associates, and other co-conspirators.

4. **Photos - All images, graphic files, video files, and other media files stored by Yahoo! (Oath Holdings Inc.,) for the listed account.**

Yahoo! (Oath Holdings Inc.,) users may have the option to store, upload, and share digital images, graphic files, video files, and other media files. These images may be downloaded from the Internet, sent from other users, or uploaded from the user's mobile device. I believe a review of these images would provide evidence depicting the suspect, his/her associates and others performing incriminating acts, and victims. I also believe these image files may assist investigators with determining geographic locations such as residences, businesses, and other places relevant to the ongoing criminal investigation.

5. **Location History - All location data whether derived from Global Positioning System (GPS) data, cell site/cell tower triangulation/trilateration, precision measurement information such as timing advance or per call measurement data, and Wi-Fi location. Such data shall include the GPS coordinates and the dates and times of all location recordings from the period** [insert date] **to** [insert date]**.**

Yahoo! (Oath Holdings Inc.,) may collect and retain location data from user mobile devices. The company may use this information for location based advertising and location based search results. While the specific parameters of when this data is collected are not entirely clear, it appears that Yahoo! (Oath Holdings Inc.,) collects this data whenever one of their services is activated and/or whenever there is an event on the mobile device. I believe this data will show the movements of the suspect's mobile device and assist investigators with establishing patterns of movement, identifying residences, work locations, and other areas that may contain further evidence relevant to the ongoing criminal investigation.

6. **Search History - All search history and queries, including by way of example and not limitation, such as World Wide Web (web), images, news, shopping, ads, videos, maps, travel, and finance.**

Yahoo! (Oath Holdings Inc.,) retains a user's search history whether it is done from a mobile device or from a traditional computer. This history includes the searched for terms, the date and time of the search, and the user selected results. Furthermore, these searches are differentiated by the specific type of search a user performed into categories. These categories include a general web search, and specialty searches where the results are focused in a particular group such as images, news, videos, and shopping.

I believe a review of the suspect's search history would reveal information relevant to the ongoing criminal investigation by revealing what information the suspect sought and when he sought it.

For these reasons, I believe probable cause exists to seize and examine the specified records held by Yahoo! (Oath Holdings Inc.,) associated with the account **vladlover50@yahoo.com**. The records to be searched for and seized are more particularly described as;

**RECORDS TO BE SEARCHED AND/OR SEIZED**

Your affiant wishes to search, seize, and analyze the data described below, being stored at Yahoo! (Oath Holdings Inc.,) for any instruments, articles, and/or things which are contraband, or used in the commission of, or may constitute evidence of the offense of **Possession of Child Pornography, in violation of Florida State Statute 827.071.**

1. Account Information - User name, primary email address, secondary email addresses, connected applications and sites, and account activity from creation to 11/24/20, including account sign in locations, browser information, platform information, and internet protocol (IP) addresses;

2. Evidence of user attribution - accounts, e-mail accounts, passwords, PIN codes, account names, user names, screen names, remote data storage accounts, credit card number or other payment methods, contact lists, calendar entries, text messages, voice mail messages, pictures, videos, telephone numbers, mobile devices, physical addresses, historical GPS locations, two-step verification information, or any other

data that may demonstrate attribution to a particular user or users of the account(s).

3. Calendar - All calendars, including shared calendars and the identities of those with whom they are shared, from creation to 11/24/20, calendar entries, notes, alerts, invites, and invitees;

4. Contacts - All contacts stored by Yahoo! (Oath Holdings Inc.,) including name, all contact phone numbers, emails, social network links, and images;

5. Yahoo! Email - All email messages from [insert date] to [insert date], including by way of example and not limitation, such as inbox messages whether read or unread, sent mail, saved drafts, chat histories, and emails in the trash folder. Such messages will include all information such as the date, time, internet protocol (IP) address routing information, sender, receiver, subject line, any other parties sent the same electronic mail through the 'cc' (carbon copy) or the 'bcc' (blind carbon copy), the message content or body, and all attached files;

6. Photos - All images, graphic files, video files, and other media files stored by Yahoo! (Oath Holdings Inc.,) associated with the listed account;

7. Search History - All search history and queries from creation to 11/24/20, including by way of example and not limitation, such as World Wide Web (web), images, news, shopping, ads, videos, maps, travel, and finance;

WHEREFORE, your Affiant respectfully requests that a Search Warrant be issued commanding all and singular the Sheriffs and their Deputies, the Director of the Florida Highway Patrol and his Troopers, the Commissioner of the Florida Department of Law Enforcement and his designees, Constables and Municipal Police Officers and State Attorney's Investigators acting within their jurisdiction, with proper and necessary assistance, to search the above described Yahoo! (Oath Holdings Inc.) account in a manner consistent with F.S. S. § 92.605 and California Penal Code §15.24.2, by delivering said warrant via facsimile or U.S. mail to an authorized legal representative of Yahoo! (Oath Holdings Inc.) and to seize any and all of the aforesaid property found by virtue of such Search Warrant and to list the property seized on a return and inventory, to be filed within this Judicial Circuit within ten days of this date.

Det. James Keller #304
Affiant / Signature
Electronic Signature

STATE OF FLORIDA          )
COUNTY OF SARASOTA )

The foregoing instrument was acknowledged before me this 10th day of December, 2020, by the individual whose name and signature appear above, and who is personally known to me and who did take an oath.

Det. Lee Wallace #163
Signature/Electronic Signature
Law Enforcement Officer
Notary Public, State of Florida

STATE OF FLORIDA               )
12TH JUDICIAL CIRCUIT   )      SEARCH WARRANT (OATH HOLDINGS INC)
COUNTY OF SARASOTA   )                   (YAHOO/AOL)

### THIS ORDER IS ISSUED PURSUANT TO SECTION 92.605, FLORIDA STATUTES. A RESPONSE IS DUE WITHIN 20 BUSINESS DAYS OF RECEIPT OF THIS ORDER UNLESS A LONGER TIME PERIOD IS STATED HEREIN.

IN THE NAME OF THE STATE OF FLORIDA, to all and singular the Sheriffs and their Deputies, the Director of the Florida Highway Patrol and his Troopers, the Commissioner of the Florida Department of Law Enforcement and his Designees, the Director of the Florida Fish and Wildlife Conservation Commission and his Officers, and Constables, Municipal Police Officers and State Attorney's Investigators all acting within their jurisdiction;

WHEREAS, I have received affidavit for search warrant, on this date made before me by the Affiant, Detective/Officer James Keller #304 who has prepared same in his/her capacity as a law enforcement officer; and

WHEREAS, the stated Detective/Officer having been placed under oath and having sworn to the facts as stated therein, and having examined the said facts set forth in support of said application for search warrant, and the facts contained therein which are now incorporated herein by reference and made a part of this Warrant, and;

WHEREAS, said facts so made known to me by such affidavit as set forth, have caused me to certify and find that there is probable cause to believe that the laws of the State of Florida relative to the possession and promotion of child pornography has been violated by UNKNOWN PERSON(S) and that evidence of the crime is currently located at or within;

A user account identified by Username of: **vladlover50@yahoo.com**
From account creation to 11/24/20 at 00:00:00 UTC
which is under the control of:
**Attention: Custodian of Records**
**Oath Holdings Inc.**
**701 First Avenue**
**Sunnyvale, CA 94089**

THEREFORE, the Court having found that Oath Holdings Inc. (Yahoo/AOL) is an out-of-state corporation that provides electronic communication services or remote computing services to the public and pursuant to Florida Statutes § 92.605 and § 934.23, as well as the United States Code 18 U.S.C. § 2703, and California Statute § 1524.2, a Judge of the Circuit Court of Florida has jurisdiction to issue a search warrant for a Yahoo! (Oath Holdings Inc.) accounts, consequently these presents are to command you, with the proper and necessary assistance, either in the day time or in the night time, as the exigencies of the situation may demand or require or on Sundays, or holidays, to enter the

said Yahoo! (Oath Holdings Inc.) account described above, and diligently search said account and seize as evidence any of the following:

### PROPERTY TO BE PROVIDED BY OATH HOLDINGS INC

- Account Information -User name, primary email address, secondary email addresses, connected applications and sites, and account activity from creation to 11/24/20, including account sign in locations, browser information, platform information, and internet protocol (IP) addresses;

- Evidence of user attribution -accounts, e-mail accounts, passwords, PIN codes, account names, user names, screen names, remote data storage accounts, credit card number or other payment methods, contact lists, calendar entries, text messages, voice mail messages, pictures, videos, telephone numbers, mobile devices, physical addresses, historical GPS locations, two-step verification information, or any other data that may demonstrate attribution to a particular user or users of the account(s);

- Calendar – All calendars, including shared calendars and the identities of those with whom they are shared, from creation to 11/24/20, calendar entries, notes, alerts, invites, and invitees;

- Contacts – All contacts stored by Yahoo! (Oath Holdings Inc.,) Including name, all contact phone numbers, emails, social network links, and images:

- Yahoo! Email – All email messages from creation to 11/24/20, including by way of example and not limitation, such as inbox messages whether read or unread, sent mail, saved drafts, chat histories, and emails in the trash folder. Such messages will include all information such as the date, time, internet protocol (IP) address routing information, sender, receiver, subject line, any other parties sent the same electronic mail through the 'cc' (Carbon copy) or the 'bcc' (Blind carbon copy), the message content or body, and all attached files;

- Photos – All images, graphic files, video files, and other media files stored by Yahoo! (Oath Holdings Inc.,) associated with the listed account;

- Search History – all search history and queries from creation to 11/24/20, including by way of example and not limitation, such as World Wide Web (WEB), images, news, shopping, ads, videos, maps, travel, and finance;

YOU ARE FURTHER DIRECTED to bring the property so seized before a court having jurisdiction to be disposed of and dealt with according to law and make return of your doings under this warrant to me or to my designated clerk, within ten (10) days of the date hereof, and give proper receipts for any property taken hereunder, and deliver a copy of this warrant to the person at whom directed.

GIVEN UNDER MY HAND and seal this day

**12/11/2020**

DATE

SIGNA                                      URE

# Doc. 138 –

# Response to Second

# Motion to Suppress

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.                                          CASE NO. 8:21-cr-00355-WFJ-CPT

GREGORY WILLIAMSON
a/k/a "VLAD VLAD"

## UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANT'S SECOND MOTION TO SUPPRESS

The United States hereby responds in opposition to Williamson's *Second Motion to Suppress* ("Motion"). Doc. 134. Williamsons' Motion challenges the same search warrant found to be valid in his First Motion to Suppress (Doc. 44). The present motion should be denied without a hearing. Having failed in his first challenge to the warrant, Williamson now proclaims – while his objections are still pending– that the parameters of the search were overbroad. (Docs. 114, 118, 134). Not only does the Eleventh Circuit precedent reject Williamson's new argument, but there is no cognizable remedy to this perceived violation as the Fourth Amendment's good-faith exception forecloses such relief. The search warrant sought in this case was neither overbroad nor did the actual search exceed the scope the court allowed; therefore, the Motion should be denied. Absent a specific allegation that law enforcement somehow went beyond the four corners of a search warrant that a third-party, Yahoo, handled entirely without the investigative team's involvement, the

issue presented to the Court is a question of law that can be resolved in the United States' favor without an evidentiary hearing.

## PROCEDURAL BACKGROUND

This is Williamson's second motion to suppress after a grand jury returned an eight-count indictment alleging various crimes against children. Docs. 1, 134. Williamson subsequently failed to suppress the search warrant results that contained evidence supporting those charged offenses. Doc. 44. On October 11, 2022, this Court held an evidentiary hearing on the first motion to suppress and, after an exhaustive record, the Court issued a Report and Recommendation that Williamson's first motion to suppress should not only be denied, but that he had failed to even meet his burden of production for a *Franks* evidentiary hearing. Doc. 99, Doc. 114. Though his objections to the Report and Recommendation are still pending before the District Court, Williamson now makes an ancillary attack on the same search warrant – this time claiming that the search warrant was overbroad. Doc. 118, Doc. 134.

## I.     RELEVANT FACTUAL BACKGROUND

On November 5, 2020, North Port Police Department ("NPPD") received a CyberTipline Report #79384716 from NCMEC. *See* Exhibit 1. The CyberTipline

Report[1] was generated in September 2020, after NCMEC received information from Oath Holdings/Yahoo about apparent child pornography. *See* Exhibit 1. The information provided that Yahoo user, "vladlover50@yahoo.com" had transmitted seven images of suspected child pornography, also known as child sexual abuse material ("CSAM").

Later, on November 11, 2020, Detective James Keller of the North Port Police Department was assigned to the case and reviewed the CyberTipline Report. Based upon his review of the CyberTipline Report and further case investigation, Detective Keller secured a search warrant in Florida's 12th Judicial Circuit for Williamson's vladlover50@yahoo.com account. *See* Exhibit 2.

The search warrant exhaustively described the categories of data intended to identify: (1) account subscriber information; (2) user attribution; (3) calendar; (4) contacts; (5) email; (6) photos; and (7) search history. With respect to each of those categories of data the provider duly complied with the requests without objection to its breadth or scope. *See* Exhibit 2.

On December 23, 2020, Yahoo provided Detective Keller the results of the search warrant.

---

[1] The CyberTipline Report is a complaint generated from the centralized reporting system for the online exploitation of children. The public and electronic service provides can make reports of suspected online child exploitation.

## II.    MEMORANDUM OF LAW

### A. The Yahoo Search Warrant was not Overbroad

Courts have consistently rejected challenges to search warrants of electronic information that describe, with particularity, the information to be searched based on the offenses being investigated – even when the scope of that search is not explicitly cabined to a narrow period of time. Nothing in the record should lead to a different conclusion here.

A search warrant must "particularly describ[e] the place to be searched, and the person or things to be seized." U.S. Const. amend IV. Pursuant to the Fourth Amendment, searches must be as limited as possible and require warrants to include a particular description of things to be seized in order to prevent the "rummaging" through a person's belongings. *United States v. Blake*, 868 F.3d 960, 973 (11th Cir. 2017). A description of the property to be seized will be acceptable if it is as specific as the circumstances and nature of the activity under investigation permit. *United States v. Moody*, 977 F.2d 1425, 1432 (11th Cir. 1992).

Williamson relies primarily on the *Blake* and *Mercery* decisions to argue that the Yahoo search warrant in this case is overbroad. Doc. 134. In *Blake*, the FBI discovered defendants Blake and Moore were running a prostitution ring and used a specific email to post Backpage ads. *Blake*, 868 F.3d at 966. The FBI arrested Blake and Moore based on a variety of investigative leads and subsequently executed four *post-arrest* search warrants. *Id*. One of the search warrants sought limited information

from a known email account associated with the prostitution ring, specifically seeking emails from Microsoft linked to the sex trafficking charges. *Id*. Another two search warrants sought information from Facebook, requesting virtually every type of data that could be located on that account. *Id*. At the time the Facebook warrants for Moore's account were executed, the FBI had extensive evidence linking Moore to the prostitution ring, including victim testimony and publicly viewable information on Moore's Facebook page.

The *Blake* court held that the Microsoft warrant complied with the Fourth Amendment's particularity requirement because it limited the emails to be turned over to the government, "ensuring that only those that had the potential to contain incriminating evidence would be disclosed." *Id*. at 973. As it relates to the Facebook warrants, the *Blake* court determined those were overbroad because they required disclosure of every kind of data that could be found in a social media account and did not limit the time period to that of which the government knew Moore was suspected of taking part in the prostitution conspiracy. *Id*. at 974.

In *Mercery*, the district court examined the sufficiency of geolocation and Instagram warrants. *United States v. Mercery*, 591 F.Supp.3d 1369 (M.D. Ga. 2022). Mercery was charged with four counts of possession of a firearm by a convicted felon. The Instagram warrant was deemed overbroad and not subject to the good-faith exception. *Id*. Law enforcement obtained the Instagram warrant based on a view of Mercery's public Instagram page where Mercery posted videos holding what

5

appeared to be large sums of money and discussing robbery and illegal drugs. *Id*. at

1379. Law enforcement identified Mercery as the individual who maintained the

Instagram account based on their investigation. *Id*. at 1378. Law enforcement sought

a large amount of information from Mercery's Instagram account, including

information on the account from approximately one year prior to the dates charged

in the indictment. *Id*. at 1379-80. The *Mercery* court held that the information law

enforcement sought in the Instagram warrant authorized the government to search

and seize data that was not related to the probable cause established by the affidavit.

*Id*. at 1382. Additionally, the *Mercery* court held that the Instagram warrant lacked

the required particularity, and the warrant was broader than other social media

warrants in violation the Fourth Amendment's particularity clause but were

ultimately upheld under *Leon*. Id. at 1383. The good faith exception did not apply

because the warrant was not tailored to the probable cause established in the

supporting affidavit. *Id*.

The Eleventh Circuit in *Alford* addressed potentially overbroad search warrants

in reference to a Google account search warrant. *United States v. Alford*, 744

Fed.Appx. 650 (11th Cir. 2018). The warrant was deemed to be sufficiently

particular by the district court because it asked for Google to provide:

> "Any and all records, files, data, and/or other forms of information including
> names, user names, dates of birth, IP addresses, home addresses, phone numbers, e-
> mail addresses, photos, videos, e-mail content, search history, call history, or other
> information held by Google Inc. which may aid in obtaining the identification and/or

location of the individual whom contacted K-mart in Hamilton, MT via phone call [to various phone numbers] on September 16, 2014 at approximately 2145 hours MST."

Further, the *Alford* court determined that the warrant fell "somewhere between the Microsoft and Facebook warrants in *Blake* because, like the Facebook warrants, it requested nearly every kind of data that could be found in a Google account, but like the Microsoft warrant, the information requested was all potentially incriminating because it could have identified the K-Mart caller." *Alford*, 744 Fed. Appx. at 653.

The Yahoo search warrant at issue in Williamson's case is much more akin to the *Alford* search warrant rather than the *Blake* and *Mercery* warrants. Detective Keller sought and obtained the search warrant for the vladlover50@yahoo.com account at the start of his investigation, right after he secured a target residential address. This is in direct contrast to the investigation conducted in *Blake* and *Mercery*, where the search warrants at issue were obtained *post-arrest* of the suspects. The Yahoo warrant is similar to the *Alford* search warrant since they were both secured at the beginning of the investigation. Based on the NCMEC CyberTip, Detective Keller had the above-detailed email address, a phone number and the name "vlad vlad" to identify the Yahoo user that distributed child sexual abuse material on the platform. *See* Exhibit 1. Detective Keller requested all the potentially incriminating information in the vladlover50@yahoo.com account in an investigative attempt to identify the email account's user, again analogous to the *Alford* case. When viewing the investigative work of Detective Keller in conjunction with the information known to him while

seeking the Yahoo search warrant for the vladlover50@yahoo.com account, Williamson's case is much more like *Alford* than to *Blake* and *Mercery*.

Additionally, Detective Keller described with particularity the records that were to be searched and seized as required under the Fourth Amendment. He detailed specifically that he was seeking Yahoo email records from the inception of the account to attempt to identify the user of the account. *See* Exhibit 2 at 5. Within the affidavit, he described in detail the records he sought from Yahoo relating to the account in question and provided a description as to why it was relevant to his investigation. *Id*. at 5-7. Some of the explanations provided by Detective Keller as to why the information was relevant were that the user's contacts will help assist with identifying previously unknown coconspirators and/or witnesses and location history of the Yahoo account will help establish the user's residence. Unlike in *Mercery,* the Yahoo search warrant in Williamson's case directly related to the probable cause in the affidavit. Unlike the *Blake* Facebook warrants, the Yahoo search warrant date range is appropriate because law enforcement was unable to narrowly tailor the date range while attempting to determine the account holder. Information such as an individual's real name or backup email addresses are normally provided at the inception of an email account. Even if a warrant is broad, it does not make it automatically overbroad in violation of the Fourth Amendment. The particularity in tandem with the overarching investigation and the caveat that a review will be done to field out any non-incriminating information, results in the

Yahoo search warrant in this case are not overbroad pursuant to the controlling Eleventh Circuit decisions and the Fourth Amendment.

## B. The Good-Faith Exception Applies

There is no evidence beyond mere conclusory allegations and interpretations that demonstrate a different decision should be found as to the Yahoo search warrant in this Motion. If, however, this Court finds the Yahoo warrant is in fact overbroad, the good faith exception should still apply. There is no evidence to support a finding that law enforcement knew or should have known that the Yahoo search warrant was impermissibly overbroad. Law enforcement made an objectively reasonable decision to rely on this warrant.

Suppression of a warrant is an appropriate remedy in the following circumstances: (1) the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth; (2) the magistrate wholly abandoned his judicial role; (3) the affidavit is lacking probable cause and it would be unreasonable to rely on it; and (4) the warrant is so facially deficient that the executing officers cannot reasonably presume it to be valid. *United States v. Leon*, 104 S.Ct. 3405, 3420 (1984).

Williamson contends that the good-faith exception should not apply, and the Yahoo search warrant should be suppressed. He asserts that the affidavit is lacking in probable cause, it would be unreasonable to rely on, and further that the warrant is

9

so facially deficient that the executing officers cannot reasonably presume it to be valid. Doc. 134. Williamson's argument also relies on the allegation that the judge in issuing the Yahoo warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth.

Probable cause has been established within the Yahoo search warrant by an independent judge. On or about December 11, 2020, a judge in and for Florida's 12th Judicial Circuit found probable cause and signed the warrant authorizing the search of the vladlover50@yahoo.com account. *See* Exhibit 2. In his first Motion to Suppress, Williamson alleged a *Franks* violation, contending various reasons why Detective Keller made material misrepresentations or omissions. Doc. 44. The Magistrate Court, by way of a detailed evidentiary hearing, determined that Williamson did not meet the necessary threshold to even require a *Franks* hearing. Doc. 114 at 40-45. Williamson contends that a probable cause determination is still at issue before this court; however, Williamson's Objection to Magistrate Judge's Report and Recommendation to Deny Motion to Suppress realleges the same arguments he made in the first Motion to Suppress and evidentiary hearing. Doc. 114, Doc. 118. The allegation of insufficient probable cause relates directly to unsubstantiated claims of untruthfulness against Detective Keller. Williamson now continues to attack Detective Keller's credibility by improperly citing the record from the evidentiary hearing. Doc. 114, Doc. 134 at 13. Williamson alleges that Detective

10

Keller testified that it was *his* policy and practice to review all images related to a NCMEC CyberTipline Report, regardless of whether those images had been previously viewed by any private entity. (emphasis added) Doc. 134 at 13. In truth, the law enforcement agency policy has changed over time seemingly based on legal advice from local legal counsel. Doc. 114 at 155. Detective Keller always acted within the policy of his agency when reviewing the NCMEC CyberTipline reports. No requisite evidence has been provided by Williamson to allege that Detective Keller lacked knowledge with constitutional boundaries of search warrants and thus the good-faith exception should not apply. Additionally, the *Franks* accusation has already been determined fruitless by the Magistrate Court. Doc. 114 at 40-45.

Williamson further alleges that the good-faith exception is not applicable because the warrant issued is so facially deficient that executing officers cannot reasonably presume it to be valid. Doc. 134 at 11. Relying exclusively on the *Mercery* decision, Williamson makes the argument that the Yahoo warrant here is overbroad and the good-faith exception does not apply. As noted earlier, the facts of *Mercery* and the facts of Williamson's case are starkly different. The probable cause in the *Mercery* Instagram search warrant did not directly correlate to sought after information relating to illegal drug activity. The underlying charges were firearm crimes and the probable cause detailed in the Instagram search warrant related to the instances of Mercery possessing firearms. There was no correlation presented in that affidavit to connect Mercery's firearm activity with evidence that would be

discovered on his Instagram account. The Yahoo search warrant here properly alleges the criminal information known at the time of the investigation and tailors the search as much as possible to still allow for law enforcement to solidify the identity of the Yahoo user that was using the Yahoo platform to distribute child sexual abuse material. There is a direct connection here between the information provided in the NCMEC CyberTipline Report relating to vladlover50@yahoo.com and the search of the vladlover50@yahoo.com account.

If the court were to find that the Yahoo search warrant was overbroad, the good-faith exception would apply, and Yahoo search warrant results should not be suppressed.

## **CONCLUSION**

Wherefore, the United States respectfully requests this Honorable Court to

deny Williamson's Second Motion to Suppress.

Respectfully submitted,

ROGER B. HANDBERG
United States Attorney

By: *s/ Erin Claire Favorit*
Erin Claire Favorit
Assistant United States Attorney
Florida Bar No. 104887
400 N. Tampa Street, Suite 3200
Tampa, Florida 33602-4798
Telephone:   (813) 274-6000
E-mail: erinf.favorit@usdoj.gov

*/s/ Abigail K. King*
Abigail K. King
Assistant United States Attorney
Florida Bar No. 294963
400 N. Tampa St., Ste. 3200
Tampa, FL 33602-4798
E-mail: Abigail.King@usdoj.gov

**U.S. v. Gregory Williamson**          **CASE NO. 8:21-cr-00355-WFJ-CPT**

## CERTIFICATE OF SERVICE

I hereby certify that on March 17, 2023, I electronically filed the

foregoing with the Clerk of the Court by using the CM/ECF system, which

will send a notice of electronic filing to the following:

Gus Centrone, Esq.

By: *s/ Erin Claire Favorit*
Erin Claire Favorit
Assistant United States Attorney
Florida Bar No. 104887
400 N. Tampa Street, Suite 3200
Tampa, Florida 33602-4798
Telephone:   (813) 274-6000
Facsimile:    (813) 274-6103
E-mail: erin.favorit@usdoj.gov

*/s/ Abigail K. King*
Abigail K. King
Assistant United States Attorney
Florida Bar No. 294963
400 N. Tampa St., Ste. 3200
Tampa, FL 33602-4798
E-mail: Abigail.King@usdoj.gov

14



# CyberTipline Report 79384716

## Priority Level: E
## (Report submitted by a registered Electronic Service Provider)

Received by NCMEC on 09-10-2020 18:02:08 UTC

All dates are displayed as MM-DD-YYYY

Except for times provided in Additional Information sections, all time zones are displayed in UTC

---

## Executive Summary

**The following is a brief overview of information contained in this CyberTipline report:**

**Incident Type:** Apparent Child Pornography
Files Not Reviewed by NCMEC, Hash Match

NCMEC Incident Type is based on NCMEC's review of the report **OR** a "Hash Match" of one or more uploaded files. NCMEC may not have viewed all uploaded files submitted by the reporting ESP.

One or more files uploaded in this CyberTipline report have resulted in a "Hash Match" to a file from a previous CyberTipline report. NCMEC staff have not viewed the uploaded files submitted with this CyberTipline report that are designated as "Hash Match." The "Hash Match" designation indicates that the uploaded files match the hash values of uploaded files from a CyberTipline report that were previously viewed and categorized by NCMEC at the time this report was generated.

Please see Section B for additional information related to the Hash Match by NCMEC.

**Total Uploaded Files:** 7

The National Center for Missing & Exploited Children (NCMEC) was incorporated in 1984 by child advocates as a private, non-profit 501(c)(3) organization to serve as a national clearinghouse and resource center for families, victims, private organizations, law enforcement, and the public on missing and sexually exploited child issues. To further our mission to help find missing children, reduce child sexual exploitation, and prevent future victimization, NCMEC operates the CyberTipline and Child Victim Identification Program. NCMEC makes information submitted to the CyberTipline and Child Victim Identification Program available to law enforcement and also uses this information to help identify trends and create child safety and prevention messages. As a clearinghouse, NCMEC also works with Electronic Service Providers, law enforcement and the public in a combined effort to reduce online child sexual abuse images. NCMEC performs its programs of work pursuant to its own private mission and independent business operations. NCMEC does not act in the capacity of or under the direction or control of the government or law enforcement agencies. NCMEC does not investigate and cannot verify the accuracy of the information submitted by reporting parties.

CyberTipline Report 79384716 | i

## Contents

### Section A: Reported Information — 1

Reporting Electronic Service Provider (ESP) — 1
Company Information — 1
Incident Information — 2
Suspect — 3
Additional Information Submitted by the Reporting ESP — 3
Uploaded File Information — 3–5

### Section B: Automated Information Added by NCMEC Systems — 6

Explanation of Automated Information (in alphabetical order) — 6
Uploaded File Information — 6

### Section C: Additional Information Provided by NCMEC — 7

NCMEC Note #1 — 7

### Section D: Law Enforcement Contact Information — 10

Central Florida ICAC — 10

*This Report is provided solely for informational purposes pursuant to NCMEC's nonprofit mission.*
*Please treat all information in this Report as confidential.*

DISC-01125

CyberTipline Report 79384716 | 1

# Section A: Reported Information

The following information was submitted to the CyberTipline by the Reporting Person or Reporting ESP. The information appearing in Section A is information received in the original submission. The reporting of information in Section A, other than the "Incident Type" and "Incident Time," is voluntary and undertaken at the initiative of the Reporting Person or Reporting ESP.

## Reporting Electronic Service Provider (ESP)

**Submitter:**

Yahoo! Inc

Business Address:
701 First Avenue
Sunnyvale, CA 94089 United States

**Point of Contact for Law Enforcement:**

Email: lawenforcement-inquiries@oath.com

https://lawenforcementrequests.oath.com

## Company Information

Reporting Electronic Service Provider (ESP)

Oath Holdings Inc (for information related to Yahoo accounts)
701 First Avenue
Sunnyvale, CA 94089 US
Point of Contact for Law Enforcement:
https://lawenforcementrequests.oath.com (US law enforcement only, for submitting US legal process) or
lawenforcement-inquiries@verizonmedia.com (US and non-European international law enforcement only, for inquiries) or
ie-legalpoc@verizonmedia.com (European law enforcement)

Oath Inc. (for information related to AOL accounts)
22000 AOL Way
Dulles, VA 20166
Point of Contact for Law Enforcement:
https://lawenforcementrequests.oath.com (US law enforcement only, for submitting US legal process) or
lawenforcement@teamaol.com (US and International law enforcement, for inquiries)

Oath Holdings Inc. and Oath Inc. and herein collectively referred to as ("Oath").

Company Information
To submit an emergency disclosure requests (EDR):

 U.S. law enforcement should submit an EDR through https://lawenforcementrequests.verizonmedia.com for both Yahoo and AOL accounts.

European law enforcement should submit an EDR to ie-emergencies-ilist@verizonmedia.com

All other international law enforcement should submit an EDR request to page-legalpoc@verizonmedia.com.
*********************************************************************************************************

This report was submitted from the Electronic Service Provider (ESP), Oath pursuant to 18 USC § 2258A. Oath has provided NCMEC with the following explanations pertaining to the reports submitted to the CyberTipline:

*This Report is provided solely for informational purposes pursuant to NCMEC's nonprofit mission.*
*Please treat all information in this Report as confidential.*

DISC-01126

When law enforcement serves legal process upon Oath Holdings Inc., law enforcement should reference:
The CyberTipline Report number
The user identifier (i.e. Yahoo or AOL email address); and/or Oath's Globally Unique
Identifier (GUID) (e.g. TYGJVP473PMKTB7CFPHVMBATKI)

The following information was submitted to the CyberTipline by the Reporting Person or Reporting ESP. The information appearing in Section A is information received in the original submission. The reporting of information in Section A, other than the "Incident Type" and "Incident Time," is voluntary and undertaken at the initiative of the Reporting Person or Reporting ESP.

Company Information

CyberTipline Report

This Report is provided solely for informational purposes pursuant to NCMEC's nonprofit mission.

Please treat all information in this Report as confidential.

For CyberTips related to images transmitted over Yahoo or AOL email, the Offense Date is the approximate date and approximate time when a message containing some of the image(s) and/or video(s) was transmitted over Yahoo or AOL email servers. To determine which reported files were part of this message, please refer to the Message ID reported under the Offense Date, and locate the the image(s)/video(s) with the same Message ID, which will be in the "Additional Information" field for each reported image and/or video. All times in Oath reports are in UTC, unless otherwise noted.

In most instances involving CyberTips related to Oath platforms other than Yahoo or AOL mail, the IP address and associated timestamp provided in the "Uploaded File Information" section of the CyberTip will be denoted with "(Upload)", which indicates that the IP address reported was the source of the reported image or video. In some cases, Oath may provide additional IP address information in this section, as described below: Other = The last known upload IP Address not associated with any of the reported content Registration = The IP Address of the user at the time the Yahoo Account was created Last Login = The IP Address of the most recent login of the reported user.

Reported image(s)/video(s) included in this CyberTip were previously posted on an Oath property/platform. The poster's account has since been disabled and these image(s)/video(s) are no longer accessible. The submitted content will be kept for at least 90 days from receipt of this report pursuant to 18 USC § 2258A(h)(2).

If your CyberTip includes a Supplemental Report authored by the Oath E-Crime Investigations Team (ECIT), the ECIT has identified the reported account as a priority, based on a number of potential factors, including but not limited to: the user(s) holding a position of authority and/or trust, the user(s) having access to children, and the user(s) being identified as repeat offenders. The Supplemental Report provides additional information about the user, and may include last login IP address, alternate communication channels (email address/phone numbers) the user added and/or verified on the account(s), and any information obtained from open-source searches.

For Oath Supplemental Reports:
Section A - Reported Information

Point of Contact for Law Enforcement:
e-crime-investigations@verizonmedia.com

Submitter:
Oath Holdings Inc
701 First Avenue
Sunnyvale, CA 94089 US

## Incident Information

This Report is provided solely for informational purposes pursuant to NCMEC's nonprofit mission.
Please treat all information in this Report as confidential.

CyberTipline Report 79384716 | **3**

| | |
|---|---|
| **Incident Type:** | Child Pornography (possession, manufacture, and distribution) |
| **Incident Time:** | 09-10-2020 15:02:06 UTC |
| **Description of Incident Time:** | This is the date/time when Oath submitted the CyberTip to NCMEC. |

## Suspect

| | |
|---|---|
| **Name:** | vlad vlad |
| **Phone:** | +19414451469 |
| **Email Address:** | vladlover50@yahoo.com |
| **ESP User ID:** | S6ACNO5WZCQ2L42AJXELMJRFGQ-yahoo |
| **Additional Information:** | Alternate Email: |

## Additional Information Submitted by the Reporting ESP

Platform: Files were transmitted over Yahoo Mail.
Offense Date/Time and IP address: 09/08/2020 @ 4:00pm (UTC) from IP 2601:701:c200:ef50:f00e:48dc:fd43:543c
Message ID: AOnVyMcZUDI-X1eqiAXYGHE_POg

## Uploaded File Information

| | |
|---|---|
| **Number of uploaded files:** | 7 |

## Uploaded File Information

| | |
|---|---|
| **Filename:** | image.4-1.gif |
| **MD5:** | d88f463af69870375efb1ea3242e1757 |
| **Original Filename Associated with File:** | 101.gif |
| **Did Reporting ESP view entire contents of uploaded file?** | Yes |
| **Did Reporting ESP view the EXIF of uploaded file?** | (Information Not Provided by Company) |
| **Were entire contents of uploaded file publicly available?** | (Information Not Provided by Company) |
| **Additional Information:** | messageID for this upload: AC8DBl036uurX0-sygDPCI_UTsk |
| **Additional Information:** | Upload Date/Time: 2020-09-02 14:31:37 |

## Uploaded File Information

| | |
|---|---|
| **Filename:** | image.125-1.jpeg |
| **MD5:** | f361bb042c6bdd5fe8f1616b5a666737 |
| **Original Filename Associated with File:** | 0_806.jpg |
| **Did Reporting ESP view entire contents of uploaded file?** | Yes |
| **Did Reporting ESP view the EXIF of uploaded file?** | (Information Not Provided by Company) |
| **Were entire contents of uploaded file publicly available?** | (Information Not Provided by Company) |
| **Additional Information:** | messageID for this upload: AEazubFrgUGlXcV9vw1KWN40I4A |
| **Additional Information:** | Upload Date/Time: 2019-11-08 14:37:51 |

*This Report is provided solely for informational purposes pursuant to NCMEC's nonprofit mission.*
*Please treat all information in this Report as confidential.*

DISC-01128

CyberTipline Report 79384716 | 4

## Uploaded File Information

| | |
|---|---|
| **Filename:** | image.1-1.jpeg |
| **MD5:** | 4f49b5d5ddb3da509e6a2ccba96b7152 |
| **Original Filename Associated with File:** | download.jpg |
| **Did Reporting ESP view entire contents of uploaded file?** | Yes |
| **Did Reporting ESP view the EXIF of uploaded file?** | (Information Not Provided by Company) |
| **Were entire contents of uploaded file publicly available?** | (Information Not Provided by Company) |
| **Additional Information:** | messageID for this upload: AOnVyMcZUDI-X1eqiAXYGHE_POg |
| **Additional Information:** | Upload Date/Time: 2020-09-08 16:00:08 |

## Uploaded File Information

| | |
|---|---|
| **Filename:** | image.120-1.jpeg |
| **MD5:** | bff21c35176766cbc454bc46057352b1 |
| **Original Filename Associated with File:** | 7.jpg |
| **Did Reporting ESP view entire contents of uploaded file?** | Yes |
| **Did Reporting ESP view the EXIF of uploaded file?** | (Information Not Provided by Company) |
| **Were entire contents of uploaded file publicly available?** | (Information Not Provided by Company) |
| **Additional Information:** | messageID for this upload: AlwCj4IsEdbzXeqPFAPoADRvP64 |
| **Additional Information:** | Upload Date/Time: 2019-12-06 17:25:39 |

## Uploaded File Information

| | |
|---|---|
| **Filename:** | image.97-1.jpeg |
| **MD5:** | 5574e059b84e096bb86a843a7ebc6590 |
| **Original Filename Associated with File:** | 671_1000.jpg |
| **Did Reporting ESP view entire contents of uploaded file?** | Yes |
| **Did Reporting ESP view the EXIF of uploaded file?** | (Information Not Provided by Company) |
| **Were entire contents of uploaded file publicly available?** | (Information Not Provided by Company) |
| **Additional Information:** | messageID for this upload: AEw2H3oNrZsAXiA_eQJhYFNT6gY |
| **Additional Information:** | Upload Date/Time: 2020-01-16 10:48:24 |

## Uploaded File Information

| | |
|---|---|
| **Filename:** | image.5-1.jpeg |
| **MD5:** | 72472b75dea64b1c29224d21475810af |
| **Original Filename Associated with File:** | 0_128.jpg |
| **Did Reporting ESP view entire contents of uploaded file?** | Yes |
| **Did Reporting ESP view the EXIF of uploaded file?** | (Information Not Provided by Company) |
| **Were entire contents of uploaded file publicly available?** | (Information Not Provided by Company) |
| **Additional Information:** | messageID for this upload: AKrmNOQYHsQpX04kHw1tgNIXT9E |

*This Report is provided solely for informational purposes pursuant to NCMEC's nonprofit mission.*
*Please treat all information in this Report as confidential.*

DISC-01129

CyberTipline Report 79384716 | 5

**Additional Information:**                                   Upload Date/Time: 2020-09-01 10:36:15

## Uploaded File Information

| | |
|---|---|
| **Filename:** | image.118-1.jpeg |
| **MD5:** | 83ab909b2ff4944af7631fbac9acca99 |
| **Original Filename Associated with File:** | 1.jpg |
| **Did Reporting ESP view entire contents of uploaded file?** | Yes |
| **Did Reporting ESP view the EXIF of uploaded file?** | (Information Not Provided by Company) |
| **Were entire contents of uploaded file publicly available?** | (Information Not Provided by Company) |
| **Additional Information:** | messageID for this upload: AlwCj4IsEdbzXeqPFAPoADRvP64 |
| **Additional Information:** | Upload Date/Time: 2019-12-06 17:25:39 |

This concludes Section A. All of the information in this section was submitted electronically to the CyberTipline by the Reporting Person, NCMEC Call Center or Reporting ESP. The information appearing in Section A is information received in the original submission. The reporting of information in Section A, other than the "Incident Type" and "Incident Time," is voluntary and undertaken at the initiative of the Reporting Person or Reporting ESP.

*This Report is provided solely for informational purposes pursuant to NCMEC's nonprofit mission.*
*Please treat all information in this Report as confidential.*

DISC–01130

CyberTipline Report 79384716 | **6**

# Section B: Automated Information Added by NCMEC Systems

Upon receipt of a CyberTipline report, NCMEC Systems may conduct automated processes on the information submitted in Section A. The information found in Section B of this CyberTipline Report has been automatically generated by NCMEC Systems. If the CyberTipline Report was submitted by a member of the public, Section B will be blank.

## Explanation of Automated Information (in alphabetical order)

**Geo-Lookup:** When a Reporting ESP voluntarily reports an IP address for the "Suspect," NCMEC Systems will geographically resolve the IP address via a publicly-available online query. The results of this lookup are displayed.

Geolocation data is approximate and may not display a user's exact location. Please be aware that the geolocation information provided is not exact but is providing a reliable estimate of location based on IP address(es) voluntarily provided by the reporting ESP.

## Uploaded File Information

**File Tag(s):** NCMEC staff have not opened or viewed the uploaded files in this CyberTipline report that are listed below and designated as "Hash Match." The "Hash Match" designation indicates that the uploaded file matches the hash value of an uploaded file from a CyberTipline report that was previously viewed and categorized by NCMEC at the time this report was generated.

Was listed file(s) viewed by NCMEC staff? No

Does listed file(s) match file previously viewed and categorized from a CyberTipline report? Yes

### Files and Categorization

| Filename | MD5 | Categorization |
|---|---|---|
| image.4-1.gif | d88f463af69870375efb1ea3242e1757 | CP (Unconfirmed) |
| image.125-1.jpeg | f361bb042c6bdd5fe8f1616b5a666737 | CP (Unconfirmed) |
| image.1-1.jpeg | 4f49b5d5ddb3da509e6a2ccba96b7152 | Apparent Child Pornography |
| image.120-1.jpeg | bff21c35176766cbc454bc46057352b1 | Child Clothed |
| image.97-1.jpeg | 5574e059b84e096bb86a843a7ebc6590 | CP (Unconfirmed) |
| image.5-1.jpeg | 72472b75dea64b1c29224d21475810af | CP (Unconfirmed) |
| image.118-1.jpeg | 83ab909b2ff4944af7631fbac9acca99 | Apparent Child Pornography |

**This concludes Section B**

*This Report is provided solely for informational purposes pursuant to NCMEC's nonprofit mission.*
*Please treat all information in this Report as confidential.*

DISC-01131

CyberTipline Report 79384716 | **7**

# Section C: Additional Information Provided by NCMEC

Section C contains information collected by NCMEC staff based on the information electronically submitted by the Reporting Person, NCMEC Call Center or Reporting ESP. Section C may contain a variety of additional information, including data gathered from queries on publicly-available, open-source websites. Any queries conducted by NCMEC staff will be documented and any query results will be saved to the electronic filing system when possible. The CyberTipline cannot confirm the accuracy of information found in public records or whether the results are affiliated with any parties relating to this report.

| | |
|---|---|
| **NCMEC Priority Level:** | E (Report submitted by a registered Electronic Service Provider) |
| **NCMEC Classification*:** | Apparent Child Pornography |
| | Files Not Reviewed by NCMEC, Hash Match |
| **NCMEC Date Processed:** | 10-22-2020 18:26:12 UTC |
| **Made Available to Law Enforcement by NCMEC:** | Yes |

NCMEC Classification is based on NCMEC's review of the report **OR** a "Hash Match" of one or more uploaded files. NCMEC may not have viewed all uploaded files submitted by the reporting ESP.

**NCMEC Note #1**

*ECD-HMF 10-22-2020 18:26:12 UTC*

CT/TA query for the reported identifiers returned negative or irrelevant results.
===
WHOIS lookup for 2601:701:c200:ef50:f00e:48dc:fd43:543c :

IP and Network lookup information:

Address lookup

lookup failed
2601:701:c200:ef50:f00e:48dc:fd43:543c


Could not find a domain name corresponding to this IP address.

Network Whois record

Queried  whois.arin.net  with " n ! NET6-2601-700-1 "...
NetRange:     2601:700:: - 2601:73F:FFFF:FFFF:FFFF:FFFF:FFFF:FFFF
CIDR:        2601:700::/26
NetName:     WEST-FLORIDA-RPD-V6-2
NetHandle:   NET6-2601-700-1
Parent:      COMCAST6NET (NET6-2601-1)
NetType:     Reassigned
OriginAS:
Organization: Comcast Cable Communications, LLC (CCCS)
RegDate:     2015-03-24
Updated:     2017-11-28
Ref:         https://rdap.arin.net/registry/ip/2601:700::
OrgName:     Comcast Cable Communications, LLC

*This Report is provided solely for informational purposes pursuant to NCMEC's nonprofit mission.*
*Please treat all information in this Report as confidential.*

CyberTipline Report 79384716 | **8**

OrgId:          CCCS
Address:        1800 Bishops Gate Blvd
City:           Mt Laurel
StateProv:      NJ
PostalCode:     08054
Country:        US
RegDate:        2001-09-18
Updated:        2017-01-28
Ref:            https://rdap.arin.net/registry/entity/CCCS
OrgAbuseHandle: NAPO-ARIN
OrgAbuseName:   Network Abuse and Policy Observance
OrgAbusePhone:  +1-888-565-4329
OrgAbuseEmail:  abuse@comcast.net
OrgAbuseRef:    https://rdap.arin.net/registry/entity/NAPO-ARIN
OrgTechHandle:  IC161-ARIN
OrgTechName:    Comcast Cable Communications Inc
OrgTechPhone:   +1-856-317-7200
OrgTechEmail:   CNIPEO-lp-registration@cable.comcast.com
OrgTechRef:     https://rdap.arin.net/registry/entity/IC161-ARIN


DNS records
DNS query for  c.3.4.5.3.4.d.f.c.d.8.4.e.0.0.f.0.5.f.e.0.0.2.c.1.0.7.0.1.0.6.2.ip6.arpa  returned an error from the server:  NameError
No records to display
Traceroute

Tracing route to  2601:701:c200:ef50:f00e:48dc:fd43:543c [2601:701:c200:ef50:f00e:48dc:fd43:543c] ...       hop   rtt   rtt   rtt
ip address     fully qualified domain name
1   3   1   1       2607:f0d0:2701:6c:ffff:ffff:ffff:ff7e     outbound.hexillion.com
2   1   1   1       2607:f0d0:2700:1::22
3   0   0   0       2607:f0d0:2700:1::e
4   *   *   3       2607:f0d0:2:2::332     2330.0000.0000.0000.2000.2000.0d0f.7062.ip6.static.sl-reverse.com
5   2   1   2       2607:f0d0:2:2::241     1420.0000.0000.0000.2000.2000.0d0f.7062.ip6.static.sl-reverse.com
6   1   1   1       2001:559::2fd     be-112-pe03.1950stemmons.tx.ibone.comcast.net
7   *   *   *
8   *   7   *       2001:558:3:12b::1     be-302-cr11.houston.tx.ibone.comcast.net
9   *   *   *
10  *   *   *
11  *   *   *
12  *   *   *
Trace aborted


Maxmind Geographic Results:

Country: US
Region: FL
City: North Port
Postal Code: 34288
Latitude: 27.0498
Longitude: -82.1288
Metropolitan Code: Tampa-St. Petersburg (Sarasota)
ISP: Comcast Cable
Organization: Comcast Cable
Types: residential

---

*This Report is provided solely for informational purposes pursuant to NCMEC's nonprofit mission.*
*Please treat all information in this Report as confidential.*

DISC–01133

CyberTipline Report 79384716 | 9

Google Geographic Results:

Country: US
Postal Code: 34288
Latitude: 27.0583726
Longitude: -82.116955
Area: 46.179 sq. km. (17.8298 sq. miles)
===
Central FL ICAC based on IP

This concludes Section C

If you need further information regarding the contents of this Report, please contact the CyberTipline at ecuassistance@ncmec.org or 1-877-446-2632, ext. 6702.

For more information regarding images containing identified child victims, please contact the Child Victim Identification Program (CVIP) at cvip@ncmec.org.

*This Report is provided solely for informational purposes pursuant to NCMEC's nonprofit mission.*
*Please treat all information in this Report as confidential.*

DISC-01134

CyberTipline Report 79384716 | **10**

# Section D: Law Enforcement Contact Information

The report was made available to the Law Enforcement Agency listed below.

Central Florida ICAC

**Investigator:**

| | |
|---|---|
| **Assigned Officer:** | Access VPN |
| **Title:** | Sergeant Justin Shah |
| **City/State:** | Kissimmee, FL |
| **Country:** | United States |
| **Phone Number:** | 407-344-5223 |
| **Email Address:** | jsha2@osceola.org,Tricia.teems@osceola.org,Loriana.fiorino@osceola.org |

**Time/Date was made available: 10-22-2020 18:26:12 UTC**

This concludes Section D

This concludes CyberTipline Report 79384716

*This Report is provided solely for informational purposes pursuant to NCMEC's nonprofit mission.*
*Please treat all information in this Report as confidential.*

DISC-01135

## IN THE CIRCUIT COURT OF THE 12th JUDICIAL CIRCUIT IN AND FOR SARASOTA COUNTY, FLORIDA

## APPLICATION FOR COURT ORDER/SEARCH WARRANT COMPELLING PRODUCTION OF OATH HOLDINGS INC. (YAHOO!) ACCOUNT RECORDS

In Re: A Criminal Investigation - Child Exploitation
Case No.20-099177
User account identified by Username:
1. **vladlover50@yahoo.com**

This account is under the control of:
**Attention: Custodian of Records**
**Oath Holdings Inc.**
**701 First Avenue**
**Sunnyvale, CA 94089**

BEFORE ME, a Judge of the Circuit Court, personally or by sworn attestment appeared Detective/Officer James Keller #304 a duly sworn law enforcement officer of the North Port Police Department, State of Florida, who after being first properly sworn, makes application for an order compelling Yahoo! (Oath Holdings Inc.) to search for, and obtain, and to provide information and data in the above described Yahoo! (Oath Holdings Inc.) account to the applicant Detective/Officer listed above, who states under oath that he/she has sufficient grounds to believe and does believe that the laws of the State of Florida have been violated, to-wit:

The laws prohibiting possession and promotion of child pornography controlled by Florida State Statute 827.071. And, that the officer has reason to believe and does believe that evidence connected with the crime is currently located within the below identified Yahoo! (Oath Holdings Inc.) accounts.

THE DESCRIPTION OF THE USER ACCOUNTS are as follows;
User account identified by Username:
1. **vladlover50@yahoo.com**

GROUNDS FOR ISSUANCE:
The following grounds for issuance of the Order Compelling Production of Yahoo! (Oath Holdings Inc.) account records, as required by Florida Statutes exist, to-wit: the evidence sought is relevant to proving the above described offense has been committed and such evidence is contained within the Yahoo! (Oath Holdings Inc.) accounts described above. *See Florida Statute 933.02(3).*

Yahoo! (Oath Holdings Inc.) is an out-of-state corporation that provides electronic communication services or remote computing services to the public. Your Affiant seeks to

seize the below-described evidence pursuant to Florida Statute § 92.605 and § 934.23, as well as the United States Code 18 U.S.C. 2703, and California Statute § 1524.2, which compel out-of-state electronic communication service or remote computing service that provides such services to the public to provide information requested pursuant to search warrants, court orders or subpoenas issued in the State of Florida.

## FACTS STATED IN SUPPORT OF APPLICATION:

Your Affiant has sufficient reasonable grounds to believe that the above-named crime has been committed and that evidence in the form of electronic communication and or data held or possessed by Yahoo! (Oath Holdings Inc.) may be discovered. This detective/officer believes probable cause exists for the following reasons:

1. Your Affiant is a Detective/Officer with the North Port Police Department and is currently assigned to the Criminal Investigations Division. Your Affiant has been a police officer for approximately seven years and seven months and has been assigned to the Criminal Investigations Division for four years and three months Your Affiant is charged with the responsibility of investigating crimes such as crimes against property and persons.

2. Your Affiant is currently assigned to the Central Florida Internet Crimes Against Children Task Force (ICAC) since May 2019. Your affiant is also currently assigned to the FBI Child Exploitation and Human Trafficking Task Force since December 2019 as a Task Force Officer. Your Affiant has been a duly sworn Police Officer for the City of North Port Police Department since December 2012. From January 2013 to March 2016, your Affiant was assigned to the North Port Police Departments Patrol Division. In March 2016, your Affiant was assigned to the Property Crimes Unit of the Criminal Investigative Division at the North Port Police Department. In March 2017, your Affiant was assigned to the Major Crimes Unit of the Criminal Investigations Division at the North Port Police Department. In May 2019, your Affiant was tasked with investigating sex crimes in the aforementioned capacity. Your Affiant is currently the North Port Police Department's agency affiliate for the Internet Crimes Against Children (ICAC) Task Force. In his career, your Affiant has conducted criminal investigations to include: crimes involving sexual abuse of children, sexual abuse of adults, aggravated battery, robbery, home invasion, kidnapping, child pornography, and homicide. Your Affiant has obtained a Bachelor of Science of Interdisciplinary Studies from Liberty University. Your Affiant has attended a 2 hour course of instruction on an Introduction to Human Trafficking. Your Affiant has attended a 40 hour course of instruction on Sex Crimes Investigations hosted by South West Florida Public Safety Academy. Your Affiant has attended a 40 hour course of instruction on Case Preparation and Courtroom Presentations Investigations hosted by South West Florida Public Safety Academy. Your Affiant has attended an 8 hour course of instruction on Pedophiles and Child Abductions hosted by South West Florida Public Safety Academy. Your Affiant has attended multiple 1 hour course(s) of instruction to include, Part 1 ICAC App-Based Chat Sites, Part II ICAC App-Based Chat Sites, Legal Issues for Undercover Chat Investigations,

and Evolution of Online Ad Site Investigations hosted by National Criminal Justice Training Center of Fox Valley Technical College. Your Affiant has attended a 40 hour course of instruction on Undercover Online Chat Operations hosted by National Criminal Justice Training Center of Fox Valley Technical College. Your Affiant has attended a 40 hour course of instruction on ICAC Investigative Techniques hosted by National Criminal Justice Training Center of Fox Valley Technical College. Your Affiant has attended a 24 hour peer-to-peer BitTorrent Investigations and a 24 hour peer-to-peer Child Protection System (CPS) Basic P2P Investigations. Your Affiant has attended a 4 hour Identify and Investigate Human Trafficking class. Your Affiant has attended a 40 hour course of instruction on Child Exploitation Investigations hosted by South West Florida Public Safety Academy.

3. Based on all the above described training and experience, the investigative facts and activity set forth herein, your Affiant has developed probable cause to believe and does believe that the crimes described herein have been and are being committed at or within the City of North Port, Sarasota County, Florida.

4. On September 10, 2020, Oath Holdings Inc. (Yahoo!), who is an Electronic Service Provider (ESP), submitted a child exploitation cyber tip (79384716) to the National Center for Missing and Endangered Children (NCMEC). Oath Holdings Inc. (Yahoo!) reported that the Yahoo! user identified as "vladlover50@yahoo.com" uploaded apparent child pornography on 9/8/20 at 1600 hours UTC from IP 2601:701:c200:ef50:f00e:48dc:fd43:543c to the Yahoo! Server (image three below "image.1-1.jpeg"). The reported user also uploaded other apparent child pornography on the following dates: 9/2/20, 11/8/19, 9/8/20, 12/6/19, 1/16/20, 9/1/20, and 12/6/19. Oath Holdings Inc. (Yahoo!) reported that the user account was disabled and the account was preserved.

5. On October 22, 2020, the National Center for Missing and Endangered Children (NCMEC) researched the reported IPv6 address of "2601:701:c200:ef50:f00e:48dc:fd43:543c" through a public available website called Maxmind. Maxmind provided an approximate GPS location of North Port, Florida. The case was forwarded to the Internet Crimes Against Children Task Force (ICAC) in Central Florida who assigned it to North Port Police Department for further investigation.

6. On November 11, 2020, the North Port Police Department (NPPD) received the cyber tip (79384716). I reviewed the cyber tip and determined that the reported user uploaded seven pictures of child sexual abusive material (CSAM).

7. The first image, "image.4-1.gif", is child sexual abusive material (CSAM). This image is a gif file and is of a prepubescent minor white female torso area laying on a bed. An adult white male is captured with an erect penis ejaculating on the minor's pubic bone area above her genitals. The image is intended to cause sexual stimulation from the viewer.

8. The second image, "image.125-1.jpeg", is child sexual abusive material (CSAM). The image is of a white female minor standing and wearing a white and red dress. The bottom of the dress is pulled up revealing the minor's genitals and is the focal point of the image. The image is intended to cause sexual stimulation from the viewer.

9. The third image, "image.1-1.jpeg", is child sexual abusive material (CSAM). The image is of a prepubescent minor white female torso area laying on a bed. An adult white male is in the image with an erect penis and semen on the minor's pubic bone area above her genitals. The image is intended to cause sexual stimulation from the viewer.

10. The fourth image, "image.120-1.jpeg", is of a white female clothed. The image is child erotica and not child sexual abusive material (CSAM).

11. The fifth image, "image.97-1.jpeg", is child sexual abusive material (CSAM). The image is of a prepubescent minor white female laying on a bed naked with her legs spread open and semen on her stomach above her genitals. The image is intended to cause sexual stimulation from the viewer.

12. The sixth image, "image.5-1.jpeg", and the seventh image, "image.118-1.jpeg" are of a white female. The pictures are age difficult.

13. I searched the IPv6 address (2601:701:c200:ef50:f00e:48dc:fd43:543c) the image was uploaded with through the American Registry for Internet Numbers (ARIN) and it came back registered to Comcast. An investigative subpoena was executed to Comcast for the IP address. Comcast provided a response with a subscriber of Sara Barnes with a subscriber address of 2575 Rolling Rd. North Port, FL 34288.

14. Based upon the above facts and circumstances, I believe that probable cause exists to search and seize evidence from the Oath Holdings Inc. (Yahoo!) user account "vladlover50@yahoo.com" for the purposes of locating evidence as it relates to F.S.S. 827.071(5) - Possession of Image/Video of Sexual Performance by a Child.

Because the out-of-state electronic communication service or remote computing service provider has no reasonable means to distinguish evidence of the crimes from any other records contained within the sought-after account, your Affiant seeks to compel the service provider to seize a copy of all records pertaining to the account and provide the entirety of the records to your Affiant. Once your Affiant has obtained those records, your Affiant and/or other representatives of his/her agency shall conduct an actual search of the items obtained from the out-of-state electronic communication service or remote computing service provider in order to sort the evidence of the violations articulated above and specifically sought herein, which may be intermingled with innocent or innocuous documents or records.

BACKGROUND OATH HOLDINGS INC:

Your Affiant seeks to seize records from Yahoo! (Oath Holdings Inc.,) to provide information requested pursuant to an issued search warrant. Information relating to an email provider such as Yahoo! (Oath Holdings Inc.,) can be found in the records possessed by the provider and on computer or mobile device(s) that sent the electronic transmissions. Once your Affiant has obtained those records, your Affiant and/or other representatives of law enforcement shall conduct a search of the items obtained from Yahoo! (Oath Holdings Inc.,) in order to identify the evidence of the crimes articulated above and specifically sought herein.

Through experience and training, your Affiant also knows that Yahoo! (Oath Holdings Inc.,) stores files for their subscribers. These files can be stored as an attachment in an email which was either received, sent, or attempted to be sent in the past, or have been saved. An analysis of these saved files is necessary to the investigating officers in order to further establish evidence of the crime.

Yahoo! (Oath Holdings Inc.,) maintains information about their customers including primary email addresses, secondary email addresses for account password recovery, applications, websites, and services that are allowed to access the user's Yahoo! (Oath Holdings Inc.,) account or use the user's Yahoo! (Oath Holdings Inc.,) account as a password login, and account login activity such as the geographic area the user logged into the account, what type of internet browser and device they were using, and the internet protocol (IP) address they logged in from. The IP address is roughly analogous to a telephone number assigned to a computer by an internet service provider. The IP can be resolved back to a physical address such as a residence or business with Wi-Fi access or residential cable internet. I believe this information will assist in the investigation by identifying previously unknown email accounts and location history information tending to show the movements of the suspect, his mobile device, and/or computers.

I know that Yahoo! (Oath Holdings, Inc.) may not verify the true identity of an account creator, account user or any other person who accesses a user's account using login credentials. For these reason's it is necessary to examine particularly unique identifying information that can be used to attribute the account data to a certain user. This is often accomplished by analyzing associated account data, usage, and activity through communication, connected devices, locations, associates, and other accounts. For these reasons it may be necessary to search and analyze data from when the Yahoo! (Oath Holdings Inc.,) account was initially created to the most current activity.

**1. Calendar - All calendars, including shared calendars and the identities of those with whom they are shared, calendar entries, notes, alerts, invites, and invitees.**

Yahoo! (Oath Holdings Inc.,) offers a calendar feature that allows users to schedule events. Calendar events may include dates, times, notes and descriptions, others invited to the event, and invitations to events from others. I believe this information will identify dates and appointments relevant to this investigation, as well as, identify previously unknown co-conspirators and/or witnesses, and any potential corroborative evidence.

**2. Contacts - All contacts stored by Yahoo! (Oath Holdings, Inc.) including name,**

**all contact phone numbers, emails, social network links, and images.**

When a user links to their Yahoo! Using a tablet or mobile device, the names, addresses, phone numbers, email addresses, notes, and pictures associated with the account may be transferred to the mobile device and vice versa. This process may continuously update so when a contact is added, deleted, or modified using either the Yahoo! (Oath Holdings Inc.,) account or the mobile device the other is simultaneously updated. I believe this information is pertinent to the investigation as it will assist with identifying previously unknown coconspirators and/or witnesses. Docs (Documents)-All documents including by way of example and not limitation, Docs (a web based word processing application), Sheets (a web-based spreadsheet program), and Slides (a web based presentation program.) Documents will include all files whether created, shared, or downloaded.

**3. Yahoo! Mail - All email messages, including by way of example and not limitation, such as inbox messages whether read or unread, sent mail, saved drafts, chat histories, and emails in the trash folder. Such messages will include all information such as the date, time, internet protocol (IP) address routing information, sender, receiver, subject line, any other parties sent the same electronic mail through the 'cc' (carbon copy) or the 'bcc' (blind carbon copy), the message content or body, and all attached files.**

The Yahoo! (Oath Holdings Inc.,) account may be used to send and receive electronic mail messages and chat histories. These messages include incoming mail, sent mail, and draft messages. Messages deleted from Yahoo! (Oath Holdings Inc.,) are not actually deleted. They are moved to a folder labelled Trash and are stored there until the user empties the Trash file. Additionally, users can send and receive files as attachments. These files may include documents, videos, and other media files. I believe these messages would reveal motivations, plans and intentions, associates, and other co-conspirators.

**4. Photos - All images, graphic files, video files, and other media files stored by Yahoo! (Oath Holdings Inc.,) for the listed account.**

Yahoo! (Oath Holdings Inc.,) users may have the option to store, upload, and share digital images, graphic files, video files, and other media files. These images may be downloaded from the Internet, sent from other users, or uploaded from the user's mobile device. I believe a review of these images would provide evidence depicting the suspect, his/her associates and others performing incriminating acts, and victims. I also believe these image files may assist investigators with determining geographic locations such as residences, businesses, and other places relevant to the ongoing criminal investigation.

**5. Location History - All location data whether derived from Global Positioning System (GPS) data, cell site/cell tower triangulation/trilateration, precision measurement information such as timing advance or per call measurement data, and Wi-Fi location. Such data shall include the GPS coordinates and the dates and times of all location recordings from the period** [insert date] **to** [insert date]**.**

Yahoo! (Oath Holdings Inc.,) may collect and retain location data from user mobile devices. The company may use this information for location based advertising and location based search results. While the specific parameters of when this data is collected are not entirely clear, it appears that Yahoo! (Oath Holdings Inc.,) collects this data whenever one of their services is activated and/or whenever there is an event on the mobile device. I believe this data will show the movements of the suspect's mobile device and assist investigators with establishing patterns of movement, identifying residences, work locations, and other areas that may contain further evidence relevant to the ongoing criminal investigation.

**6. Search History - All search history and queries, including by way of example and not limitation, such as World Wide Web (web), images, news, shopping, ads, videos, maps, travel, and finance.**

Yahoo! (Oath Holdings Inc.,) retains a user's search history whether it is done from a mobile device or from a traditional computer. This history includes the searched for terms, the date and time of the search, and the user selected results. Furthermore, these searches are differentiated by the specific type of search a user performed into categories. These categories include a general web search, and specialty searches where the results are focused in a particular group such as images, news, videos, and shopping.

I believe a review of the suspect's search history would reveal information relevant to the ongoing criminal investigation by revealing what information the suspect sought and when he sought it.

For these reasons, I believe probable cause exists to seize and examine the specified records held by Yahoo! (Oath Holdings Inc.,) associated with the account **vladlover50@yahoo.com**. The records to be searched for and seized are more particularly described as;

**RECORDS TO BE SEARCHED AND/OR SEIZED**

Your affiant wishes to search, seize, and analyze the data described below, being stored at Yahoo! (Oath Holdings Inc.,) for any instruments, articles, and/or things which are contraband, or used in the commission of, or may constitute evidence of the offense of **Possession of Child Pornography, in violation of Florida State Statute 827.071.**

1. Account Information - User name, primary email address, secondary email addresses, connected applications and sites, and account activity from creation to 11/24/20, including account sign in locations, browser information, platform information, and internet protocol (IP) addresses;

2. Evidence of user attribution - accounts, e-mail accounts, passwords, PIN codes, account names, user names, screen names, remote data storage accounts, credit card number or other payment methods, contact lists, calendar entries, text messages, voice mail messages, pictures, videos, telephone numbers, mobile devices, physical addresses, historical GPS locations, two-step verification information, or any other

data that may demonstrate attribution to a particular user or users of the account(s).

3. Calendar - All calendars, including shared calendars and the identities of those with whom they are shared, from creation to 11/24/20, calendar entries, notes, alerts, invites, and invitees;

4. Contacts - All contacts stored by Yahoo! (Oath Holdings Inc.,) including name, all contact phone numbers, emails, social network links, and images;

5. Yahoo! Email - All email messages from [insert date] to [insert date], including by way of example and not limitation, such as inbox messages whether read or unread, sent mail, saved drafts, chat histories, and emails in the trash folder. Such messages will include all information such as the date, time, internet protocol (IP) address routing information, sender, receiver, subject line, any other parties sent the same electronic mail through the 'cc' (carbon copy) or the 'bcc' (blind carbon copy), the message content or body, and all attached files;

6. Photos - All images, graphic files, video files, and other media files stored by Yahoo! (Oath Holdings Inc.,) associated with the listed account;

7. Search History - All search history and queries from creation to 11/24/20, including by way of example and not limitation, such as World Wide Web (web), images, news, shopping, ads, videos, maps, travel, and finance;

WHEREFORE, your Affiant respectfully requests that a Search Warrant be issued commanding all and singular the Sheriffs and their Deputies, the Director of the Florida Highway Patrol and his Troopers, the Commissioner of the Florida Department of Law Enforcement and his designees, Constables and Municipal Police Officers and State Attorney's Investigators acting within their jurisdiction, with proper and necessary assistance, to search the above described Yahoo! (Oath Holdings Inc.) account in a manner consistent with F.S. S. § 92.605 and California Penal Code §15.24.2, by delivering said warrant via facsimile or U.S. mail to an authorized legal representative of Yahoo! (Oath Holdings Inc.) and to seize any and all of the aforesaid property found by virtue of such Search Warrant and to list the property seized on a return and inventory, to be filed within this Judicial Circuit within ten days of this date.

Det. James Keller #304
Affiant / Signature
Electronic Signature

STATE OF FLORIDA        )
COUNTY OF SARASOTA )

The foregoing instrument was acknowledged before me this 10th day of December, 2020, by the individual whose name and signature appear above, and who is personally known to me and who did take an oath.

Det. Lee Wallace #163
Signature/Electronic Signature
Law Enforcement Officer
Notary Public, State of Florida

STATE OF FLORIDA            )
12TH JUDICIAL CIRCUIT   )          SEARCH WARRANT (OATH HOLDINGS INC)
COUNTY OF SARASOTA    )                          (YAHOO/AOL)

### THIS ORDER IS ISSUED PURSUANT TO SECTION 92.605, FLORIDA STATUTES. A RESPONSE IS DUE WITHIN 20 BUSINESS DAYS OF RECEIPT OF THIS ORDER UNLESS A LONGER TIME PERIOD IS STATED HEREIN.

IN THE NAME OF THE STATE OF FLORIDA, to all and singular the Sheriffs and their Deputies, the Director of the Florida Highway Patrol and his Troopers, the Commissioner of the Florida Department of Law Enforcement and his Designees, the Director of the Florida Fish and Wildlife Conservation Commission and his Officers, and Constables, Municipal Police Officers and State Attorney's Investigators all acting within their jurisdiction;

WHEREAS, I have received affidavit for search warrant, on this date made before me by the Affiant, Detective/Officer James Keller #304 who has prepared same in his/her capacity as a law enforcement officer; and

WHEREAS, the stated Detective/Officer having been placed under oath and having sworn to the facts as stated therein, and having examined the said facts set forth in support of said application for search warrant, and the facts contained therein which are now incorporated herein by reference and made a part of this Warrant, and;

WHEREAS, said facts so made known to me by such affidavit as set forth, have caused me to certify and find that there is probable cause to believe that the laws of the State of Florida relative to the possession and promotion of child pornography has been violated by UNKNOWN PERSON(S) and that evidence of the crime is currently located at or within;

A user account identified by Username of: **vladlover50@yahoo.com**
From account creation to 11/24/20 at 00:00:00 UTC
which is under the control of:
**Attention: Custodian of Records**
**Oath Holdings Inc.**
**701 First Avenue**
**Sunnyvale, CA 94089**

THEREFORE, the Court having found that Oath Holdings Inc. (Yahoo/AOL) is an out-of-state corporation that provides electronic communication services or remote computing services to the public and pursuant to Florida Statutes § 92.605 and § 934.23, as well as the United States Code 18 U.S.C. § 2703, and California Statute § 1524.2, a Judge of the Circuit Court of Florida has jurisdiction to issue a search warrant for a Yahoo! (Oath Holdings Inc.) accounts, consequently these presents are to command you, with the proper and necessary assistance, either in the day time or in the night time, as the exigencies of the situation may demand or require or on Sundays, or holidays, to enter the

said Yahoo! (Oath Holdings Inc.) account described above, and diligently search said account and seize as evidence any of the following:

### PROPERTY TO BE PROVIDED BY OATH HOLDINGS INC

- Account Information -User name, primary email address, secondary email addresses, connected applications and sites, and account activity from creation to 11/24/20, including account sign in locations, browser information, platform information, and internet protocol (IP) addresses;

- Evidence of user attribution -accounts, e-mail accounts, passwords, PIN codes, account names, user names, screen names, remote data storage accounts, credit card number or other payment methods, contact lists, calendar entries, text messages, voice mail messages, pictures, videos, telephone numbers, mobile devices, physical addresses, historical GPS locations, two-step verification information, or any other data that may demonstrate attribution to a particular user or users of the account(s);

- Calendar – All calendars, including shared calendars and the identities of those with whom they are shared, from creation to 11/24/20, calendar entries, notes, alerts, invites, and invitees;

- Contacts – All contacts stored by Yahoo! (Oath Holdings Inc.,) Including name, all contact phone numbers, emails, social network links, and images:

- Yahoo! Email – All email messages from creation to 11/24/20, including by way of example and not limitation, such as inbox messages whether read or unread, sent mail, saved drafts, chat histories, and emails in the trash folder. Such messages will include all information such as the date, time, internet protocol (IP) address routing information, sender, receiver, subject line, any other parties sent the same electronic mail through the 'cc' (Carbon copy) or the 'bcc' (Blind carbon copy), the message content or body, and all attached files;

- Photos – All images, graphic files, video files, and other media files stored by Yahoo! (Oath Holdings Inc.,) associated with the listed account;

- Search History – all search history and queries from creation to 11/24/20, including by way of example and not limitation, such as World Wide Web (WEB), images, news, shopping, ads, videos, maps, travel, and finance;

YOU ARE FURTHER DIRECTED to bring the property so seized before a court having jurisdiction to be disposed of and dealt with according to law and make return of your doings under this warrant to me or to my designated clerk, within ten (10) days of the date hereof, and give proper receipts for any property taken hereunder, and deliver a copy of this warrant to the person at whom directed.

GIVEN UNDER MY HAND and seal this day

12/11/2020

_____

DATE

_____ 12/11/2020 5:50:20 PM _____

SIGNA͘                                           ͘URE

Donna Padar
Circuit Judge

# Doc. 173 –

# Report and

# Recommendation as to

# Second Motion to

# Suppress

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.                                          Case No. 8:21-cr-355-WFJ-CPT

GREGORY ALLEN WILLIAMSON
a/k/a "VLAD VALD"
_____/


## REPORT AND RECOMMENDATION

Before me on referral is Defendant Gregory Allen Williamson's second motion to suppress evidence seized from his Oath Holdings, Inc. d/b/a Yahoo! (Yahoo) email account pursuant to a search warrant authored by North Port Police Department (NPPD) Detective James Keller. (Doc. 134).[1]  Detective Keller obtained this warrant following his review of suspected child pornographic images that Yahoo found in Mr. Williamson's email account.  (Docs. 114, 144, 145).  Detective Keller learned of these images after Yahoo transmitted them to the National Center for Missing and Exploited Children (NCMEC), which then forwarded them to Detective Keller.  *Id.*

In support of his motion, Mr. Williamson argues that Detective Keller's warrant violated the Fourth Amendment's particularity requirement because it was not properly limited in time or scope, and that the warrant cannot be saved by the good

_____
[1] Mr. Williamson's first suppression motion was denied following an evidentiary hearing.  (Docs. 114, 144, 145).

faith exception enunciated by the Supreme Court in *United States v. Leon*, 468 U.S. 897 (1984). (Doc. 134). The government opposes Mr. Williamson's motion. (Doc. 138).

I heard oral argument on the matter, after which the parties filed supplemental submissions addressing the issue of severability. (Docs. 169, 171). Based upon my review of the parties' filings and other pertinent portions of the record, I respectfully recommend that Mr. Williamson's second suppression motion be denied.

## I.

The background of this case is set forth in detail in a prior Order of the Court (Docs. 114, 144, 145) and therefore need only be summarized here with some supplementation. Yahoo is a private corporation that offers email services to its customers, among other products. (Doc. 114 at 3). NCMEC is a not-for-profit organization that Congress has tasked with operating a CyberTipline. *Id.* The CyberTipline is a national recording and reporting mechanism for child sexual exploitation and essentially serves as a conduit for child pornography-related tips made by the public and electronic service providers like Yahoo. *Id.*

On September 8, 2020, Yahoo learned that an email sent from the email account "vladlover50@gmail.com"[2] included an image[3] believed to constitute child sexual abuse material (CSAM). *Id.* at 8. Upon further investigation, Yahoo discovered that the vladlover50 account contained a total of seven CSAM photographs. *Id.* Two days

---

[2] The vladlover50 email account will be referred to herein as the vladlover50 account.
[3] To avoid being repetitious, I will employ the terms image, photograph, and file interchangeably throughout my report and recommendation.

later, on September 10, 2020, Yahoo submitted a CyberTipline report to NCMEC relative to these files, and disabled the vladlover50 account in the process. *Id.* Yahoo also included in its report the name, phone number, email address, and IP address associated with the vladlover50 account, as well as the upload date and time for each of the seven images.[4] *Id.* at 9.

After receiving Yahoo's submission, NCMEC compiled its own report in which it classified two of the files as apparent child pornography, four of the files as "CP (unconfirmed)" (i.e., unconfirmed child pornography), and one of the files as "child clothed." *Id.* at 9–10. NCMEC additionally determined that the geolocation of the IP address for the vladlover50 account was situated in North Port, Florida. *Id.* at 10. As a result of this information, NCMEC's report was provided to the NPPD, where it was assigned to Detective Keller in mid-November 2020. *Id.*

By that point in his career, Detective Keller had been with NPPD for approximately eight years and had been charged with investigating sex crimes for over a year-and-a-half. *Id.* During the latter time frame, Detective Keller was a member of both the Central Florida Internet Crimes Against Children Task Force (CFICAC)[5] and the FBI's Child Exploitation and Human Trafficking Task Force, and had attended multiple training sessions regarding the investigation and identification of CSAM. *Id.* at 10–11.

---

[4] According to the report, the CSAM images were uploaded between November 8, 2019, and September 8, 2020. (Doc. 114 at 9 n.8).

[5] CFICAC is a subdivision of a national task force—ICAC—that is headed by the Federal Bureau of Investigation (FBI). (Doc. 114 at 10 n.11).

After reviewing NCMEC's CyberTipline report, Detective Keller determined that the user of the vladlover50 account uploaded multiple files containing CSAM. *Id.* at 11–12. Detective Keller then issued a subpoena to the Internet Service Provider associated with the IP address identified in the report and learned that the subscriber of that IP address was an individual with the initials of S.B. residing at 2575 Rolling Road in North Port, Florida.[6] *Id.* at 11; (Doc. 134-1 at 5). Based upon this information, Detective Keller applied to a state court judge on December 10, 2020, for a search warrant directed to Yahoo for the vladlover50 account.[7] (Doc. 134-1 at 10). In his warrant application, Detective Keller sought the seizure of several defined categories of data which either constituted evidence or contraband of possession of child pornography in violation of Florida Statute § 827.071(5), or which was used in the commission of that offense. *Id.* at 8–9; *see also id.* at 11–12. These categories were as follows:

> 1.     Account Information—User name, primary email address, secondary email addresses, connected applications and sites, and account

---

[6] In a later warrant to search this North Port residence, Detective Keller stated that the initials of the individual at that address were A.W. (Doc. 114 at 11). I refer to those initials here as "S.B." because that it is how Detective Keller described them in his Yahoo warrant. (Doc. 134-1).

[7] The Court's decision resolving Mr. Williamson's first suppression motion indicated that the vladlover50 warrant was submitted and signed on December 1, 2020. (Doc. 114 at 11). The Court derived this date from the warrant that was admitted into evidence at the evidentiary hearing on the first suppression motion. *Id.* (citing Def. Exh. C). It now appears, however, that this warrant was the first of two warrants Detective Keller requested for the vladlover50 account. It seems that the first warrant incorrectly listed the target email address as "vladlover5@yahoo.com" (Doc. 134 at 2 n.1), and that after Yahoo informed Detective Keller of this error, he submitted the second warrant (which is the one I rely upon here) with the correct email address. *Id.* These facts do not appear to be contested by the parties.

activity from creation to 11/24/20, including account sign in locations, browser information, platform information, and [IP] addresses;

2.      Evidence of user attribution—accounts, [e]mail accounts, passwords, PIN codes, account names, user names, screen names, remote data storage accounts, credit card number or other payment methods, contact lists, calendar entries, text messages, voice mail messages, pictures, videos, telephone numbers, mobile devices, physical addresses, historical GPS locations, two-step verification information, or any other data that may demonstrate attribution to a particular user or users of the account(s);

3.      Calendar—All calendars, including shared calendars and the identities of those with whom they are shared, from creation to 11/24/20, calendar entries, notes, alerts, invites, and invitees;

4.      Contacts—All contacts stored by Yahoo[ ] . . . including name, all contact phone numbers, emails, social network links, and images;

5.      Yahoo[ ] Email—All email messages from [insert date] to [insert date], including by way of example and not limitation . . . inbox messages whether read or unread, sent mail, saved drafts, chat histories, and emails in the trash folder.  Such messages will include all information[,] such as the date, time, [IP] address routing information, sender, receiver, subject line, any other parties sent the same electronic mail through the 'cc' (carbon copy) or the 'bcc' (blind carbon copy), the message content or body, and all attached files;

6.      Photos—All images, graphic files, video files, and other media files stored by Yahoo[ ] . . . associated with the listed account; [and]

7.      Search History—All search history and queries from creation to 11/24/20, including by way of example and not limitation, . . . World Wide Web (web), images, news, shopping, ads, videos, maps, travel, and finance[.]

*Id.* at 8–9.

In support of his request to obtain this information, Detective Keller set forth a detailed description of the contents of each of the above seven images tied to the vladlover50 account and attested that he personally reviewed these photographs.  *Id.* at 4–5.  Relying on Florida's definition of CSAM and his own training and experience, Detective Keller also stated that he deemed four of these files to be CSAM involving prepubescent and minor females; two of the files to be "age difficult" (i.e., it was difficult for Detective Keller to discern the approximate ages of the subjects in the images); and the remaining file to be child erotica.  *Id.*

As pertinent here, Detective Keller additionally referenced the need to identify the user of the vladlover50 account and explained that this objective necessitated that the scope of the warrant, including the time frame, be more expansive.  Specifically, he advised:

> Yahoo[ ] . . . may not verify the true identity of an account creator, account user or any other person who accesses a user's account using login credentials.  For these reason[s,] *it is necessary to examine particularly unique identifying information that can be used to attribute the account data to a certain user*.  This is often accomplished by analyzing associated account data, usage, and activity through communication, connected devices, locations, associates, and other accounts.  For these reasons[,] it may be necessary to search and analyze data from *when the Yahoo[ ] . . . account was initially created to the most current activity*.

*Id.* at 6 (emphasis added).

As an example of the type of identifying information he sought, Detective Keller further advised:

> Yahoo[ ] maintains information about their customers[,] including primary email addresses, secondary email addresses for account password recovery, applications, websites, and services that are allowed to access the user's Yahoo[ ] . . . account or use the user's Yahoo[ ] . . . account as a password login, and account login activity[,] such as the geographic area the user logged into the account, what type of internet browser and device they were using, and the [IP] address they logged in from. . . . *The IP can be resolved back to a physical address[,] such as a residence or business with Wi-Fi access or residential cable internet. I believe this information will assist in the investigation by identifying previously unknown email accounts and location history information tending to show the movements of the suspect, his mobile device, and/or computers.*

*Id.* (emphasis added).

Along with the above identifying information, Detective Keller articulated the basis for seizing the other requested data as well. *Id.* at 6–8. Detective Keller explained, *inter alia*, that this additional information could likewise be used to tie the vladlover50 account to the suspect, witnesses, associates, and victims, and could constitute evidence or contraband of the crime itself. *Id.* For instance, as to the sought-after calendar entries, contacts, email messages, photos, videos, and search history for the vladlover50 account, Detective Keller stated: (a) Yahoo's calendar feature, which "allows users to schedule events" and which "may include dates, times, notes[,] and descriptions," could assist law enforcement in identifying the user's co-conspirators and/or witnesses, as well as potentially "corroborative evidence;" (b) the user's contacts, including names, phone numbers, and email addresses, could also help law enforcement ascertain the names of co-conspirators and witnesses; (c) the user's email messages, whether read, unread, sent, saved, or placed in a trash folder, could similarly

reveal the identities, motives, and plans of associates and co-conspirators; (d) the user's photos and videos could "depict[ ] the suspect, his/her associates[,] and others performing incriminating acts, and victims," as well as further facilitate the discovery of residences and other "geographic locations" relevant to the investigation; and (e) the user's search history and queries, including "specialty searches where the results" focus on a "particular group," could equally reveal information pertinent to the investigation. *Id.*

Detective Keller's warrant contemplated that it be executed in two steps. *Id.* at 5, 8, 11–12. The first step required Yahoo to provide him with all the records for the vladlover50 account, while the second step involved Detective Keller searching those records and seizing only that information covered by one or more of the above seven categories. *Id.*

The state court judge authorized the warrant on December 11, 2020. *Id.* at 13. In response to the warrant, Yahoo produced the images that it sent to NCMEC as part of its CyberTipline report and other items. (Doc. 134 at 14 n.5).

## II.

## A.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."[8] U.S. Const. amend. IV. A search warrant must therefore "'particularly

---

[8] The Court has already determined that Mr. Williamson has standing to challenge a search of the vladlover50 email account. (Docs. 114, 144, 145).

describ[e] the place to be searched, and the persons or things to be seized.'" *United States v. Alford*, 744 F. App'x 650, 652 (11th Cir. 2018) (per curiam) (quoting U.S. Const. amend IV) (alteration in original).  "The 'specific evil' [this] limitation targets 'is not that of intrusion per se, but of a general, exploratory rummaging in a person's belongings.'" *United States v. Blake*, 868 F.3d 960, 973 (11th Cir. 2017) (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971)).  Such rummaging was allowed in the colonial era by the "general warrant," which was "an instrument 'abhorred by the colonists.'"  *Id.* (quoting *Coolidge*, 403 U.S. at 467).

While recognizing the importance of the particularity requirement, the Eleventh Circuit has instructed that it should be applied with "a practical margin of flexibility" and that warrants need only be as "specific as the circumstances and nature of the activity under investigation permit[ ]."  *Alford*, 744 F. App'x at 653 (citing *United States v. Bradley*, 644 F.3d 1213, 1259 (11th Cir. 2011); *United States v. Moody*, 977 F.2d 1425, 1432 (11th Cir. 1992)).  Put another way, a search warrant will survive a particularity challenge under governing Eleventh Circuit precedent if it sufficiently connects the items to be searched and seized to the crime(s) under investigation.  *United States v. Wheat*, 2022 WL 16851663, at *7 (N.D. Ga. Nov. 10, 2022) (citing *Blake*, 868 F.3d at 973).

Here, Mr. Williamson asserts that Detective Keller's warrant for the vladlover50 account was constitutionally infirm because the nature of the data it sought was "virtually unlimited," and because it also did not have a meaningful temporal restriction.  (Docs. 134, 171).  To buttress this contention, Mr. Williamson

relies on the Eleventh Circuit's decision in *Blake*, among other case authority. *Id.* The government counters that Detective Keller's warrant was not impermissibly overbroad and—in addition to distinguishing *Blake*—cites the Eleventh Circuit's opinion in *Alford* to bolster its position. (Docs. 138, 169).

In *Blake*, the defendants—Dontavious Blake and Tara Jo Moore—were convicted after a trial of various sex trafficking-related offenses that stemmed from their management of a prostitution ring involving underage girls. 868 F.3d at 966. During the course of its investigation of this ring, the FBI discovered that the defendants were using a specific email address belonging to Ms. Moore (the S.B. email address) to post ads on a classified website known as Backpage.com. *Id.* The FBI subsequently arrested Mr. Blake and Ms. Moore and, of relevance here, served a search warrant on Microsoft and two on Facebook pertaining to the defendants. *Id.* The Microsoft warrant had no temporal limitation but was confined to certain categories of emails from two of the defendants' email accounts (including the S.B. email account) that were linked to the sex trafficking crimes. *Id.*

The Facebook warrants, on the other hand, sought "virtually every type of data that could be located in a Facebook account." *Id.* at 966. By way of example, the warrants requested that Facebook disclose:

> [E]very private instant message [Ms.] Moore had ever sent or received, every IP address she had ever logged in from, every photograph she had ever uploaded or been "tagged" in, every private or public group she had ever been a member of, every search on the website she had ever conducted, and every purchase she had ever made through "Facebook Marketplace," as well as her entire contact list.

*Id.* at 966–67.

The Facebook warrants asked for this wide swath of information even though the FBI already knew the Facebook account was Ms. Moore's because it was associated with both her S.B. email address and her phone number.  *Id.* at 966.  The warrants also were not confined to the time frame in which Ms. Moore managed the prostitution ring and instead were essentially unbounded temporally.  *Id.* at 967.  The potential saving grace was that the Facebook warrants required a second step that restricted law enforcement to seizing only data "'constitut[ing] fruits, evidence[,] and instrumentalities'" of sex trafficking.  *Id.*

In response to Ms. Moore's argument that the Microsoft and Facebook warrants violated the Fourth Amendment's particularity requirement, the Eleventh Circuit found that the Microsoft warrant was "appropriately limited in scope because it sought only discrete categories of emails that were connected to the alleged crimes."  *Id.* at 973, 973 n.7.  As a result, the court determined that the absence of a time delimiter alone did not render the warrant unconstitutional.  *Id.*

The court, however, criticized the breadth of the Facebook warrants, stating that they "unnecessarily" called for the disclosure of nearly "every kind of data that could be found in a social media account."  *Id.* at 974 (citation omitted).  Relative to the sought-after instant messages, for example, the court noted that the warrants could have cabined this "request to messages sent to or from persons suspected at that time of being prostitutes or customers" and to "data only from the period of time during

which [Ms.] Moore was suspected of taking part in the prostitution conspiracy." *Id.*
The court commented that such restrictions "would have undermined any claim that
the Facebook warrants were the internet-era version of a 'general warrant.'" *Id.* (citing
*Coolidge*, 403 U.S. at 467; *Riley v. California*, 134 S. Ct. 2473, 2488–91 (2014)).

The court was skeptical that the cases relied upon by the government—which
involved a two-step search process whereby hard drives seized in a defendant's home
were later searched at the government's offices—could be applied to the Facebook
warrants. *Id.* (citations omitted). The court pointed out that hard drive searches entail
"time-consuming electronic forensic investigation with special equipment" and that
conducting such a "search in the defendant's home would be impractical, if not
impossible." *Id.* By contrast, the court stated that "when it comes to Facebook
account searches, the government need only send a request with the specific data
sought and Facebook will respond with precisely that data." *Id.* (citation omitted).
The court added that it did not appear this one-step procedure would have been
"impractical for Facebook or for the government" to utilize in the case given the record
before it. *Id.* (citation omitted).

Despite these criticisms, the court declined to resolve the issue of whether the
Facebook warrants were insufficiently particularized for purposes of the Fourth
Amendment. *Id.* Instead, relying on *Leon*, it held that even if the warrants were
impermissibly overbroad, the "district court did not err in allowing the government to
use evidence gathered as a result of them." *Id.* (citing *United States v. Herring*, 492 F.3d
1212, 1215 (11th Cir. 2007)).

In *Alford*, which was decided almost a year after *Blake*, the defendant challenged his conviction for the receipt of child pornography on, among other grounds, that a search warrant issued to Google during the investigation was not adequately particularized. *Alford*, 744 F. App'x at 652–53. This Google warrant apparently related to a nighttime phone call in September 2014 from an anonymous Google Voice phone number to a K-Mart in Hamilton, Montana, in which the caller claimed his daughter was being victimized. *Id.* The warrant directed Google to provide:

> *Any and all records, files, data, and/or other forms of information* including names, user names, dates of birth, IP addresses, home addresses, phone numbers, e-mail addresses, photos, videos, e-mail content, search history, call history, or other information held by Google Inc. which may aid in obtaining the identification and/or location of the individual whom [sic] contacted K-mart in Hamilton, MT via [a] phone call [to various phone numbers] on September 16th, 2014 at approximately 2145 hours MST.

*Id.* at 652 (alteration in original) (emphasis added).

Following a review of its decision in *Blake*, the Eleventh Circuit in *Alford* characterized the Google warrant as "fall[ing] somewhere between the Microsoft and Facebook warrants in *Blake*." *Id.* at 652–53. It stated that "like the Facebook warrants, [the Google warrant] requested nearly every kind of data that could be found in a Google account, but like the Microsoft warrant, the information requested was all potentially incriminating because it could have identified the K-Mart caller." *Id.* Employing a "practical margin of flexibility," the court ruled that notwithstanding the breadth of the Google warrant, it was "as specific as the circumstances and nature of

the activity under investigation permitted." *Id.* (citing *Blake*, 868 F.3d at 973–74; *Bradley*, 644 F.3d at 1259; *Moody*, 977 F.2d at 1432). To support this finding, the court emphasized that the applicant seeking the warrant "was not merely rummaging around Alford's Google account to find whatever he could, but rather was trying to find the identity of the caller and [the] potential victim" and that "*all* of the evidence seized" could have helped law enforcement ascertain who owned the Google account. *Id.* (citing *Blake*, 868 F.3d at 973) (emphasis added). The *Alford* court also ruled that the Google warrant fell within the ambit of *Leon*'s good faith exception in any event. *Id.* at 653–54 (citing *Blake*, 868 F.3d at 975).

Applying the teachings of *Blake* and *Alford* here, Detective Keller's vladlover50 warrant appears to be adequately particularized. I begin by noting that although the warrant contemplated a two-step procedure whereby Yahoo was initially compelled to turn over all requested records pertaining to the vladlover50 account regardless of whether they were evidence, contraband, or instrumentalities of the stated crime, it confined the subsequent search of those documents to the above-referenced seven distinct categories of information. (Doc. 134-1 at 5, 8, 11–12). This materially differentiates Detective Keller's warrant from the Facebook warrants at issue in *Blake*. Detective Keller's warrant is further unlike the Facebook warrants in *Blake*, insofar as he explicitly explained it was necessary to employ the bifurcated search protocol he proposed because Yahoo had "no reasonable means to distinguish evidence of the crimes from other records contained within the [vladlover50] account." *Id.* at 5.

Detective Keller's warrant also bears a number of similarities to the Google warrant in *Alford*. Akin to the Google warrant, for example, much, if not virtually all, of the data requested in Detective Keller's warrant arguably pertained to the identity of the user of the vladlover50 account. *Id.* at 6–9, 11–12. This is evident by the fact that the information Detective Keller referenced in the "user attribution" category in his warrant included many of the items he listed elsewhere in the warrant. *Id.* at 8–9, 12.

It bears highlighting in this respect that, in contrast to *Blake* where the Facebook warrants were executed towards the end of the investigation after law enforcement had already developed "extensive evidence" against the account holder, Ms. Moore, *Blake*, 868 F.3d at 966, Detective Keller's investigation directed at the user of the vladlover50 account was still in its relative infancy at the time the Yahoo warrant was sought (Doc. 134-1 at 4–5). The record before the Court indicates, for example, that law enforcement did not know a great deal about the user of the vladlover50 account at that juncture, clearly not enough to prove a case against him. *See id.* Nor was much apparently known about the associate(s) or victim(s) affiliated with the emails containing the CSAM that Yahoo discovered during its review of the vladlover50 account. *See id.* As discussed previously, the vast majority of the data requested by Detective Keller in the Yahoo warrant was potentially relevant to these issues. Notably, a number of the types of information Detective Keller asked for in the vladlover50 warrant—like user names, IP addresses, email addresses, photos, videos, email content, and search history—were deemed by the Eleventh Circuit in *Alford* to

be pertinent to the issue of the target's identity in that case.  *Alford*, 744 F. App'x at 652.

Besides the data bearing on the identity of the vladlover50's account user, a fair portion of the sought-after information in Detective Keller's warrant also constituted possible evidence of the account user's possession of child pornography, particularly since—as Detective Keller articulated in his affidavit—the user of this account had emailed CSAM to other(s) in the past.  (Doc. 134-1 at 4–5).  The information that fell into this grouping consisted of, *inter alia*, records and data linking the user of the vladlover50 account to CSAM, photos or videos containing CSAM, emails and other communications containing or relating to CSAM, and third parties who sent CSAM to or received CSAM from the vladlover50 account user.  As Detective Keller stated in his affidavit:

> [Your affiant knows t]hrough [his] experience and training . . . that Yahoo[ ] . . . stores files for their subscribers.  *These files can be stored as an attachment in an email which was either received, sent, or attempted to be sent in the past, or have been saved*.  An analysis of these saved files is necessary to the investigating officers in order to further establish evidence of the crime.

*Id.* at 6 (emphasis added).

In light of the above averments, there was at least a "fair probability" that the type of evidence, contraband, and/or instrumentalities of possession of child pornography detailed by Detective Keller in his warrant would be found in the vladlover50 account at the time the warrant was issued.  *United States v. Orr*, 819 F. App'x 756, 765 (11th Cir. 2020) (per curiam) ("Although the government did not

attach photographs or describe specific pornographic images officers expected to find at the apartment, there is no requirement that it do so given the other details provided in the affidavit.  Probable cause for child pornography offenses does not depend on law enforcement having proof that child pornography is in the defendant's possession.") (citing *United States v. Williams*, 444 F.3d 1286, 1304 n.87 (11th Cir. 2006)).

The fact that Detective Keller's warrant did not have a temporal limitation does not render it invalid.  The warrant in *Alford* also did not have such a restriction.  744 F. App'x at 652.  And here, as discussed earlier, Detective Keller made clear that because "Yahoo may not verify the true identity of an account creator, account user[,] or any other person who accesses a user's account[,]" it is often necessary to analyze "associated account data, usage, and activity through communication, connective devices, locations, associates, and other accounts" from when the target "account *was initially created to the most current activity*."  (Doc. 134-1 at 6) (emphasis added).  These attestations further evidence that Detective Keller's warrant for the vladlover50 account was as "specific as the circumstances and nature of the activity under investigation permitted."  *Alford*, 744 F. App'x at 653 (citation omitted).

In short, applying "a practical margin of flexibility," *id.*, the vladlover50 warrant properly connected the items to be searched and seized to the possession of child pornography offense under investigation, *Wheat*, 2022 WL 16851663, at *7; *United States v. Montgomery*, 2022 WL 3582814, at *4–5 (M.D. Ga. Aug. 19, 2022) (upholding

a warrant where the information to be seized was limited to incriminating data even though the scope of the materials Yahoo was required to produce was broader).

That said, I do recognize that—as Mr. Williamson maintains—Detective Keller's warrant (like most warrants) could have been better drafted. At times, for example, Detective Keller could have used more tailored language to justify the search and seizure of certain information that more neatly fit the circumstances of this case.

But the Fourth Amendment's particularity requirement does not demand that a warrant be perfect. *United States v. Martinez-Martinez*, 777 F. App'x 441, 444 (11th Cir. 2019) (per curiam) (stating that the "particularity standard 'does not necessitate technical perfection'") (quoting *Bradley*, 644 F.3d at 1259); *see also United States v. Ulbricht*, 858 F.3d 71, 100 (2d Cir. 2017) ("[T]he Fourth Amendment does not require a perfect description of the data to be searched and seized," and "a search warrant does not necessarily lack particularity simply because it is broad."), *abrogated on other grounds by Carpenter v. United States*, 138 S. Ct. 2206 (2017). Courts must instead look at search warrants as a whole and in a realistic and practical manner, and "should not invalidate [a] . . . warrant by interpreting [the supporting] affidavit in a hypertechnical, rather than a commonsense, manner." *Illinois v. Gates*, 462 U.S. 213, 236 (1983) (internal quotation marks and citations omitted). This is because affidavits and warrants "are frequently drafted under time pressure, often by police or persons without legal training, and . . . must frequently express complex thoughts." *Nat'l City Trading Corp. v. United States*, 487 F. Supp. 1332, 1336 (S.D.N.Y. 1980), *aff'd*, 635 F.2d 1020 (2d Cir. 1980). As a result, warrants "cannot properly be subjected to the same

standards of dissection as might befit a criminal statute, an indictment, or a trust indenture." *Id.* Mr. Williamson's critique of Detective Keller's warrant, pursued with the benefit of hindsight, seemingly exceeds the standard to which the Court must hold the warrant in this case.

The Court, however, need not decide whether the vladlover50 warrant contravened the Fourth Amendment's particularity requirement because, even if it did, it falls squarely within the good faith exception to the exclusionary rule established in *Leon*. As the Court observed in its earlier Order (Doc. 114), the Supreme Court held in *Leon* that where an officer relies on a subsequently invalidated warrant in an objectively reasonable manner, the evidence obtained as a result of the warrant should generally not be excluded. *Leon*, 468 U.S. at 897, 918. The Supreme Court also identified four instances in *Leon* where this exception would not apply, including—of relevance here—where the challenged warrant was "so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers c[ould not have] reasonably presume[d] it to be valid." *Id.* at 923.[9] In the end, the government bears the burden of demonstrating that the *Leon* good faith exception applies. *United States v. Morales*, 987 F.3d 966, 974 (11th Cir. 2021).

---

[9] The Supreme Court in *Leon* additionally held that the government cannot rely on the good faith exception where the affidavit in support of the warrant is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable. *Leon*, 468 U.S. at 914–15. While Mr. Williamson originally contended in his instant suppression motion that the vladlover50 warrant was devoid of probable cause and thus not protected by *Leon* (Doc. 134), he conceded at oral argument that this assertion is foreclosed by the Court's ruling on his first suppression motion, which was issued after he filed this second motion (Docs. 114, 144, 145).

The government has met its burden here.  Even assuming *arguendo* that the vladlover50 warrant was not sufficiently particularized, it was not so facially deficient that Detective Keller could not have reasonably assumed it was valid.  One need only look to the Eleventh Circuit's decision in *Blake* for support for this finding.  Despite the Eleventh Circuit's robust disapproval of the arguably far more deficient Facebook warrants in *Blake*, it nonetheless invoked *Leon* in that case in upholding the district court's determination to allow the government to use the evidence gathered as a result of those warrants.  *Blake*, 868 F.3d at 975.  The Eleventh Circuit similarly found in *Alford* that even if the Google warrant in that matter was not properly particularized, it was shielded by *Leon*'s good faith exception as well.  *Alford*, 744 F. App'x at 653–54.

On his best day, Mr. Williamson can, at most, assert that the particularity of the vladlover50 warrant presents a close question.  But, in my view, he cannot fairly maintain that the vladlover50 warrant was so patently lacking in particularity that it is "an open and shut matter."  *Blake*, 868 F.3d at 975.  As such, the good faith exception applies here.  *See id.*; *Alford*, 744 F. App'x at 653–54 ("Even if the warrant should have been further limited in scope, it is a close question and the warrant was not so obviously flawed that [the officer] could not have reasonably believed it to be valid.  Accordingly, even if the warrant was insufficiently particular and overbroad, the evidence need not have been suppressed because [the officer]'s reliance on it was objectively reasonable.") (citing *Blake*, 868 F.3d at 975); *United States v. Badiki*, 2018 WL 7283636, at *17 (N.D. Ga. Dec. 31, 2018) (finding that "to the extent that the warrant was overbroad and lacked particularity, the *Leon* good-faith exception save[d]

the warrant's fruits from suppression" because, "although there was no temporal limitation and the warrant authorized the [g]overnment to obtain all records from the email accounts, the warrant limited the [g]overnment to seizing records that evidenced the crimes under investigation"), *report and recommendation adopted*, 2019 WL 397991 (N.D. Ga. Jan. 31, 2019).

The other cases upon which Mr. Williamson principally relies (Docs. 134, 162)—*United States v. Mercery*, 591 F. Supp. 3d 1369 (M.D. Ga. 2022), *United States v. Irving*, 347 F. Supp. 3d 615 (D. Kan. 2018), and *United States v. Shah*, 2015 WL 72118 (E.D.N.C. Jan. 6, 2015)—do not dictate a different result. All of these decisions were issued by courts outside of this District and are not binding on the Court. Furthermore, they also involved facts and circumstances far different from those present in this action.

In *Mercery*, the court determined that a warrant for an Instagram account contravened the particularity requirement because it was "not tailored to evidence of the crimes under investigation, the time period during which [the defendant] allegedly committed the crimes, or the persons allegedly involved in the crimes." 591 F. Supp. 3d at 1381. Indeed, not only did the court deem the Instagram warrant to be "unnecessarily overbroad," it noted that the warrant was "even [more expansive] than the warrants described in *Blake*," with "absolutely no limitation" on what data law enforcement could seize after Instagram's wide-ranging disclosures that encompassed "eighteen broad categories of information." *Id.* In light of these infirmities, the court

in *Mercery* concluded that the warrant could not be saved by *Leon*'s good faith exception. *Id.* at 1382–83.

In *Irving*, the court found that a warrant for a Facebook account was overbroad because even though the offense under investigation only involved a registered sex offender's alleged failure to register his Facebook account, the warrant was "not defined and limited by that crime" at all. 347 F. Supp. 3d at 624. In fact, the warrant authorized "the search and seizure of [the d]efendant's entire Facebook account" with "no set limits." *Id.* Given these deficiencies and the other information before it, the *Irving* court ruled that *Leon* did not apply. *Id.* at 625–26.

In *Shah*, the court decided that a warrant for a Google account was insufficiently particularized because, although it contemplated a two-step process, the second step did not "impose any real limitation" on the breadth of the search. *Shah*, 2015 WL 72118, at *13. The court observed, for instance, that the warrant did not adequately "clarify the particular crime at issue," nor did it "offer[ anything] about the time frame of the offense." *Id.* at *14. That said, the court concluded that the warrant fell within *Leon*'s good faith exception. *Id.* at *15–16.

Because Detective Keller's vladlover50 warrant is materially distinguishable from the warrants challenged in *Mercery*, *Irving*, and *Shah*, those cases are of no help to Mr. Williamson in this action. Indeed, the court's finding in *Shah* on the applicability of *Leon* undercuts Mr. Williamson's argument.

B.

In light of the above findings, the Court need not reach the severability question briefed by the parties in their supplemental submissions.  (Docs. 169, 171).  Leaving the resolution of that issue for another day appears to be especially appropriate given that, according to the parties' filings, there is no controlling Eleventh Circuit authority on the matter of severability and addressing it could prove quite nettlesome.

III.

Based upon the foregoing, I respectfully recommend that Mr. Williamson's second motion to suppress (Doc. 134) be denied.

Respectfully submitted this 6th day of July 2023.

HONORABLE CHRISTOPHER P. TUITE
United States Magistrate Judge

**NOTICE TO PARTIES**

A party has fourteen (14) days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions.  A party's failure to file written objections, or to move for an extension of time to do so, waives that party's right to challenge on appeal any unobjected-to factual finding(s) or legal conclusion(s) the District Judge adopts from the Report and Recommendation.  *See* 11th Cir. R. 3-1; 28 U.S.C. § 636(b)(1).

Copies to:
Honorable William F. Jung, United States District Judge
Counsel of record

# Doc. 273 –

# Judgment

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**UNITED STATES OF AMERICA**                    **Case Number: 8:21-cr-355-WFJ-CPT**

**v.**                                          **USM Number: 75211-509**

**GREGORY ALLEN WILLIAMSON**                    **Bjorn Brunvand, CJA**

---

### JUDGMENT IN A CRIMINAL CASE

The Defendant was found guilty to Counts One, Two, Three, Four, Five, Six, Seven, and Eight of the Indictment. The Defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Date Offense Concluded | Count Numbers |
|---|---|---|---|
| 18 U.S.C. § 2422(b) | Coercion and Enticement of a Minor to Engage in Sexual Activity | January 27, 2021 | One |
| 18 U.S.C. §§ 2251(a) and (e) | Attempted Production of Child Pornography | May 5, 2020 | Two |
| 18 U.S.C. §§ 2251(a) and (e) | Production and Attempted Production of Child Pornography | May 26, 2020 | Three |
| 18 U.S.C. §§ 2251(a) and (e) | Production and Attempted Production of Child Pornography | May 26, 2020 | Four |
| 18 U.S.C. §§ 2252(a)(2) and (b)(1) | Distribution of Child Pornography | January 16, 2020 | Five |
| 18 U.S.C. §§ 2252(a)(2) and (b)(1) | Distribution of Child Pornography | February 5, 2020 | Six |
| 18 U.S.C. §§ 2252(a)(2) and (b)(1) | Distribution of Child Pornography | September 8, 2020 | Seven |
| 18 U.S.C. §§ 2252(a)(4)(B) and (b)(2) | Possession of Child Pornography | January 27, 2021 | Eight |

The Defendant is sentenced as provided in the following pages of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

**IT IS ORDERED** that the Defendant must notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the Defendant shall notify the court and United States Attorney of any material change in the Defendant's economic circumstances.

Date of Imposition of Judgment:

June 20, 2024

WILLIAM F. JUNG
UNITED STATES DISTRICT JUDGE

June _____ 2024

AO 245B (Rev. 09/19) Judgment in a Criminal Case

Gregory Allen Williamson
8:21-cr-355-WFJ-CPT

# IMPRISONMENT

The Defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of **LIFE**. This term consists of a Life term as to Count One, a 360-month term as to Counts Two, Three, and Four, a 240-month term as to Counts, Five, Six, and Seven and a 120-month term as to Count Eight, all such terms to run concurrently.

The Court makes the following recommendations to the Bureau of Prisons:

- The Defendant be incarcerated in a Federal Correctional Institute in California.

The Defendant is remanded to the custody of the United States Marshal.

# RETURN

I have executed this judgment as follows:

_____

_____

_____

_____

Defendant delivered on _____ to _____

at _____, with a certified copy of this judgment.

_____

UNITED STATES MARSHAL

By: _____

Deputy U.S. Marshal

AO 245B (Rev. 09/19) Judgment in a Criminal Case

## SUPERVISED RELEASE

Upon release from imprisonment, the Defendant will be on supervised release for a term of **LIFE**. This term consists of a Life term as to Counts One through Eight, all such terms to run concurrently.

## MANDATORY CONDITIONS

1. Defendant shall not commit another federal, state or local crime.
2. Defendant shall not unlawfully possess a controlled substance.
3. Defendant shall refrain from any unlawful use of a controlled substance. Defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court. The mandatory drug testing requirements of the Violent Crime Control Act are suspended. However, the Defendant must submit to random drug testing not to exceed two tests per week.
4. Defendant shall cooperate in the collection of DNA as directed by the Probation Officer.
5. Defendant shall comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq.*) as directed by the Probation Officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense.

The Defendant shall comply with the standard conditions that have been adopted by this court (set forth below).

The Defendant shall also comply with the additional conditions on the attached page.

AO 245B (Rev. 09/19) Judgment in a Criminal Case

Gregory Allen Williamson
8:21-cr-355-WFJ-CPT

# STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, Defendant shall comply with the following standard conditions of supervision.  These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by Probation Officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1. Defendant shall report to the Probation Office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the Probation Officer instructs you to report to a different Probation Office or within a different time frame. After initially reporting to the Probation Office, the Defendant will receive instructions from the court or the Probation Officer about how and when the Defendant must report to the Probation Office, and the Defendant must report to the Probation Officer as instructed.
2. After initially reporting to the Probation Office, you will receive instructions from the court or the Probation Officer about how and when Defendant shall report to the Probation Officer, and Defendant shall report to the Probation Officer as instructed.
3. Defendant shall not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the Probation Officer.
4. Defendant shall answer truthfully the questions asked by your Probation Officer
5. Defendant shall live at a place approved by the Probation Officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), Defendant shall notify the Probation Officer at least 10 days before the change. If notifying the Probation Officer in advance is not possible due to unanticipated circumstances, Defendant shall notify the Probation Officer within 72 hours of becoming aware of a change or expected change.
6. Defendant shall allow the Probation Officer to visit you at any time at your home or elsewhere, and Defendant shall permit the Probation Officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7. Defendant shall work full time (at least 30 hours per week) at a lawful type of employment, unless the Probation Officer excuses you from doing so.  If you do not have full-time employment Defendant shall try to find full-time employment, unless the Probation Officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), Defendant shall notify the Probation Officer at least 10 days before the change. If notifying the Probation Officer at least 10   days in advance is not possible due to unanticipated circumstances, Defendant shall notify the Probation Officer within 72 hours of becoming aware of a change or expected change.
8. Defendant shall not communicate or interact with someone you know is engaged in criminal activity.  If you know someone has been convicted of a felony, Defendant shall not knowingly communicate or interact with that person without first getting the permission of the Probation Officer.
9. If you are arrested or questioned by a law enforcement officer, Defendant shall notify the Probation Officer within **72 hours**.
10. Defendant shall not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11. Defendant shall not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. If the Probation Officer determines that you pose a risk to another person (including an organization), the Probation Officer may require you to notify the person about the risk and Defendant shall comply with that instruction.  The Probation Officer may contact the person and confirm that you have notified the person about the risk.
13. Defendant shall follow the instructions of the Probation Officer related to the conditions of supervision.

# U.S. Probation Office Use Only

A U.S. Probation Officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.


Defendant's Signature:_____    Date:_____

AO 245B (Rev. 09/19) Judgment in a Criminal Case

## ADDITIONAL CONDITIONS OF SUPERVISED RELEASE

1.  The Defendant shall participate in a mental health treatment program (outpatient and/or inpatient) and follow the probation officer's instructions regarding the implementation of this court directive. Further, you shall contribute to the costs of these services not to exceed an amount determined reasonable by the Probation Office's Sliding Scale for Mental Health Treatment Services.

2.  The Defendant shall participate in a mental health program specializing in sexual offender treatment and submit to polygraph testing for treatment and monitoring purposes. The Defendant shall follow the probation officer's instructions regarding the implementation of this court directive. Further, the Defendant shall contribute to the costs of such treatment and/or polygraphs not to exceed an amount determined reasonable by the probation officer based on ability to pay or availability of third-party payment and in conformance with the Probation Office's Sliding Scale for Treatment Services.

3.  The Defendant shall register with the state sexual offender registration agency(s) in any state where you reside, visit, are employed, carry on a vocation, or are a student, as directed by the probation officer.

4.  The probation officer shall provide state officials with all information required under Florida sexual predator and sexual offender notification and registration statutes (F.S. 943.0435) and/or the Sex Offender Registration and Notification Act (Title I of the Adam Walsh Child Protection and Safety Act of 2006, Public Law 109-248), and may direct the defendant to report to these agencies personally for required additional processing, such as photographing, fingerprinting, and DNA collection.

5.  The Defendant shall have no direct contact with minors (under the age of 18) without the written approval of the probation officer and shall refrain from entering any area where children frequently congregate including: schools, daycare centers, theme parks, playgrounds, etc.

6.  The Defendant is prohibited from possessing, subscribing to, or viewing any images, videos, magazines, literature, or other materials depicting children in the nude and/or in sexually explicit positions.

7.  Without prior written approval of the probation officer, the Defendant is prohibited from either possessing or using a computer (including a smart phone, a hand-held computer device, a gaming console, or an electronic device) capable of connecting to an online service or an internet service provider. This prohibition includes a computer at a public library, an internet cafe, their place of employment, or an educational facility. Also, the Defendant is prohibited from possessing an electronic data storage medium (including a flash drive, a compact disk, and a floppy disk) or using any data encryption technique or program. If approved to possess or use a device, the Defendant must permit routine inspection of the device, including the hard drive and any other electronic data storage medium, to confirm adherence to this condition. The United States Probation Office must conduct the inspection in a manner no more intrusive than necessary to ensure compliance with this condition. If this condition might affect a third party, including their employer, the Defendant must inform the third party of this restriction, including the computer inspection provision.

8.  Defendant shall have no contact, direct or indirect, with D.A. or any of her blood relatives, including siblings or mother.

9.  The Defendant shall submit to a search of their person, residence, place of business, any storage units under their control, computer, or vehicle, conducted by the United States Probation Officer at a reasonable time and in a reasonable manner, based upon reasonable suspicion of contraband or evidence of a violation of a condition of release. The Defendant shall inform any other residents that the premises may be subject to a search pursuant to this condition. Failure to submit to a search may be grounds for revocation.

10. The Defendant shall be prohibited from incurring new credit charges, opening additional lines of credit, or obligating themselves to any major purchases without the approval of the probation officer. The Defendant shall provide the probation officer access to any requested financial information.

Gregory Allen Williamson
8:21-cr-355-WFJ-CPT

## CRIMINAL MONETARY PENALTIES

The Defendant must pay the following total criminal monetary penalties under the schedule of payments set forth in the Schedule of Payments.

| Assessment | Restitution | Fine | AVAA Assessment* | JVTA Assessment** |
|------------|-------------|------|------------------|-------------------|
| $800.00 | TBD | Waived | Not Imposed | Not Imposed |

## SCHEDULE OF PAYMENTS

Having assessed The Defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

Special Assessment shall be paid in full and is due immediately.

Unless the court has expressly ordered otherwise in the special instructions above, if this judgment imposes a period of imprisonment, payment of criminal monetary penalties shall be due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court, unless otherwise directed by the court, the Probation Officer, or the United States attorney.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, and (9) penalties, and (10) costs, including cost of prosecution and court costs.

## FORFEITURE

Defendant shall forfeit to the United States those assets that are subject to forfeiture as previously identified in the Order of Forfeiture and any subsequent orders.

AO 245B (Rev. 09/19) Judgment in a Criminal Case

# Doc. 276 –

# Notice of Appeal

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.                                    CASE NO. 8:21-cr-355-WFJ-CPT

GREGORY WILLIAMSON

## NOTICE OF APPEAL

Notice is given that the Defendant, Gregory Williamson, hereby appeals to the United States Court of Appeals for the Eleventh Circuit the final judgment and sentence entered on June 20th 2024.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 21st day of June 2024, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

s./ *Bjorn E. Brunvand*
BJORN E. BRUNVAND, ESQ.
BRUNVAND WISE, P.A.
Attorney for the Defendant
615 Turner Street
Clearwater, FL 33756
Telephone:  727-446-7505
Facsimile:  727-446-8147
Email: bjorn@acquitter.com
Florida Bar No. 0831077

# CERT

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing was filed using the CM/ECF system, which will send a notice of electronic filing to all counsel of record, on May 14, 2025.

s/ *Bjorn E. Brunvand*
BJORN E. BRUNVAND, ESQ.
Brunvand & Wise Law Group
615 Turner Street
Clearwater, Florida 33756
Florida Bar # 0831077
Telephone: 727-446-7505
Facsimile: 727-446-8147
E-Mail: bjorn@acquitter.com
CJA Counsel for Appellant
